UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| LARRY MOSES, | ) | |
| | ) | |
| *Plaintiff,* | ) | Civil Action No. |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| The CITY OF NEW ORLEANS, | ) | |
| WAYNE RUMORE, former New | ) | |
| Orleans Police Detective, JOHN | ) | |
| RONQUILLO, former New Orleans | ) | |
| Police Detective, PATRICK JONES, | ) | |
| former New Orleans Police Detective | ) | |
| Sergeant, SERGEANT ANDERSON, | ) | |
| former New Orleans Police Detective | ) | |
| Sergeant, JASON R. WILLIAMS, | ) | |
| Orleans Parish District Attorney, | ) | |
| ALLISON MONAHAN, former Orleans | ) | |
| Parish Assistant District Attorney, and | ) | |
| GLYNN ALEXANDER, former Orleans | ) | |
| Parish Assistant District Attorney, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## COMPLAINT

Plaintiff, LARRY MOSES, by and through counsel, hereby complains against Defendants

The CITY OF NEW ORLEANS, WAYNE RUMORE, former New Orleans Police Detective,

JOHN RONQUILLO, former New Orleans Police Detective, PATRICK JONES, former New

Orleans Police Detective Sergeant, and SERGEANT ANDERSON, former New Orleans Police

Detective Sergeant, JASON R. WILLIAMS, Orleans Parish District Attorney, ALLISON

MONAHAN, former Orleans Parish Assistant District Attorney, and GLYNN ALEXANDER,

former Orleans Parish Assistant District Attorney, as follows:

## INTRODUCTION

1.      Plaintiff Larry Moses spent nearly 29 years wrongfully incarcerated for two 1994 murders he did not commit and of which he was innocent.

2.      Mr. Moses was finally released from prison, and the charges against him dismissed, in 2023.

3.      This wrongful conviction was no accident but, instead, occurred due to the misconduct of state actors who violated Plaintiff's rights under the United States Constitution and Louisiana law.

4.      Mr. Moses now brings this complaint for damages seeking redress for the violation of his rights and to, hopefully, prevent such events from happening to other innocent people in New Orleans.

## JURISDICTION & VENUE

5.      This Court has matter jurisdiction over Moses's claims under 28 U.S.C. §§ 1331, 1334, as Moses brings this action for violations of his federal constitutional rights. This Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367.

6.      Under 28 U.S.C. § 1391, this Court is the proper venue for Moses's claims because the crime for which Moses was wrongfully convicted and imprisoned occurred, was investigated, and was prosecuted in Orleans Parish, which is within this district.

## PARTIES

7.      Plaintiff **Larry Moses** is a citizen of Louisiana, where he lives and intends to stay. Mr. Moses spends his time working on cars, both for income and as a hobby, and spending time with friends and family in the New Orleans area.

8.      Defendant **City of New Orleans** is a political subdivision of the State of Louisiana.

2

It operates the New Orleans Police Department, a law enforcement agency operating in the Eastern District of Louisiana which employed and controlled the Defendant Officers in this case and was responsible for the hiring, training, and discipline of the officers. The City of New Orleans, through the NOPD, also created, instituted, and oversaw enforcing the policies and procedures at issue in this case.

9.      Defendants **Wayne Rumore** and **John Ronquillo** are former NOPD detectives. They are sued in their individual capacities. They referred to collectively as the "Detective Defendants."

10.     Defendants **Patrick Jones and Anderson** are former NOPD Detective Sergeants, sued in their individual capacities. Sergeant Anderson, first name currently unknown, expressly approved of primary Supplemental Report written by the Defendant Officers as below:

```
DETECTIVE:                      TECHNICIAN:
EMS/TOW/OTHER:                  ACCESS NUMBER:

REPORTING OFFICER:  WAYNE RUMORE           BADGE:  919

REPORTING OFFICER:  JOHN RONQUILLO         BADGE:  1251

CAR:3145                     SUPERVISOR: SGT ANDERSON
```

Sergeants Jones and Anderson are referred to collectively as the "Supervising Detectives." The Detective Defendants and Supervising Detectives are collectively referred to as the "Defendant Officers."

11.     Defendant **Jason R. Williams** is the Orleans Parish District Attorney, sued in his official capacity as the successor in office to former District Attorney Harry F. Connick, Sr. Williams is a citizen of Louisiana because he lives, and intends to stay, in Louisiana.

12.     **Allison Monahan and Glynn Alexander** are former Orleans Parish Assistant District Attorneys, sued in their individual capacities. Defendant Alexander died in 2023 and

Plaintiff intends to substitute the Estate of Glynn Alexander as a party. Collectively, Defendants Williams, Monahan, and Alexander are referred to as the "District Attorney Defendants."

## FACTS

### *The Armed Robbery and Murder of Daniel Ratliff and Alma Causey*

13.     Around 1:00 a.m. the morning of January 4, 1994, Daniel Ratliff and Alma Causey were shot and killed during an armed robbery near the intersection of Feliciana and Humanity Streets in the Ninth Ward of New Orleans.

14.     The shooting happened on Humanity Street.

15.     Mr. Moses was not involved in the Ratliff-Causey murders in anyway whatsoever.

16.     Indeed, Mr. Moses could not have committed the crime, as he was still in Bogalusa, Louisiana (over 70 miles and a nearly 90-minute drive away) where he spent Christmas and New Years holidays when the crimes occurred.

17.     The shooting took place in the jurisdiction of the Fifth District of the New Orleans Police Department (NOPD), and NOPD was called and reported to the scene shortly after the crime.

18.     Detective Wayne Rumore was assigned to be the lead investigator on the case and worked with Detective John Ronquillo and Detective Patrick Young on the homicide.

19.     The entirety of the Detective Defendants' work was supervised, and approved by, the Supervising Detectives, Sgt. Anderson and Sgt. Jones.

20.     Upon arrival, NOPD beat officers spoke with a witness, Jean Barras (aka June Hayes), the only actual—albeit partial—eyewitness to the crime.

21.     At the time, Ms. Barras was inside a corner home at southwest corner of the intersection of Feliciana and Humanity Streets, taking care of Clarence Bailey, an elderly Black

4

man who lived at the home.

22.     Ms. Barras saw the perpetrator and provided a description of the person, though she admitted she did not see the shooting itself or see the perpetrator's face.

23.     Ms. Barras also told police that before shooting Ratliff and Causey, she heard the perpetrator commanded the victims something to the effect of get on the ground and give him their money.

24.     Ms. Barras observed and heard these things from a window facing Humanity Street (rather than Feliciana).

25.     Ms. Barras knew Mr. Moses all her life and did not suggest to police that Mr. Moses may have been the perpetrator on the night of the murders, either from what she observed for from hearing the shooter make commands to the victims.

26.     Instead, Ms. Barras truthfully indicated the shooter was unknown.

27.     Ms. Barras provided the police with a rough description of the perpetrator; a description of a person who was too short and too light to have been Mr. Moses and inconsistent with his height and build in 1994.

28.     Ms. Barras did not report seeing or hearing any other people at or near the intersection or walking on Humanity Street shortly before or after the shooting as she looked out from the window.

29.     No evidence collected at the crime scene, forensic or otherwise, linked or pointed to Mr. Moses as being involved in the Ratliff-Causey murders whatsoever.

### *Initial Police Investigation*

30.     In the days after the January 4 homicide, the Defendant Officers did not actively investigate the case or work to develop suspects.

31.     Indeed, the Defendant Officers did not inquire or learn about why Ms. Barras or Mr. Bailey were up and about at 1:00 a.m., or about the circumstances of the shooting.

32.     For example, though roughly 20 people came to the scene after the shooting as police were responding to the crime, the Defendant Officers did not document the identity of all of these people or question them about potential information related to the double homicide.

33.     Nor did the Defendant Officers canvas the neighborhood, looking for witnesses, potential motive, or other evidence.

34.     Nor did the Defendant Officers ask Ms. Barras to view a lineup of anyone.

35.     According to police documents, Mr. Moses's name first came to light when one of the victim's family members told police he had heard a rumor that Mr. Moses and Mr. Ratliff had an argument a couple days before the shooting.

36.     Being nothing more than an unsubstantiated and hearsay rumor, Mr. Moses was not seriously investigated or considered a suspect for the shooting.

37.     The Detective Defendants, with approval from the Supervising Detectives, did not seek to interview Mr. Moses or otherwise try to substantiate the rumor by speaking with Ms. Barras, Mr. Bailey, or anyone else about the allegation.

38.     The investigation went completely cold.

39.     Some six months later, by June of 1994, the case was still cold; there were no active suspects; and there was no active investigation.

### Frederick Stamps Falsely Claims he is Robbed By Plaintiff and Stamps's Ex-Girlfriend

40.     On or around May 28, 1994—with the Causey-Ratliff case still entirely cold—Frederick P. Stamps reported to NOPD in the middle of the night that he had allegedly been the victim of an armed robbery by his ex-girlfriend, Gail Jenkins.

6

41.     Ms. Stamps made his report to the Fifth District of the NOPD.

42.     Mr. Stamps claimed that Ms. Jenkins had lured him into a robbery by a man named "Larry" and Ms. Jenkins. This was completely false.

43.     In reality, Mr. Stamps was the violent, aggressor who committed domestic violence against Jenkins and threatened to do harm to her in public.

44.     Mr. Moses sought to intervene, to protect Ms. Jenkins and deescalate the situation, and was attacked by Mr. Stamps while doing so. A fight ensued.

45.      In making the bogus accusation, which led to Ms. Jenkins' arrest, Mr. Stamps told police he did not know "Larry's" last name.

46.     Nor did Mr. Stamps say anything about the Ratliff-Causey homicide.

### The Defendant Officers Fabricate Evidence to Obtain an
### Indictment of Mr. Moses and Secure his Wrongful Conviction

47.     Roughly a week later, in June 1994, Defendants Rumore, Ronquillo, and Jones met with Mr. Stamps and spoke with him about the Ratliff-Causey homicide.

48.     In these conversations, none of which were recorded, Mr. Stamps made it clear to the officers he had a vendetta against Mr. Moses, he had obvious credibility issues; that he was mentally unstable; and that he was making outlandish, unreliable claims.

49.     Following this meeting, as a joint creation between Mr. Stamps and the Defendant Officers, a false, fabricated narrative was created.

50.     This narrative was repeated in police documents, including a transcribed statement where Stamps falsely claimed that he had actually seen the murder; that he knew "Larry's" last name, which was Larry Moses; that Mr. Stamps had seen Larry Moses commit the double homicide; that he was walking down Humanity before the shooting happened; that Mr. Stamps had actually interacted with Mr. Moses who threatened him with a gun; and that Mr. Moses was

talking with the victims (but they were not having a loud argument); that the victim Daniel Ratliff was loudly begging for his life and for the perpetrator not to shoot the other victim, Alma Causey; and that Mr. Stamps actually also observed Ms. Barras observing all of this from the window of the house on the corner.

51.     These contentions—fabrications—were obviously unreliable and implausible.

52.     For example, Ms. Barras did not ever identify another person as having been on Humanity when the shooting took place, or shortly before it. Ms. Barras described loud commands, not quiet talking; and Ms. Barras never described hearing Mr. Ratliff begging for his life or anything to that effect.

53.     In further fabricating evidence, the Defendant Officers had Mr. Stamps look at a six-picture photographic lineup and falsely claimed that this lineup had been created in January— rather than in June—following the hearsay rumor that was never even investigated about Mr. Moses alleged involvement in the crime.

54.     Despite the obvious inaccuracies and fabrications, the Supervising Detectives both participated in and approved of the Detective Defendants work and entirety of their police reports.

### Criminal Proceedings And Additional Fabricated Evidence

55.     Based upon these fabricated documents, an arrest warrant was issued for Mr. Moses on June 6, 2024.

56.     Before Mr. Stamps met with Defendants Rumore, Ronquillo, and Jones there was no probable cause to suspect Mr. Moses in the crime.

57.     After Mr. Stamps met with Defendants Rumore, Ronquillo, and Jones, including after pointing out Mr. Moses in a photo-lineup, there was no probable cause to suspect Mr. Moses in the crime.

58.     The basis for the charges was evidence that was false, fabricated, and/or made-up.

59.     Mr. Moses was out of state when the warrant was issued and turned himself in when he found out he had been charged. He was extradited back to New Orleans without incident.

60.     At some point during the criminal proceedings, after Mr. Moses had been charged, Mr. Stamps, the Detective Defendants, and/or the District Attorney Defendants spoke with Ms. Barras.

61.     Ms. Barras came to learn that Mr. Moses was a suspect and that Mr. Stamps had accused Mr. Moses of the crime. As a result of interactions with Mr. Stamps, the Detective Defendants, and/or the District Attorney Defendants, Ms. Barras would later provide a false and fabricated account that she "voice identified" and recognized the perpetrator's voice as belonging to Mr. Moses (even though that was not the case, and even though she never told this to the police in the nearly six months before Mr. Moses was charged).

62.     Criminal proceedings were undertaken by the Orleans Parish District Attorney's Officer.

63.     The grand jury proceedings were predicated upon the fabrications made by Stamps, the Defendant Officers, and possibly others.

64.     Before the grand jury proceedings, there was no probable cause to suspect Mr. Moses in the crime.

65.     After the grand jury proceedings, there was no probable cause to suspect Mr. Moses in the crime.

66.     Mr. Moses demanded a trial and maintained his innocence.

67.     Before trial, acting pursuant to the policies and customs of the NOPD, the Defendant Officers did not ever disclose their own acts in fabricating evidence, including the

9

documents concerning Mr. Stamps and the made-up "voice identification" by Ms. Barras.

68.     This information would have been favorable to Mr. Moses at trial and could have helped him prove his innocence and/or obtain an acquittal by challenging the quality of the police investigation, the credibility of the police officers, the veracity of the bogus "voice identification," and in other ways favorable to Mr. Moses.

69.     In addition, before trial, the Defendants—including the Defendant Offices and District Attorney Defendants—obtained additional information about Mr. Stamps's unreliability, bias, substance use issues, and mental health instability and diagnosis (the "Stamps *Brady* Material").

70.     The Stamps *Brady* Material would have been favorable to Mr. Moses at trial and could have helped him prove his innocence and /or obtain an acquittal by challenging the quality of the police investigation, the credibility of the officers, the credibility of Mr. Stamps, and in other ways favorable to Mr. Moses.

71.     Yet, owing to the policies and practices of the NOPD and the Orleans Parish District Attorney's Officer, the favorable information outlined above was never disclosed to Mr. Moses's defense and was secreted in the files that were never turned over to Mr. Moses or his defense attorney.

72.     The case went to trial. There, both Detective Defendants testified consistent with their fabricated documents; Mr. Stamps testified, completely inconsistently with his prior statements; and Ms. Barras testified inconsistently with her original statements but along the lines of the made-up account and "voice identification" fabricated at some point before trial.

73.     In addition, unbeknownst to Mr. Moses, Mr. Stamps had previously changed his story about the May incident involving Ms. Jenkins (which was supposedly the reason he came to

claim Mr. Moses was the perpetrator in the first place). This information was known to Defendants but also undisclosed to Mr. Moses or his defense counsel.

74.    With favorable information hidden from him, and fabricated evidence used against him, Mr. Moses was wrongfully convicted of two murders he did not commit.

75.    Mr. Moses was sentenced to life imprisonment.

### *The Widespread Practice of Wrongful Convictions,*
### *Often Facilitated By Evidence Suppression by NOPD, in Orleans Parish*

76.    According to the U.S. Department of Justice, the state of Louisiana routinely has the highest rate of per-capita incarceration in the world.

77.    And Orleans Parish has the highest rate of per-capita incarceration of all Louisiana parishes.

78.    These mass incarceration rates are a total failure: Louisiana is still consistently ranked one of the most dangerous states in America, with the highest per-capita crime rate. Similarly, New Orleans has one of the highest crime rates in America compared to communities of all sizes.

79.    Louisiana's and Orleans Parish's historical approach to incarcerating people convicted of crimes is broken, does not seek the truth, and has victimized certain populations; namely people of color and the poor.

80.    As one example of this problem, Louisiana and New Orleans have repeatedly incarcerated the wrong people—sowing community distrust while letting actual perpetrators remain free.

81.    According to the National Registry of Exonerations, Louisiana has the highest rate of per-capita exonerations for wrongfully convicted persons in the nation.

82.    To this day, Orleans Parish has among the highest rate of per-capita exonerations

for any parish or county in America.

83.     Like the OPDA discussed below, the NOPD and the City of New Orleans by and through their policymakers, maintained a policy, custom, or pattern and practice of condoning misconduct, including by failing to train, supervise, and discipline police officers for *Brady* violations and fabrication of evidence.

84.     Among other things, the NOPD failed to maintain individual training records; failed to conduct any in-service or advanced training for supervisors; failed to ensure that its supervisors had the training and resources to supervise serious investigations; and failed to adequately document and enforce disciplinary investigations and findings against individual officers.

85.     The NOPD of the 1990s was a "troubled and unruly police department" with "the highest rate of proven wrongful convictions and convictions caused by official misconduct in the country."

86.     An FBA investigation, "Operation Shattered Shield" found misconduct that "no doubt epitomized a completely broken police department."

87.     According to LSU criminologist Peter Scharf, the NOPD of the 1990s was marked by systemic corruption." In other words, "This was an era—not an individual."

88.     In 1994, the United States Attorney for the Eastern District of Louisiana said he "would describe corruption in the New Orleans Police Department to be pervasive, rampant and systemic."

89.     Indeed, during this period, ten percent of NOPD's officers were facing criminal charges.

90.     More than forty NOPD officers were arrested from 1991 to 1994 for crimes like murder, rape, bank robbery, and auto theft. In 1993, two NOPD officers were charged with the

rape of a woman in their custody, and seventeen officers were either arrested or convicted for criminal activity. And in 1995, thirty NOPD officers were charged with felonies including rape, kidnapping, and extortion.

91.     In 1991, the International Association of Chiefs of Police (IACP) published a report citing a "stunning lack of training" at the NOPD and finding that the NOPD's training record was "not nearly in compliance with professional expectations." With respect to criminal investigations, the report concluded, that NOPD's investigations bureau was "failing in almost every crime category" due to "primitive case management practices, absence of performance goals, measurement accountability, flawed selection process, and a stunning lack of training [that] inhibits investigative effectiveness."

92.     The IACP also noted problems with the NOPD's lack of supervision and its derelict disciplinary process.

93.     With regard to supervision, it found that:

    i.    "Commanders and supervisors do not establish goals or objectives for their  subordinates. Their superiors do not establish goals or objectives for them."

    ii.    A number of officers apparently last received management/command/supervisory experience four years ago."

    iii.    "A serious flaw in command/supervision relationships is the absence of performance goals to guide, evaluate, and correct performance of subordinates and to form the basis for commonly understood superior/subordinate performance expectations."

94.     These policies, practices, customs and other failures at NOPD remained in 1994

when Mr. Moses was arrested and continued through his trial in 1995 and the years thereafter.

95.     The City had further notice of the systemic problems at NOPD. For example, on March 10, 1993, a New Orleans city councilperson to requested that the United States Attorney conduct a criminal investigation of the NOPD. The councilperson wrote, "I am afraid that the problems afflicting the department are so deeply seeded and widespread that only by combining the resources of your office with those of the department itself, can this task be accomplished."

96.     In 1995, after Mr. Moses was arrested and the year of his trial, the New Orleans Human Relations Committee conducted a study that included the views of the City's Chief Administrative Officer, the City Attorney, and the Mayor's Criminal Justice Coordinator, among others. The findings concluded that supervision of NOPD officers was a major problem: "District Commanders, the Department's front line of management, had no authority over, or even information about, details working in their district. This meant, for example, that a district commander could not meaningfully monitor, much less manage, actions of officers wearing NOPD uniforms and working in their district."

97.     The study further found that "[t]here were no supervisory training programs for sergeant[s] and above." Instead, training across the board was "generally non-existent or haphazard," with "virtually no on-the-job supervision of policemen on the beat."

98.     Throughout the 1970s, 1980s, and 1990s, the NOPD maintained a widespread practice of promoting, facilitating, and/or condoning improper, illegal, and unconstitutional investigative techniques, including (a) creation and presentation of false or materially misleading evidence; (b) failure to document and disclose exculpatory and impeachment evidence to prosecutors, defense counsel, and courts; and (c) as engaging in the affirmative and/or passive concealment of those types of misconduct.

99.     Despite knowing that NOPD's custom, pattern, and practice of promoting, facilitating, and/or condoning improper, illegal, and unconstitutional investigative techniques, and failing to adequately supervise, discipline, and train its officers was reasonably likely to lead to wrongful convictions, the NOPD leadership continued to maintain those customs, patterns, and practices of deliberate indifference to the rights of suspects and criminal defendants.

100.    With respect to training in particular, in 1994, the Louisiana National Guard, in partnership with the City, found that "It is clearly apparent that the city and department leaders do not understand, or simply choose to ignore, the importance of training for police officers and police civilians engaged in supporting police officers. Unfortunately, even after three previous reports criticizing training within the NOPD, very little action has been taken to improve the situation."

101.    In addition, before and at the time of Moses's conviction, the NOPD, by and through its final policymakers, maintained a custom or practice of a "blue curtain," or code of silence, pursuant to which police misconduct—including the manufacture of false evidence, the suppression of exculpatory evidence, and the malicious investigation of innocent individuals without probable cause—was routinely not reported by fellow officers or not disciplined or otherwise addressed by the department. To the contrary, officers customarily engaged in misconduct themselves to cover up any misconduct they witnessed by a fellow officer.

102.    By way of example, in 1979, then-Superintendent James C. Parsons testified at a jury trial that a code of silence existed at the NOPD. *Thomas v. City of New Orleans*, 687 F.2d 80, 82 (5th Cir. 1982). In that case, Officer Thomas was retaliated against and discharged because of his complaint against a fellow officer. Superintendent Parsons testified that he had considered taking steps to protect officers who broke the code of silence, but he did not do so.

103.    As another example, in 1981, NOPD paramedic Christopher Hero was wrongfully

dismissed in retaliation for reporting to the Internal Affairs Division another officer's unlawful conduct. The City of New Orleans Civil Service Commission reinstated Hero and found that he had "established beyond doubt that a 'code of silence' does operate within the New Orleans Police Department …". *See Christopher Hero v. Dep't of Police*, No. 1775 (Civil Service Commission, City of New Orleans, Mar. 17, 1983).

104.    Notwithstanding these and other warnings, the NOPD failed to institute meaningful reforms that would have constrained police misconduct and addressed the code of silence at the NOPD.

105.    These failures of training, supervision, and discipline led to a pattern and practice of unconstitutionally suggestive identification processes, fabrication of evidence, and *Brady* violations by NOPD officers.

### The OPDA's Troubling History of Constitutional Violations

106.    The outsized rate of wrongful convictions in Orleans Parish is also attributable to the historical policies and practices of the District Attorney's office, led by Harry Connick Sr. from 1973 to 2003.

107.    Throughout Connick's tenure, and especially during the 1990s, the District Attorney prioritized overzealous prosecutions and securing convictions, rather than seeking truth and justice.

108.    As part of this regime, the District Attorney had no meaningful onboarding process for new assistant district attorneys (ADAs) and failed to appropriately train attorneys on their constitutional and ethical obligations.

109.    Worse, the District Attorney maintained a widespread custom and practice of whereby ADAs freely—and egregiously—violated the constitution's duty to disclose favorable

evidence pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and other progeny.

110.    These rules exist as a matter of due process to ensure a defendant's constitutional right to a fair trial.

111.    The due process and fair trial obligation requires police and prosecutors to disclose any information favorable to an accused that is material to that person's potential guilt or punishment.

112.    Favorable information includes not only evidence that is exonerating but that could be used to benefit a criminal defendant, for example to impeach the credibility of a witness or to call into question the honesty and integrity of a police investigation.

113.    Favorable information, which the constitution requires to be disclosed, also includes also includes information that would demonstrate a witness is unreliable or that the account provided by witnesses is improbable, impossible, or unlikely.

114.    A police officer or prosecutor's failure to disclose *Brady* material is a constitutional violation, regardless of the prosecutor's subjective intent.

115.    Even if an officer prosecutor inadvertently failed to disclose *Brady* material or simply misunderstood the significance of the evidence in the context of the case, a constitutional violation has occurred, and the defendant has been deprived of due process and a fair trial.

116.    In Orleans Parish, the ADAs handled many felony cases and would often be assigned case files shortly before trial, which limited the time ADAs had to learn case facts, nuances, and weaknesses.

117.    Without enough time to study their cases, ADAs often struggled to discern what evidence they needed to disclose under *Brady*, as well as what evidence might have already been

disclosed before the current prosecutor assumed the file.

118.    The ADAs did not have much incentive to be concerned with closely following their *Brady* obligations—they were permitted to suppress this information as a matter of practice. These practices were reflected in written documents and informally, as a matter of custom.

119.    For example, as to written material, the District Attorney maintained a written *Brady* policy within a larger policy manual, from at least 1987 through 2003, that was incorrect and enabled constitutional violations, suggesting that the disclosure obligation was triggered only in "most" cases and where a specific court order demanded the production of <u>Brady</u> material (implying that, without a court order, such information need not be disclosed).

120.    The District Attorney's written *Brady* policy applicable when Mr. Moses was prosecuted also defined *Brady* material to include only "information . . . which is exculpatory," even though *Brady* material includes "favorable" evidence that undermines the prosecutors' theories, that can be used to impeach witnesses, or that can be used to call into question the honesty and integrity of a police investigation.

121.    The District Attorney was deliberately indifferent to these faults in the written policies, and re-printed and re-issued deficient documents in February 1987, March 1997, and August 1999, though the District Attorney knew of its inaccuracies.

122.    Consistent with a practice of evidence suppression, the District Attorney provided little-to-no formal *Brady* training or supervision and did not enact any procedural safeguards or other policies for ensuring *Brady* material was disclosed to criminal defendants.

123.    The District Attorney did not require prosecutors to affirmatively investigate whether they had obtained all favorable information from police officers, investigators, or detectives working on a case that should have been disclosed to criminal defendants.

18

124.    In 1994 and 1995, the District Attorney was aware that *Brady* violations were regularly committed in criminal cases prosecuted in Orleans Parish, including suppression of evidence by ADAs and NOPD officers.

125.    Yet, even when the District Attorney learned about *Brady* violations within the office the District Attorney failed to record or otherwise track the type or frequency of those violations, which would have allowed the District Attorney to discern and correct patterns of *Brady* violations or systemic misunderstandings of prosecutors' disclosure obligations.

126.    The District Attorney could have created written *Brady* policies, training materials, FAQs, and the like from its own history of case reversals to ensure that similar mistakes would not happen again, but simply failed, or chose not, to do so.

127.    Instead, showing hubris beyond deliberate indifference, the District Attorney publicly complained that "[w]hat some judges, or courts consider to be *Brady* is sometimes ridiculous to the extreme."

128.    The District Attorney also failed to discipline prosecutors found to have violated *Brady*. They were not reprimanded; there were no notes or marks included in their personnel files; they were not instructed to undertake additional research or independent study of *Brady*'s requirements or obligations; and they were allowed to continue to try to discern what case file information was or was not *Brady* material for themselves with no oversight.

129.    In contrast, however, the District Attorney regularly tracked "wins" (convictions) and "losses" (acquittals), with acquittals often leading to reprimand or discipline. Unlike *Brady* violations, acquittals were recorded in ADA personnel files and openly discussed (or ridiculed) within the office.

130.    In other words, the District Attorney cared more about "winning" by securing

convictions, even at the price of imprisoning innocent people, than ensuring justice was done by adhering to the requirements of due process and fair trials.

131.    By tracking only acquittals and faulting prosecutors for failing to convict defendants, while also ignoring or downplaying prosecutors' *Brady* violations, the District Attorney further implemented a practice to his prosecutors that involved ignoring the contours of their disclosure obligations and that even discouraged *Brady* disclosures.

132.    These practices and policies—including the failure to implement affirmative rules requiring production of favorable information—caused many *Brady* violations over the years.

133.    For instance, between just October 1992 and August 1997, Orleans Parish ADAs violated *Brady* at least 18 times in felony trial cases, including cases like *Kyles v. Whitley* (1995) in which the U.S. Supreme Court announced to the nation that the Orleans Parish District Attorney failed to comply with *Brady*.

134.    *Kyles* was decided in April of 1995, six months before Mr. Moses was prosecuted. Had the District Attorney (and the City of New Orleans, discussed below) heeded that decision, and required the production of *Brady* material, including the information specifically emphasized in *Kyles*, Mr. Moses would have received the favorable information that was suppressed from him, and likely led to his acquittal at trial.

135.    In the five years after *Kyles*, when the District Attorney should have required more exacting compliance with *Brady*, affirmatively trained prosecutors on their disclosure obligations, and adopted a policy manual that adhered to the law, Orleans Parish ADAs committed more *Brady* violations.

136.    Indeed, Orleans Parish prosecutors and/or NOPD officers committed a pattern of *Brady* violations in felony cases both before and after Larry Moses was prosecuted (and before Mr.

Moses's wrongful conviction became final). Examples include:

i. **Larry Hudson (convicted in 1967)**: prosecutors failed to disclose a supplemental police report detailing that the prosecution's only testifying witness had originally identified someone else in a photo array and struggled to consistently identify an alleged perpetrator in a physical lineup.

ii. **Hayes Williams (convicted in 1968)**: prosecutors failed to disclose a supplemental police report containing prior inconsistent statements by the prosecution's only eyewitness, who had said he never saw the face of the third perpetrator, who the prosecution argued was Williams.

iii. **Michael Williams (convicted in 1974)**: prosecutors failed to disclose a police report explaining that the prosecution's key witness was likely high or otherwise impaired when she allegedly saw the defendant commit the crime because she had just visited a methadone clinic.

iv. **Gregory Bright** and **Earl Truvia (convicted in 1976)**: prosecutors failed to disclose evidence of the real perpetrator, as well as evidence that the prosecution's only witness was a heroin-addicted paranoid schizophrenic who was paid to talk to the police and whose eyewitness account fundamentally conflicted with scientific evidence of the crime.

v. **Errol Bernard (convicted in 1976)**: prosecutors failed to disclose a police report containing a testifying witness's prior inconsistent statement that supported the defendant's version of events, corroborated other favorable witness statements, and directly undermined the prosecution's theory.

vi. **Floyd Falkins (convicted in 1976)**: prosecutors failed to disclose two witness's prior identifications of a different alleged perpetrator.

vii. **Elvis Brooks (convicted in 1977)**: prosecutors failed to disclose a note in the prosecutor's files confirming that Brooks was not the source of crime-scene fingerprints, that two witnesses gave prior inconsistent statements to police, and that victims of a similar crime did not identify the defendant as the likely perpetrator.

viii. **Calvin Williams (convicted in 1977)**: prosecutors failed to disclose a police report detailing that the prosecution's eyewitness did not identify the defendant in a previous photo lineup and had made prior inconsistent statements to police.

ix. **Issac Knapper (convicted in 1979)**: prosecutors failed to disclose a police report that contradicted the prosecution's evidence and police witness testimony, including by confirming that the gun used to murder the victim was linked to another crime with a different, identified shooter.

x.    **William Perkins (convicted in 1980)**: prosecutors failed to disclose a written witness statement that supported the defendant's theory of self-defense and undermined the prosecution's version of events.

xi.    **Ronald Monroe (convicted in 1980)**: prosecutors failed to disclose a confession by an alternate suspect.

xii.    **John Floyd (convicted in 1982)**: prosecutors failed to disclose fingerprint analyses that did not match the defendant's fingerprints; the fact that the interrogating detective showed the defendant crime-scene photos, which increased the likelihood of a false or coerced confession; and witness statements that undermined the police investigation of the defendant.

xiii.    **Reginald Adams (convicted in 1983)**: prosecutors failed to disclose evidence of forensic examinations, including ballistics testing, as well as a police report linking two people, with no connection to the defendant, with the murder weapon and valuables stolen from the crime scene.

xiv.    **Stephen Rosiere (convicted in 1984)**: prosecutors failed to disclose testifying and nontestifying witness statements corroborating the defendant's theory of self-defense and undermining the prosecution's theory of the crime.

xv.    **Curtis Kyles (convicted in 1984)**: prosecutors failed to disclose testifying and nontestifying witness statements that were materially inconsistent and at times self- incriminating, as well as a list of vehicles present at the crime scene that favored the defendant.

xvi.    **John Thompson (convicted in 1985)**: prosecutors failed to disclose blood samples collected from the crime scene, as well as a lab report identifying the perpetrator had a different blood type than the defendant.

xvii.    **Calvin Duncan (convicted in 1985)**: prosecutors failed to disclose evidence that the perpetrator's physical characteristics were different from the defendants, as well as the circumstances of the witness's identification which undermined all reliability in that identification.

xviii.    **George Toca, Jr. (convicted in 1985)**: prosecutors failed to disclose eyewitnesses' prior inconsistent statements, as well as a police report corroborating the defendant's alibi and containing information about another suspect.

xix.    **Raymond Flanks (convicted in 1985)**: prosecutors failed to disclose prior inconsistent statements from the prosecutor's only eyewitness that confirmed her description of the perpetrator did not match the defendant's physical description, as well as the fact that the police detective suggested who the witness should identify in a photo lineup.

xx.  **Sullivan "Sal" Walter (convicted in 1986):** prosecutors failed to disclose blood and saliva analyses reports that would have excluded the defendant as the perpetrator, as well as prior inconsistent statements by the victim and specific details about the crime that undermined the reliability of any potential identification.

xxi.  **Erin Hunter (convicted in 1988):** prosecutors failed to disclose the key witness's prior inconsistent statement about whether the witness in fact saw the defendant after the crime.

xxii.  **Darryl Washington (convicted in 1988):** prosecutors failed to disclose witness's prior inconsistent statement during which witness identified the perpetrator by a different name.

xxiii.  **Eugene Lindsey (convicted in 1988)**: prosecutors failed to disclose key witness's prior statements corroborating the defendant's theory of the case.

xxiv.  **Alvin Jeanmarie (convicted in 1992)**: prosecutors failed to disclose initial and supplemental police reports containing witnesses' prior consistent statements about the perpetrator's appearance.

xxv.  **Jerome Morgan (convicted 1994):** prosecutors failed to disclose 911 call log establishing crime scene chronology/timeline undermining prosecution's only theory, as well as circumstances of police photo lineup in which detective told teenage witnesses which photo belonged to the defendant.

xxvi.  **Alfred Oliver (convicted in 1994)**: prosecutors failed to disclose initial and supplemental police reports containing victims' prior inconsistent statements, including statements about circumstances of one victim's escape from the perpetrator.

xxvii.  **Daniel Rideau (convicted in 1995)**: prosecutors failed to disclose supplemental police report containing non-testifying witness statements describing a person other than the defendant as leaving the crime scene with the type of gun used in the crime.

xxviii.  **Kuantau Reeder (convicted in 1995):** prosecutors failed to disclose key witness's prior criminal history, which the witness lied about during trial; the failure to analyze fingerprint evidence found at the crime scene or compare the crime-scene fingerprints to the defendant's fingerprints, which would have excluded the defendant; and prosecutors' notes that witness twice identified a different suspect during photo lineups.

xxix.  **Darnell Lewis (convicted in 1995):** prosecutors failed to disclose supplemental police report and notes containing prior inconsistent statements by victims that they could not see or identify the perpetrator.

xxx. **Dwayne Williams (convicted in 1995)**: prosecutors failed to disclose police report containing witnesses' prior inconsistent statement and police informant's description of perpetrator, as well as latent fingerprints that were not a match for the defendant.

xxxi. **Dan L. Bright (convicted in 1996)**: prosecutors failed to disclose an informant's report that the defendant had been prosecuted and imprisoned for a murder committed by someone else, as well as a key witness's criminal history.

xxxii. **Shareef Cousin (convicted in 1996):** prosecutors failed to disclose key witness's prior inconsistent statement that she could not see or identify perpetrator because it was dark, and she was not wearing contacts or glasses at the time.

xxxiii. **Kunta Gable, Sidney Hill (aka Leroy Nelson),** and **Bernell Juluke (convicted in 1996):** prosecutors failed to disclose police communication logs and other information including prior inconsistent statements about the color of the getaway car at the crime scene.

xxxiv. **Craig Johnson (convicted in 1996):** prosecutors failed to disclose that the alleged victim had accused at least 16 people of robbing him and then demanded money in exchange for dropping the charges.

xxxv. **Robert Jones (convicted in 1996):** prosecutors failed to disclose victim's prior statements containing key details about the location of the crime and the perpetrator's physical appearance that exculpated the defendant, that a police informant possessed items stolen from each crime scene, and a prosecutor's internal memo corroborating information that favored the defendant.

xxxvi. **Juan Smith (convicted in 1996):** prosecutors failed to disclose investigation notes containing victim's prior inconsistent statements, such as inability to describe the perpetrator other than as a "black male" which directly undermined victim's trial testimony about the perpetrator's alleged build, haircut, and gold teeth.

xxxvii. **James Walker (convicted in 1997):** prosecutors failed to disclose witness's prior inconsistent statement that the perpetrator was 10 years younger than the defendant, three inches shorter than the defendant, and had a mustache that the defendant did not.

xxxviii. **Dwight LaBran (convicted in 1997):** prosecutors failed to disclose that single prosecution witness and only eyewitness gave a false name to police and at trial to avoid being arrested on several parole violations and lied about details he allegedly witnessed during crime.

xxxix. **Eddie Triplett (convicted in 1998)**: prosecutors failed to disclose police report detailing how officers stopped the defendant and another man before arresting the defendant and releasing the other man though the report identified the other man as the person detained and arrested, which undermined police testimony that no

other suspects were present at the crime scene.

xl.   **David Mahler (convicted in 1998)**: prosecutors failed to disclose a supplemental police report and prior inconsistent statements of several witnesses that corroborated the defendant's version of events and contradicted the prosecution's theory of the case.

xli.  **Cedric Dent (convicted in 1999):** prosecutors failed to disclose notes undermining a detective's testimony about how the defendant became a suspect and revealing a second eyewitness who described the perpetrator's physical appearance differently from the defendant's known appearance, as well as four out of six different, prior witness statements from the prosecution's primary witness.

137.   The list above is necessarily underinclusive. Many cases resolve in plea deals before trial, even where *Brady* material still has not been produced. As a result, the number of known *Brady* violations in Orleans Parish—which is already staggering—*underestimates* the number of *Brady* violations by the District Attorney during this time.

**Post-Conviction Proceedings and Mr. Profound Moses's Damages**

138.   Mr. Moses steadfastly maintained his innocence despite being wrongfully convicted for nearly 29 years. During that time, friends, loved ones, and family members passed away. Mr. Moses missed out on life opportunities, was restrained in his freedom, and suffered emotional distress.

139.   In 2022, a joint investigation between the District Attorney and the New Orleans Innocence Project, Mr. Moses's post-conviction counsel, revealed that *Brady* material had been withheld from Mr. Mosses's defense.

140.   Counsel then filed a motion for post-conviction relief on behalf of Mr. Moses.

141.   A hearing was held, and as a result the court granted relief on Mr. Moses's *Brady* claim, finding that the State "knew that their only eyewitness, Mr. Frederick Stamps, suffered from an apparent mental illness and, additionally, had a possible reason to blame" Mr. Moses for the

murder.

142.    The trial court found that the prosecution had medical records and handwritten notes about Mr. Stamps' medications, that could have at "very least" been "used for impeachment purposes during trial."

143.    The trial court further found that the State knew, but had not disclosed, that Mr. Stamps had been inconsistent about his story involving Ms. Jenkins in May 1995.

144.    The trial court further found that the State knew, but had not disclosed, that Mr. Stamps had been inconsistent about the nature of the relationship between Mr. Stamps and Ms. Jenkins altogether.

145.    The trial court found: "Due to Mr. Stamps inconsistencies, mental illness, and potential grudge against [Mr. Moses] as a romantic rival, Stamps' credibility certainly would have been an issue ripe for cross-examination" had Mr. Moses been "provided this relevant information."

146.    Yet, the court continued, "none of this clearly favorable information was ever turned over to the defense during either pre-trial discovery" or otherwise prior to the trial.

147.    The wrongful conviction was vacated in May 2023, but Mr. Stamps remained subject to criminal charges for the Daniel Ratliff-Alma Causey double homicide.

148.    On July 19, 2023, the charges against Mr. Moses were finally dismissed.

149.    All told, Mr. Moses spent 28 years, 11 months, and 20 days imprisoned for murders he did not commit.

## CLAIMS FOR RELIEF

### Count One –42 U.S.C. § 1983
### Violation of the Fourteenth Amendment of The U.S. Constitution
### (All Defendants)

150.    Moses realleges and incorporates all of the preceding paragraphs.

151.    As described above, the Defendant Officers and District Attorney Defendants, while acting individually, jointly, and/or in conspiracy, as well as under the color of law and within their scope of employment, deprived Moses of his constitutional right to due process and a fair trial through the fabrication of evidence that impacted Mr. Moses's criminal proceedings and by withholding and failing to disclose favorable information from Mr. Moses, his attorneys, and even possibly one another, thereby misleading and misdirecting the criminal prosecution of Mr. Moses for a double homicide he did not commit.

152.    Upon information and belief, the Defendant Officers concealed and fabrication evidence that is not yet known to Mr. Moses.

153.    As described above, Defendant Officers and District Attorney Defendants individually, jointly, and/or in concert and conspiracy, deliberately withheld exculpatory information. In doing so, Defendants violated their clearly established duties to report all material exculpatory and impeachment information to prosecutors, to preserve material evidence, and to ensure the integrity of a criminal investigation.

86.    The misconduct described in this Count directly resulted in Mr. Moses's unjust criminal prosecution and wrongful conviction, thereby denying him his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, Mr. Moses's prosecution would not and could not be pursued, and there is a reasonable probability that the outcome of the criminal case would have been different.

87.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and with total disregard for the truth and Mr. Moses's innocence.

154.    As a direct and proximate result of Defendants' misconduct, Mr. Moses suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

155.    The misconduct described in this Count by the District Attorney Defendants and the District Attorney was undertaken pursuant to the policy and practice of the District Attorney in the manner more fully described in Count V, below.

156.    The misconduct described in this Count by the Defendant Officers was undertaken pursuant to the policy and practices of the City of New Orleans in the manner more fully described in Count VI, below.

### COUNT II— 42 U.S.C. § 1983
### Liberty Deprivation without Probable Cause in Violation of the Fourth Amendment
### (City Defendants)

157.    Moses realleges and incorporates all of the preceding paragraphs.

158.    As described above, the Defendant Officers individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, used fabricated evidence to accuse Mr. Moses of criminal activity and detain him without probable cause.

159.    In so doing, Defendant Officers caused Mr. Moses to be deprived of his liberty and detained without probable cause in violation of his rights secured by the Fourth Amendment and incorporated by the Fourteenth Amendment. Specifically, Mr. Moses was incarcerated from the date of his arrest until nearly twenty-nine years later.

160.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and with total disregard for the truth and Mr. Moses' innocence.

161.     As a direct and proximate result of Defendants' misconduct, Mr. Moses suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

162.     The misconduct described in this Count by Defendant Officers was undertaken pursuant to the policy and practice of the City in the manner more fully described in Count VI.

**COUNT III – 42 U.S.C. § 1983**
**Failure to Intervene**
**(City Defendants)**

163.     Moses realleges and incorporates all of the preceding paragraphs.

164.     As described above, by their conduct and under color of law, during the constitutional violations described herein, one or more of Defendant Officers stood by without intervening to prevent the violation of Mr. Moses's constitutional rights, even though they had the opportunity to do so.

165.     Defendant Officers had a reasonable opportunity to prevent this harm but failed to do so.

166.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to Mr. Moses's clearly established constitutional rights.

167.     As a direct and proximate result of Defendants' misconduct, Mr. Moses suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

168.    The misconduct described in this Count by Defendant Officers was undertaken pursuant to the policy and practice of the City in the manner more fully described in Count VI.

## COUNT IV – 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights
### (City Defendants)

169.    Moses realleges and incorporates all of the preceding paragraphs.

170.    In investigating the murders of Daniel Ratliff and Alma Causey, the Defendant acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to act in concert in order to deprive Mr. Moses of his constitutional rights, including his rights to due process and to a fair trial, all as described in the various paragraphs of this Complaint.

171.    Additionally, before and after Mr. Moses' conviction, the Defendant Officers further conspired to deprive Mr. Moses of favorable information to which he was lawfully entitled and which would have led to either not being charged, acquittal, or faster exoneration.

172.    In this manner, the Defendant Officers acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

173.    In furtherance of the conspiracy, each co-conspirator engaged in and facilitated numerous overt acts, including but not limited to those set forth above—such as fabricating evidence or withholding favorable information—and was an otherwise willful participant in joint activity.

174.    As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Mr. Moses suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

175.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others and with total disregard for the truth and Moses's innocence.

176.     The misconduct by Defendant Officers described in this Count was undertaken pursuant to the policy and practice of the City in the manner more fully described in Count VI.

**COUNT V – 42 U.S.C. § 1983**
*Monell* **Claim Regarding Orleans Parish District Attorney Practices**
**(The Orleans Parish District Attorney)**

177.     Moses realleges and incorporates all of the preceding paragraphs.

178.     The misconduct described in Count I by the District Attorney Defendants and the District Attorney was undertaken pursuant to the policy and practice of the District Attorney in the manner more fully described above.

179.     The Orleans Parish District Attorney is responsible for all policies, practices, and customs of the Orleans Parish District Attorney's Office—whether formal or informal, written or unwritten.

180.     Before Mr. Moses's wrongful prosecution, conviction, and nearly-30-year imprisonment, the District Attorney had a widespread unwritten practices of *Brady* violations and incorrect and unlawful written policies concerning the *Brady* disclosure obligation that were followed by Assistant District Attorneys in Orleans Parish.

181.     The District Attorney also routinely failed to train ADAs on their constitutional obligations to disclose information to criminal defendants and expected prosecutors to learn on the job without providing them the information, tools, or resources to effectively do so.

182.     The District Attorney expressed opposition to and deliberate indifference to the constitutional requirements imposing disclosure obligations on the State in ensuring due process

and fair trials for criminal defendants, which further discouraged prosecutors from disclosing favorable information to the defense, lest that information ultimately result in an acquittal.

183.     By negatively considering any acquittal a "loss," rather than the right and just result of a failure to prove a person's guilt beyond a reasonable doubt, the District Attorney prioritized convictions over justice, even if that meant convicting and imprisoning innocent people in violation of their constitutional rights.

184.     The District Attorney either knew, or alternatively was deliberately indifferent to, the fact that these policies, practices, and customs were likely to result in constitutional violations and, additionally, wrongful convictions and imprisonment for innocent people.

185.     The District Attorney had notice of the fact its policies, practices, and customs caused convictions obtained in violation of due process, and included wrongful convictions of innocent people in myriad ways, including but not limited to (1) knowledge of its own practices, (2) because state courts had vacated or reversed convictions after finding *Brady* violations, (3) federal courts  vacating or reversing convictions after finding *Brady* violations, (4) complaints and lawsuits alleging constitutional violations, and (5) motions filed in criminal proceedings.

186.     Despite having notice, the District Attorney did alter, improve, or amend his policies, practices, or customs to require disclosure of *Brady* material, to adopt procedural safeguards that would ensure the production or *Brady* material, or to adequately train prosecutors to correctly understand when disclosure was constitutionally required.

187.     Despite having notice of the *Brady* violation in Mr. Moses's case, the final policymakers with authority for the OPDA exhibited deliberate indifference to the violation, and even attempted to excuse the violation, thereby effectively ratifying it as part and parcel of the OPDAs policies and customs.

188.     The *Brady* violations in Mr. Moses's case were not unique. He is one of many former criminal defendants convicted and imprisoned in violation of the constitution after Orleans Parish prosecutors failed to disclose favorable evidence to defense counsel before trial.

189.     If the District Attorney had formalized a legitimate and accurate written *Brady* policy, implemented procedural safeguards, and/or trained prosecutors on the *Brady* disclosure rules, Mr. Moses and other people like him would not have been wrongly convicted and imprisoned.

190.     The OPDA violations violated Mr. Moses's Fourteenth Amendment rights under U.S. Constitution.

191.     The District Attorney is liable to Mr. Moses for his wrongful conviction and imprisonment, and Mr. Moses has suffered extensive and practically immeasurable damages in the form of his loss of freedom, lost wages and loss of earning capacity, loss of enjoyment and quality of life, loss of consortium based on his intensely strained familial and social relationships, pain and suffering, physical injuries, and other damages to be proven at trial.

### COUNT VI – 42 U.S.C. § 1983
### *Monell* Claim Regarding City of New Orleans/NOPD Practices
### (The City of New Orleans)

192.     Moses realleges and incorporates all of the preceding paragraphs.

193.     As described in detail above, Defendant City of New Orleans is liable for the violation of Mr. Moses's constitutional rights because his injuries were caused by the policies, practices, and customs of the City, as well as by the actions of final policymakers for the City.

194.     At all relevant times and for a period of time prior thereto, the City and its final policymakers promulgated policies and procedures for the conduct of homicide investigations, the production of *Brady* material, and other investigative work.

195.     These policies and procedures were implemented by officers of the NOPD, including the Defendant Officers who were responsible for working on the Daniel Ratliff and Alma Causey homicide investigation.

196.     At the relevant times, the City of New Orleans through NOPD implemented or tolerated a pattern and practice, as well as plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning the constitutional duties of NOPD officers, the fabrication of evidence and failing to document and disclose material, exculpatory and impeachment evidence to prosecutors, defense counsel, and the court.

197.     These widespread policies and practices were allowed to flourish because NOPD directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of NOPD employees, and/or failed to adequately punish, discipline, and deter prior instances of misconduct. In this way, NOPD violated Plaintiffs' rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

198.     The City and its final policymakers failed to promulgate adequate policies or procedures on these topics (although the need for such policies and procedures was obvious, given the recurring situations faced by officers) in order to prevent the violation of citizens' constitutional rights. In addition, the City and its final policymakers failed to promulgate proper or adequate policies or procedures for training and supervision of NOPD officers on these topics.

199.     The failure to promulgate proper or adequate policies or procedures was committed by persons with final policymaking authority in the NOPD and the City.

200.     At all relevant times and for a period of time prior thereto, the City and its final policymakers had notice of the above-referenced widespread practices and customs. This includes widespread practices and customs under which individuals suspected of criminal activity, such

34

as Mr. Moses, were routinely deprived of their right to due process or Fourteenth Amendment rights. For instance, it was common that suspects were prosecuted based on fabricated evidence and/or that exculpatory and impeaching information was suppressed

201.    The above-described widespread practices and customs, so well settled as to constitute *de facto* policies of the City, were able to exist and thrive, individually and together, because final policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

202.    In addition, the misconduct described herein was undertaken pursuant to the policies and practices of the City in that the constitutional violations committed against Moses were committed with the knowledge or approval of persons with final policymaking authority for the City or were actually committed by persons with such final policymaking authority.

203.    The Defendant Officers acted pursuant to the City's policies, widespread practices, and customs in engaging in the misconduct described in this Complaint. Mr. Moses's injuries were directly and proximately caused by the City's policies, widespread practices, and customs.

204.    As a direct and proximate result of Defendant City's policies, widespread practices, and customs, Mr. Moses suffered and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional damages, as set forth above.

### Count VII – Violation of the Louisiana Constitution (All Defendants)

205.    Moses again realleges and incorporates all of the preceding paragraphs.

206.    Like the U.S. Constitution, the Louisiana Constitution guarantees a person's right to be secure in his person and effect from unreasonable seizure, to equal protection of the law, to due process of law, to be free from discrimination, to be free from cruel, excessive, or unusual

punishment, and to additional unenumerated rights. See La. Cost. Art. I, §§ 2, 3, 5, 12, 13, 15, 16, 20, 22, & 24.

207.    The same conduct that violated Mr. Moses's federal constitutional rights also violated the rights that the Louisiana Constitution guarantees to Mr. Moses.

208.    These violations of the Louisiana Constitution caused Mr. Moses to be wrongfully convicted and imprisonment for a crime he did not commit, which further caused him to suffer the physical, emotional, and pecuniary damages described throughout this complaint.

**Count VIII – State Law Tort of Negligence**
**(The Defendant Officers and District Attorney Defendants)**

209.    Moses realleges and incorporates each and every foregoing paragraph.

210.    In the alternative to the Counts above, the Defendant Officers had a duty to undertake an honest and reliable police investigation to ensure that the rights of civilians are not abused and to ensure that victims of crimes have an opportunity to obtain justice for crimes committed against them.

211.    In the alternative to the Counts above, the District Attorney defendants had a duty to undertake an honest and transparent prosecution of a criminal defendant that, among other things, imposed a duty on them to disclose favorable information to Mr. Moses or his defense counsel.

212.    The Defendant Officers failed to take due care, and instead were negligent and/or grossly negligent in conducting the Daniel Ratliff and Alma Causey homicide investigation and in making the criminal case against Mr. Moses, these negligent and/or grossly negligent acts included the quality of the initial investigation, the fabrication of evidence, the suppression of *Brady* material, the departure from established police protocols for the interview of witnesses and documenting those witnesses, and other aspects of homicide investigation.

36

213.    It was foreseeable that, as a result of such negligence, Mr. Moses would be wrongfully detained, prosecuted, and incarcerated, and in fact, Moses was wrongfully detained and incarcerated and served almost twenty-nine years for a crime he did not commit, and suffered the additional physical, emotional, and pecuniary damages as described herein.

214.    Mr. Moses was harmed as a result of the negligence of the Defendant Officers, as described throughout.

### Count IX— State Law Tort of Intentional Infliction of Emotional Distress
### (Defendant Officers, District Attorney Defendants)

215.    Moses realleges and incorporates each and every foregoing paragraph.

216.    The acts and conduct of the Defendant Officers and District Attorney Defendants as set forth above were extreme and outrageous. Defendants' actions were rooted in an abuse of power or authority and were undertaken with intent to cause—or were in reckless disregard of the probability that their conduct would cause—severe emotional distress to Mr. Moses, as is more fully alleged above.

217.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and with total disregard for the truth and Mr. Moses's innocence.

218.    As a direct and proximate result of Defendants' misconduct, Mr. Moses suffered, and continues to suffer, grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional distress and damages, as set forth above.

### Count X – Vicarious Liability for State Law Torts
### (Williams, City of New Orleans)

219.    Plaintiff realleges and incorporates each and every foregoing paragraph.

220.    At all relevant times, the District Attorney Defendants were acting within the

37

scope of their employment and as agents for OPDA.

221.     At all relevant times, the NOPD officer defendants were acting within the scope of their employment and as agents for NOPD.

222.     Consequently, the City of New Orleans and OPDA are liable under the doctrine of *respondeat superior* for any and all tortious actions of their employees and agents.

## RELIEF REQUESTED

223.     Larry Moses respectfully requests that judgment be entered in his favor and against each defendant, finding that the defendant violated the U.S. Constitution and the Louisiana Constitution and awarding all damages available under the law (including punitive damages against individual defendants), pre- and post-judgment interest, all costs and attorneys' fees, and any other or further relief, at law or in equity, that Mr. Moses may be entitled or deserve.

## JURY DEMAND

224.     Plaintiff hereby demands a trial by jury pursuant to Federal Rules of Civil Procedure 38(b) on all issues so triable.


Respectfully submitted,

/s/ *William Most*

William Most, La. Bar No. 36914
Caroline Gabriel, La. Bar No. 38224
MOST & ASSOCIATES
201 St. Charles Ave., Ste. 2500, #9685
New Orleans, LA 70170
T: (504) 509-5023
williammost@gmail.com

David B. Owens*
LOEVY & LOEVY
311 N. Aberdeen St 3FL
Chicago IL 60607

c/o Civil Rights and Justice Clinic
University of Washington Law School
William H. Gates Hall, Suite 265
P.O. Box 85110, Seattle, WA 98145-1110
david@loevy.com
*motion for admission pro hac vice
forthcoming