UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **LARRY MOSES** | * | CIVIL ACTION |
| **Plaintiff** | * | NUMBER: 24-1768 |
| | * | |
| **VERSUS** | * | SECTION "M" |
| | * | JUDGE BARRY W. ASHE |
| | * | |
| **THE CITY OF NEW ORLEANS,** *et. al.* | * | MAGISTRATE |
| **Defendants** | * | JUDGE KAREN WELLS ROBY |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

Defendant, the City of New Orleans (the "City") respectfully submits this memorandum in support of its motion to dismiss the claims against it in Plaintiff Larry Moses's ("Moses") Complaint, R. Doc. No. 1, pursuant to Federal Rule of Procedure 12(b)(6).

**INTRODUCTION**

This is a civil rights case arising from events leading to Moses's conviction for two murders in 1995 and the trial court's decision to vacate this conviction last year. Moses alleges that the State committed *Brady* violations by withholding information which would have revealed fabricated evidence and the unreliability of witnesses who testified against him.

Moses filed his Complaint against the City of New Orleans; former New Orleans Police ("NOPD") detectives Wayne Rumore, John Ronquillo, Patrick Jones, and "Sergeant" Anderson; Orleans Parish District Attorney ("OPDA") Jason Williams; former assistant OPDA Allison Monahan; and former assistant OPDA Glynn Allison.[1] He asserts federal law claims for the deprivation of civil rights under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments of the United States Constitution. He also asserts a *Monell* claim against the City and OPDA for

---

[1] R. Doc. No. 1

1

allegedly maintaining unlawful policies, practices, and customs that ultimately led to his wrongful conviction. Lastly, Moses asserts several supplemental state law claims in connection with these allegations.

As discussed more fully below, Moses fails to state a claim upon which relief can be granted against the City. He has not established the requisite pattern of constitutional violations needed to demonstrate the existence of an official policy that resulted in a deprivation of his rights. Further, Moses has not pleaded sufficient facts to support a failure to train, supervise, or discipline claim. Accordingly, Moses's *Monell* claim against the City should be dismissed.

## FACTUAL BACKGROUND

In the early morning hours of January 4, 1994, Daniel Ratliff ("Ratliff") and Alma Causey ("Causey") were shot and killed during an armed robbery in the Ninth Ward of New Orleans.[2] NOPD detectives responded to the scene and spoke with witness Jean Barras ("Barras") who provided a description of the perpetrator and told the detectives she had heard him command the victims "something to the effect of get on the ground and give him their money."[3] The investigation subsequently "went completely cold."[4]

Approximately six months later, Frederick Stamps ("Stamps") reported he had been the victim of a robbery to the same NOPD district that responded to the murders.[5] Stamps claimed that this robbery was orchestrated by his ex-girlfriend, Gail Jenkins ("Jenkins") and a man he would later identify as Moses.[6] Jenkins was arrested.[7] Moses alleges that—in reality—Stamps had

---

[2] *Id.* at ¶ 13.
[3] *Id.* at ¶¶ 22-23.
[4] *Id.* at ¶ 38.
[5] *Id.* at ¶¶ 40-41.
[6] *Id.* at ¶ 42.
[7] *Id.* at ¶ 45.

2

threatened to harm Jenkins and when Moses sought to intervene, a fight between him and Stamps ensued.[8]

A week later, the detectives spoke to Stamps about the double murder.[9] Moses alleges that during these conversations, it was apparent Stamps was mentally unstable and had a vendetta against Moses.[10] Moses further alleges that Stamps and the detectives then fabricated a narrative about the night of the murder that implicated Moses and recorded it in their written reports.[11] Moses alleges that this narrative was inconsistent with the narrative initially provided by Barras.[12] Stamps told the detectives he had witnessed Moses commit the murders and later identified him from a photo lineup.[13]

Moses alleges that at some point after he was charged, the detectives spoke again with Barras, and she told them for the first time that she had recognized Moses's voice the night of the murder.[14] Moses alleges that this too was "made-up."[15] Moses was convicted for the murders and sentenced to life in prison.[16] He argues that his conviction was the result of the State withholding information that would have revealed the fabrication of the police narrative and Barra's voice-identification as well as the unreliability of Stamps.[17]

Following a joint investigation by the New Orleans Innocence Project ("IPNO") and the OPDA decades later, a post-conviction relief hearing was held.[18] The court found that the OPDA

---

[8] *Id.* at ¶ 44.
[9] *Id.* at ¶ 47.
[10] *Id.* at ¶ 48.
[11] *Id.* at ¶¶ 49-50.
[12] *Id.* at ¶ 52.
[13] *Id.* at ¶¶ 50,53.
[14] *Id.* at ¶ 61.
[15] *Id.* at ¶ 67.
[16] *Id.* at ¶ 75.
[17] *Id.* at ¶ 74.
[18] *Id.* at ¶ 139.

had violated *Brady* in withholding the favorable information.[19] Moses did not allege in his Application for Post-Conviction Relief, and the court did not find that City or NOPD officers did anything wrong relative to Moses's conviction.[20] Moses's conviction was vacated, and he subsequently filed the instant suit.[21]

## LEGAL STANDARD

A motion under Federal Rule of Civil Procedure 12(b)(6) challenges whether the plaintiff has asserted "a claim upon which relief can be granted." "Under Rule 12(b)(6), a claim may be dismissed when a plaintiff fails to allege any set of facts in support of his claim which would entitle him to relief." *Taylor v. Books A Million, Inc.*, 296 F. 3d 376, 378 (5th Cir. 2002) (citing *McConathy v. Dr. Pepper/Seven Up Corp.,* 131 F. 3d 558, 561 (5th Cir. 1998)). "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead enough facts to "state a claim to relief which is 'plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544,570 (2007)). A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In conducting that review, the court accepts all well-pleaded facts as true, drawing "all reasonable inferences in favor of the nonmoving party." *Harmon v. City of Arlington, Texas*, 16 F.4th 1159, 1162 (5th Cir. 2021) (quoting *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (en banc)). The court is not, however, bound to accept as true legal conclusions couched as factual

---

[19] *Id.* at ¶¶ 141-146.
[20] Exhibit 1 – State of Louisiana v. Larry Moses, Criminal District Court Case No. 371-524 "D" - Post-Conviction Hearing Ruling dated May 25, 2023. Moses's Complaint repeatedly quotes this ruling (R. Doc. 1 at ¶¶ 141-146), and "'[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the plaintiff's] claims.'" *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000). (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp*., 987 F.2d 429, 431 (7th Cir. 1993)). Further, it is well-established and "'clearly proper in deciding a 12(b)(6) motion [that a court may] take judicial notice of matters of public record.'" *Funk v. Stryker Corp*., 631 F.3d 777, 783 (5th Cir. 2011) (quoting *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007)) (citing *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994)).
[21] R. Doc. No. 1 at ¶ 147.

allegations. *Iqbal*, 556 U.S. at 678. "[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Taylor*, 296 F. 3d at 378. (internal quotations omitted).

## LAW AND ARGUMENT

I. **Moses has not established that the City is liable under *Monell*.**

It is well settled that municipalities are subject to lawsuits under § 1983. *Monell v. Department of Social Services*, 436 U.S. 658 (1978). A government entity cannot be held liable under § 1983 pursuant to a theory of *respondeat superior*; rather, it can only be responsible when the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may be fairly said to represent official policy, inflicts the injury." *Id.* at 694. Thus, to establish municipal liability under §1983, "a plaintiff must show that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Hicks-Fields v. Harris Cnty. Tex.,* 860 F.3d 803, 808 (5th Cir. 2017) (quoting *Peterson v. City of Fort* Worth, 588 F.3d 838, 847 (5th Cir. 2009)). An official policy usually exists in writing but "may also arise in the form of a widespread practice that is so common and well-settled as to constitute a custom." *Alvarez v. City of Brownsville*, 904 F.3d 282, 390 (5th Cir. 2018)(en banc). To succeed on a municipal claim under § 1983, a plaintiff must also show that "the policy was implemented with deliberate indifference to the known or obvious consequences that constitutional violations would result." *Id.* "Deliberate indifference is a degree of culpability that goes beyond mere negligence or even gross negligence; it must amount to an intentional choice, not merely an unintentional oversight." *James v. Harris County*, 577 F.3d 612, 617–18 (5th Cir. 2009)(quoting *Rhyne v. Henderson County,* 973 F.2d 386, 392 (5th Cir. 1992)).

Moses has asserted several constitutional claims based on the alleged actions of the NOPD detectives who investigated the murders of Ratliff and Causey. These include violations of due process (Count 1), deprivation of liberty (Count 2), failure to intervene (Count 3), and civil rights conspiracy (Count 4). He argues, generally, that because the NOPD is operated by the City, these violations were undertaken pursuant to the "policy and practices" of the City (Count 6). However, Moses has not pleaded plausible facts to support that any official policy promulgated by a City policymaker was the moving force behind the violation of his rights. His claims against the City should be dismissed.

### A. Moses has not established the requisite pattern of constitutional violations needed to demonstrate the existence of an official policy.

A civil rights plaintiff may carry his burden of proof under the official policy prong of *Monell* in three ways. *See Brown v. Bryan Cnty., OK*, 219 F.3d 450, 457 (5th Cir. 2000). First, he can demonstrate the existence of "a policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority." *Id.* (quoting *Bennett v. City of Slidell*, 735 F. 2d 861, 862 (5th Cir. 1984)(en banc)). Second, an official policy can also be evidenced by custom, that is, "[a] persistent, widespread practice of city officials or employees, which although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Id.* (quoting *Bennett*, 735 F. 2d at 862). Finally, "[w]hen the person who committed the challenged act is in charge of policymaking in that part of the government, 'policy' can sometimes be found to have been established by the very act itself." *Hampton Co. Nat'l Surety, LLC v. Tunica Cnty., Miss.*, 543 F. 3d 221, 227 (5th Cir. 2008).

Here, Moses does not allege the existence of any written unconstitutional policy; nor does he allege that his rights were violated by the person in charge of policymaking. Rather, it appears he attempts to demonstrate the existence of an official policy through custom, that is, a pattern of violations by NOPD detectives that resulted in wrongful convictions. However, he has only provided what amounts to broad conclusory assertions. Moses's central allegation against the City, as described above, is that NOPD detectives allegedly fabricated and suppressed evidence during their investigation of the Ratliff and Causey murders, and that doing so resulted in Moses being wrongly convicted for the crime. Moses has pleaded no facts which would connect any known pattern of misconduct to these allegations.

Moses also alleges the existence of a "blue curtain" or code of silence among NOPD officers whereby wrongdoing by police is never reported. However, he fails to establish the requisite pattern of conduct to establish this custom as well. He also fails to connect this allegation to the facts of his case. Finally, Moses alleges that the NOPD failed to train, supervise, and discipline its officers, but again, pleads little more than a conclusory recitation of elements.

Establishing a municipal policy through a pattern of conduct requires "specificity and sufficiently numerous prior incidents." *Davidson v. City of Stafford,* 848 F.3d 384, 396 (5th Cir. 2017). The alleged conduct "must be similar to the case at hand: Prior indications cannot simply be for any and all bad or unwise acts, but rather must point to **the specific violation in question**." *Johnson v. Harris County*, 83 F.4th 941, 946-47 (5th Cir. 2023)(quotation omitted, emphasis added). Only "very similar violations" can provide the "notice" to policymakers that would give rise to deliberate indifference. *See Jason v. Tanner*, 938 F.3d 191, 198 (5th Cir. 2019); *see also Robinson v. Midland County*, 80 F. 4th 704, 710 n. 3 (5th Cir. 2023).

Throughout his Complaint, Moses makes broad allegations about bad or unwise acts without the requisite specificity. He provides no facts that establish very similar conduct by other NOPD officers that provided requisite notice to the City. As such, he has not shown that policymakers had plausible notice of any misconduct that would give rise to "deliberate indifference."

### 1. *Moses's Evidence Fabrication and Suppression Claims*

At paragraphs 76 through 82, Moses alleges facts related to high incarceration and exoneration rates in the State of Louisiana and Orleans Parish. Notably, he does not plead any facts to establish the basis of the high rates incarceration, but he claims that the "actual perpetrators remain free," which seemingly indicates Moses recognizes that the State of Louisiana and Orleans Parish have a high frequency of criminal activity. Although Moses acknowledges that criminal activity does take place in Louisiana and New Orleans, he fails to provide facts that would establish that incarcerations occur as a result of evidence fabrication or suppression by the NOPD.

At paragraphs 83 and 84, Moses merely recites his claims that NOPD has a pattern of condoning misconduct and also failed to train, supervise and discipline officers. (Moses's failure to train claims are the subject of subsection I.A.3, *infra*.) No facts are provided regarding NOPD condoning misconduct, and no facts are provided that establish the NOPD failed to train, supervise and discipline officers.

At paragraph 85, Moses, quoting the opinion of an unidentified source, claims that the NOPD of the 1990s was a "troubled and unruly police department." He then references an "FBA [sic] investigation" that called the NOPD "a completely broken police department," and similar generalized opinion statements from a criminology professor and a U.S. Attorney.[22] It is unclear

---

[22] *Id.* at ¶¶ 86-88.

8

how the quoted opinions concern the claims made by Moses. Additionally, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Fernandez–Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir.1993).

Next, Moses provides statistics related to criminal charges against NOPD officers, none of which relate to the fabrication or suppression of evidence or appear to have any bearing on his allegations against the detectives in this case.[23]

Moses then references a study by the International Association of Chiefs of Police (IACP) which reported deficiencies in training and supervision at the NOPD.[24] He quotes, again, generalized opinion statements. At no point, does Moses allege that this report provided any finding related to the fabrication or suppression of evidence or even the NOPD's training regarding the handling of evidence.

At paragraph 95, Moses quotes an unidentified City councilperson who alludes to "deeply seeded and widespread" problems at the NOPD without pleading additional facts which might indicate what these problems could be. Moses does not provide any facts that would establish the quoted statement has anything to do with fabricating or suppressing evidence.

At paragraph 96 and 97, Moses points to a 1995 study by the New Orleans Human Relations Committee which found issues with the chain of command and management in NOPD districts. However, this study was conducted *after* Moses was arrested and could not thereby provide the "notice" needed to give rise to "deliberate indifference" to any purported misconduct. Further, even if the study was conducted prior to his arrest, Moses does not plead facts to show that this study made any determination regarding the NOPD fabricating or suppressing evidence.

---

[23] *Id.* at ¶ 89-90.
[24] *Id.* at ¶¶ 91-94

At paragraphs 98 and 99, Moses repeats his conclusory allegations, asserting the existence of an NOPD practice of condoning the fabrication and suppression of evidence, without providing factual support. He also recites again his vague failure to train, supervise, and discipline claims.

At paragraph 100, Moses references another study, conducted by the Louisiana National Guard in partnership with the City, that found deficiencies in training and that "little action has been taken to improve the situation." No further facts are alleged, and the reader is left wondering what deficiencies were alleged by the Louisiana National Guard.

In short, Moses pleads no facts related to a pattern of evidence fabrication or suppression. He merely provides generalized conclusions about the NOPD as a whole without connecting any specific past violations to the facts of his case.

### 2. Moses's "Blue Curtain" claim

Moses then asserts another type of generalized claim with an even more tenuous connection to the specific allegations at bar. At paragraphs 101 through 103 he claims that NOPD maintained the "practice of a 'blue curtain,' or code of silence" among officers whereby misconduct "including the manufacture of evidence" and "the suppression of exculpatory evidence" was not reported or covered up.[25] This too is wholly conclusory.

Moses cites two cases in support of this claim: *Thomas v. City of New Orleans,* 687 F.2d 80, 82 (5th Cir. 1982) and *Christopher Hero v. Dep't of Police,* No. 1775 (Civil Service Commission, City of New Orleans, Mar. 17, 1983). *Thomas* related to the firing of an NOPD officer after he reported another officer's use of excessive force. *Hero* involved the firing of a paramedic shortly after he intervened to stop an NOPD officer from beating a shooting suspect. The misconduct underlying both cases is indeed reprehensible but has nothing to do with the

---

[25] *Id.* at ¶ 100.

fabrication or suppression of evidence. Moses never alleges any excessive use of force by any NOPD officer in his Complaint. He has also not pleaded sufficient facts to suggest that a "code of silence" deprived him of any right. Alleged contradictions in witness statements taken by NOPD detectives hardly implies a cover-up.  Indeed, it is evident the alleged contradictions are contained in the NOPD reports that were turned over to the OPDA, which would necessarily undermine Moses' cover-up theory. Moreover, a finding that the OPDA withheld such statements from Moses's defense counsel, similarly, does not implicate any action taken by the NOPD or the City – let alone the existence of a widespread cover-up practice or policy.

Further, claims based on a "code of silence" theory are consistently disfavored by the Fifth Circuit. In *York v. Welch*, No. 20-40580, 2024 WL 775179, at *6,8 (5th Cir. Feb. 26, 2024) the Court recently explained that these claims are interpreted as ratification claims and that "precedent has limited ratification to 'extreme factual situations.'" *See also, Snyder v. Trepagnier,* 142 F.3d 791,797-98 (5th Cir. 1998); *Coon v. Ledbetter*, 780 F. 2d 1158, 1161 (5th Cir. 1986).

The *York* Court found that "generic statistics" proffered by the plaintiffs lacked the context necessary to render their code-of-silence claims plausible. *Id.* at *8. The Court held that "cover-up" allegations based *solely* on the events underlying the lawsuit, "suggest[ed] that any cover-up was an isolated incident and 'not the persistent, often repeated constant violations that constitute custom and policy.'" *Id.* (citing *Campbell v. City of San Antonio*, 43 F.3d 973, 977 (5th Cir. 1995). Such is the case here.

### 3. *Moses's failure to train, supervise, and discipline claims.*

Failure to train, supervise, and discipline claims are all types of *Monell* claim that require a plaintiff to meet the same specialized standard.[26]

---

[26] *See Peña v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (stating standard for failure to train or supervise); *Hunter v. City of Houston*, 564 F. Supp. 3d 517, 529 (S.D. Tex. 2021), appeal dismissed sub nom. *Hunter*

To state a claim that a municipality is liable for failing to train, supervise, or discipline an employee, the plaintiff must allege "(1) that the municipality's training, supervisory, or disciplinary policies or practices were inadequate, (2) that the municipality was deliberately indifferent in adopting [these] deficient polic[ies], and (3) that the inadequate training, supervisory, or disciplinary polic[ies] directly caused the violations in question." *Watt v. New Orleans City*, 647 F. Supp. 3d 496, 502 (E.D. La. 2022), aff'd, No. 23-30050, 2023 WL 6807033 (5th Cir. Oct. 16, 2023)(internal citations omitted). Moreover, "absent specific allegations supporting a plausible causation inference" such a claim is a legal conclusion that "warrants dismissal under Rule 12(b)(6)." *Ratliff v. Aransas Cnty., Texas*, 948 F.3d 281, 285 (5th Cir. 2020).

Moses has provided what amounts to little more than a recitation of claims. As discussed in Section I.A.1, *supra*, he references studies that appear to conclude that there are global deficiencies in NOPD training and supervision, but without the specificity required to support any plausible causation inference as to a violation of his rights.[27] At paragraphs 91 through 94, he provides scant details regarding the findings of the IACP study with respect to deficiencies in NOPD supervision. These include that "commanders and supervisors do not establish goals or objectives for their subordinates," that "a number of" NOPD officers had not "received management/command/supervisory experience" in the last four years, and that there were flaws in the establishment of performance expectations.[28] However, Moses does not connect these purported deficiencies with any of the alleged misconduct asserted in this litigation.

Moses provides even fewer details regarding the other studies he references in support of his failure to train, supervise, and discipline claims. At paragraph 96, Moses points to a 1995 study

---

*v. City of Houston, Texas*, No. 21-20632, 2022 WL 1782610 (5th Cir. Mar. 21, 2022) (citing *Deville v. Marcantel*, 567 F.3d 156, 171 (5th Cir. 2009)) (noting test for failure to discipline).

[28] R. Doc. No. 1 at ¶ 93.

12

by the New Orleans Human Relations Committee that found problems in the management of NOPD districts. This opinion has no relation to the homicide unit because it is not part of an NOPD district.[29] He alleges no specific facts which might connect this assertion to his case. As previously discussed, this study was also published *after* Moses's arrest.

At paragraph 100, Moses references a conclusion from a National Guard Study, finding that the NOPD "did not understand, or simply choose [sic] to ignore, the importance of training." This, again, is a conclusory statement that Moses does not elaborate upon by alleging any facts.

Moses also argues, generally, that the City "failed to promulgate proper or adequate polices or procedures for training and supervision."[30] But he provides no plausible support for this claim either. A failure to promulgate claim "must amount to an intentional choice, not merely unintentionally negligent oversight." *Grant v. LeBlanc,* No. 21-30230, 2022 WL 301546, at *5 (5th Cir. Feb. 1, 2022)(quoting *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 392 (5th Cir. 1992)). Moses has not pleaded any facts that would meet this high standard. He has not alleged an intentional choice by the NOPD to not train its employees on the handling of evidence. Moreover, he has not alleged what policymaker would be making this purported choice.

Thus, Moses has not satisfied any of the elements required for a cognizable failure to train, supervise, or discipline claim.

### B. Moses's has not identified a policymaker at the City.

In addition to failing to satisfy the "official policy" prong of *Monell*, Moses has also failed to identify the requisite policymaker.

---

[29] In 1995 there were 8 NOPD districts in the City of New Orleans. The Homicide Section, which was responsible for the investigation at issue, was a part of the Investigative Services Bureau which was a City-wide Bureau and not limited to a district.
[30] *Id.* at ¶ 198-199.

"A city cannot be liable for an unwritten custom unless 'actual or constructive knowledge' of such custom is attributable to a city policymaker." *Peña v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (quoting *Hicks-Fields*, 860 F.3d at 808).

In *Peña*, the Fifth Circuit found the policymaker element unsatisfied when a plaintiff's complaint "invite[d] no more than speculation that any particular policymaker, be it the chief of police or the city commission, knew about the alleged custom" of tasing non-threatening non-suspects. *Id.* Given the plaintiff's "utter failure to allege facts connecting this floating custom to any particular policymaker," she could not demonstrate any actual or constructive knowledge of the custom. *Id.* at 623, n. 15.

Moses's claims fail for the same reasons. He blames the City's "final policymakers" for a purported policy that deprived him of his rights without identifying who these policymakers might be.[31] Even if Moses was able to establish an official policy based on a pattern of constitutional violations, he has not pleaded any facts that would demonstrate that the City had actual or constructive knowledge of the pattern.

It is also important to note that Moses's Complaint is predicated on a *Brady* violation by the OPDA.[32] He alleges that exculpatory information was improperly withheld from Moses's defense counsel by the State. Moses has pleaded no facts which would implicate a City policymaker for this violation or that the City was found liable for a *Brady* violation by any court that heard his case.[33] It goes without saying, the City has no authority over the OPDA and its prosecutorial decisions. The District Attorney is a state elected official, and the City has no control over the functions of the District Attorney's office.[34]

---

[31] *Id.* at ¶¶ 83, 101, 193, 194, 198, 200, 201.
[32] *Id.* at ¶¶ 139-147.
[33] *Id.*
[34] *See* La. R.S. 16:1-16.

Because Moses has not pleaded facts to establish that an official City policy promulgated by an official City policymaker was the moving force behind a violation of his constitutional rights, Moses's claims fail under *Monell*. Accordingly, his § 1983 claims against the City should be dismissed.

## II.     Moses has not established a claim under the Louisiana Constitution.

Moses fails to state a claim for a Louisiana constitutional violation against the City. Moses's Complaint contains a threadbare assertion that the "same conduct that violated Brown's federal constitutional rights also violated the rights that the Louisiana Constitution guarantees to Mr. Moses."[35]  Moses makes clear his federal and state constitutional rights are equivalent;[36] therefore, his state constitutional claims fail for the same reasons his federal claims fail.[37] Specifically, his conclusory allegation does not state a plausible claim against the City.

## CONCLUSION

Because Moses has failed to plead sufficient facts to support the foregoing claims, Moses's constitutional claims against the City should be dismissed.

        Respectfully submitted,

        /s/ *Corwin St. Raymond*
        **CORWIN ST. RAYMOND, LSB #31330**
        CHIEF DEPUTY CITY ATTORNEY
        **DONESIA D. TURNER, LSB #23338**
        CITY ATTORNEY
        1300 PERDIDO STREET
        CITY HALL - ROOM 5E03
        NEW ORLEANS, LOUISIANA 70112
        TELEPHONE:  (504) 658-9800
        FACSIMILE:   (504) 658-9868

---

[35] *Id*. at 207.
[36] *Id*. at 206.
[37] *See Brown v. Williams, et al.* No. 24-423, WL 4855323 (E.D. La. Nov. 21, 2024). *Brown* was a similar civil rights case arising from a vacated conviction. Plaintiff asserted identical state constitutional claims as here. (No. 24-423, R. Doc. 1. at 196 – 199.)  These claims were summarily dismissed by the Eastern District because Plaintiff's coextensive federal claims failed. *Id.* at *7.

E-MAIL: cmstraymond@nola.gov

*Counsel for Defendants the City of New Orleans*