UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| LARRY MOSES,<br><br>　　　　*Plaintiff*,<br><br>v.<br><br>THE CITY OF NEW ORLEANS, *et al.*,<br><br>　　　　*Defendants*. | Civil Action No. 24-01768<br><br>Section M<br>Judge Barry W. Ashe<br><br>Division 4<br>Magistrate Judge Karen Wells Roby |

### MEMORANDUM IN SUPPORT OF OPDA'S MOTION TO DISMISS

Defendant Jason R. Williams, in his official capacity as Orleans Parish District Attorney ("OPDA"), through undersigned counsel, respectfully submits this memorandum in support of his motion to dismiss the claims against OPDA in Plaintiff Larry Moses's First Amended Complaint (the "Complaint"), Doc. No. 30, pursuant to Federal Rule of Civil Procedure 12(b)(6). Even if accepted as true for purposes of this motion, Mr. Moses's factual allegations do not plausibly demonstrate that OPDA is responsible for any violation of his constitutional rights. Accordingly, Mr. Moses's claims against OPDA must be dismissed.

### INTRODUCTION

In 1995, Mr. Moses was unanimously convicted by a jury of murdering Alma Causey and Daniel Ratcliff during an armed robbery. Mr. Moses alleges that three NOPD detectives (Wayne Rumore, John Ronquillo, and Patrick Jones) worked with a witness (Frederick Stamps) to intentionally create a "false, fabricated narrative" implicating Mr. Moses in the murders. Doc. No. 30 at ¶¶ 46–53. He also suggests that NOPD detectives may have been responsible for another witness (Jean Barras) changing her initial account of the events to provide a "false and fabricated

1

account" implicating Mr. Moses. *Id.* at ¶ 60. Mr. Moses alleges that "the Defendant Officers did not ever disclose their own acts in fabricating evidence . . . ." *Id.* at ¶ 66.

Notwithstanding these allegations that NOPD officers secretly, and without the knowledge of prosecutors, intentionally fabricated evidence implicating an innocent man in two murders, Mr. Moses also seeks to hold OPDA liable for his allegedly wrongful conviction. Mr. Moses alleges that OPDA prosecutors failed to disclose information concerning one of the witnesses, Frederick Stamps, that would have been helpful to his defense. However, Mr. Moses has not adequately alleged that prosecutors violated his constitutional rights by failing to disclose material exculpatory evidence. And even if he could show a *Brady* violation, he has not adequately alleged that OPDA maintained any unconstitutional official policies that were the "moving force" causing the alleged *Brady* violation. OPDA therefore requests that Mr. Moses's claims be dismissed.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "To be plausible, the complaint's 'factual allegations must be enough to raise a right to relief above the speculative level.'" *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 210 (5th Cir. 2010) (quoting *Twombly*, 550 U.S. at 555). The Court must "accept all well-pleaded facts as true," but it should not "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Id.* (quotation omitted).

2

**LAW AND ARGUMENT**

**I.   Mr. Moses has not adequately alleged that OPDA suppressed material exculpatory evidence.**

"The prosecutor has no constitutional duty to make a complete and detailed accounting of all police investigatory work on a case—to routinely deliver his entire file—to defense counsel." *United States v. Brown*, 628 F.2d 471, 473 (5th Cir. 1980); *see also Miller v. Dretke*, 431 F.3d 241, 245 (5th Cir. 2005) ("The Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense.") (quotation omitted). "To prevail on [a] *Brady* claim, [a plaintiff] must show that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defense, and (3) the evidence was material." *Lawrence v. Lensing*, 42 F.3d 255, 257 (5th Cir. 1994).

"Evidence is material only where there exists a reasonable probability that had the evidence been disclosed the result at trial would have been different." *Felder v. Johnson*, 180 F.3d 206, 212 (5th Cir. 1999). "[A]lleging a speculative outcome is insufficient. Rather, a petitioner must demonstrate a reasonable probability that the result at trial would have been different." *Dickson v. Quarterman*, 462 F.3d 470, 478 (5th Cir. 2006). The "materiality" analysis "implicate[s] the totality of the evidence presented at trial." *United States v. Cessa*, 861 F.3d 121, 129 (5th Cir. 2017). "[B]ecause the court must judge the effect of the evidence on the jury's verdict, the *Brady* decision can never be divorced from the narrative of the trial." *Banks v. Thaler*, 583 F.3d 295, 321 (5th Cir. 2009) (quotation omitted). "[T]he court must consider not simply the withheld evidence in isolation, but also the quantity and quality of other evidence in the record." *Id.* (quotation omitted).

The claims against OPDA are based on alleged nondisclosure of vaguely described "information" about the "unreliability, bias, substance use issues, and mental health instability and

3

diagnosis" of one witness, Frederick Stamps—defined in the Complaint as "the Stamps *Brady* Material." Doc. No. 30 at ¶ 69. Mr. Moses alleges that this information "would have been favorable to [him] at trial and could have helped him prove his innocence and/or obtained an acquittal by challenging the quality of the police investigation, the credibility of the officers, the credibility of Mr. Stamps, and in other ways favorable to [him]." *Id.* at ¶ 70.

Yet Mr. Moses provides no further explanation of exactly what this "information" was. Nor does he explain (beyond the conclusory statement quoted above) exactly how the information could have been used at trial to impeach the testimony of the state's witnesses or to otherwise "prove his innocence." Mr. Moses's allegations about the testimony and evidence presented at trial are contained in a single sentence: "[B]oth Detective Defendants testified consistent with their fabricated documents; Mr. Stamps testified, completely inconsistently with his prior statements; and Ms. Barras testified inconsistently with her original statements but along the lines of the made-up account and 'voice identification' fabricated at some point before trial." Doc. No. 30 at ¶ 71. The facts alleged by Mr. Moses, even if accepted as true, simply do not allow this Court to consider the allegedly suppressed *Brady* evidence, in light of the totality of evidence presented at trial, and conclude that there is a reasonable probability that Mr. Moses would have been acquitted if the alleged *Brady* evidence had been disclosed. Mr. Moses's conclusory allegation that this evidence "could" have led to a different outcome does not adequately allege a constitutional violation.

## II. Mr. Walter has not adequately alleged that OPDA had an unconstitutional official policy, practice, or custom.

Even assuming for the sake of argument that Mr. Moses has adequately alleged that his constitutional rights were violated by nondisclosure of exculpatory evidence in connection with his criminal proceedings, he has not adequately alleged the elements necessary to hold OPDA liable. "Three essential elements must be established for a municipality to face § 1983 liability."

4

*Alvarez v. City of Brownsville*, 904 F.3d 382, 389 (5th Cir. 2018) (en banc). "There must be (1) a policymaker; (2) an official policy; and (3) a violation of a constitutional right whose 'moving force' is the policy or custom." *Id.* "An official policy usually exists in the form of written policy statements, ordinances, or regulations, but may also arise in the form of a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Id.* at 389–90 (quotation omitted). However, "[a] city cannot be liable for an unwritten custom unless ***actual or constructive knowledge of such custom is attributable to a city policymaker***." *Pena v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (quotation omitted, emphasis added). The plaintiff "must demonstrate that the policy was implemented with deliberate indifference to the known or obvious consequences that constitutional violations would result." *Id.* at 390 (quotations omitted). "The description of a policy or custom and its relationship to the underlying constitutional violation, moreover, cannot be conclusory; it must contain specific facts." *Guillot on behalf of T.A.G. v. Russell*, 59 F.4th 743, 752 (5th Cir. 2023).

Although Mr. Moses does not directly allege who OPDA's "policymakers" were at the time of his prosecution, OPDA infers from the Complaint that Mr. Moses is alleging that former District Attorney Harry Connick was the policymaker.[1] However, he has not adequately alleged that Mr. Connick adopted official policies that directly caused his constitutional rights to be violated or that Mr. Connick acted with deliberate indifference.

---

[1] *See, e.g.*, Doc. No. 30 at ¶ 113 (alleging that the District Attorney's Office was "led by Harry Connick Sr. from 1973 to 2003"); *id.* at ¶ 185 (alleging that "[t]he Orleans Parish District Attorney is responsible for all policies, practices, and customs of the Orleans Parish District Attorney's Office").

>    **1.    Because Mr. Moses has not alleged that OPDA had a facially unconstitutional official *Brady* policy, he must show that OPDA's alleged policymaker, Harry Connick, acted (or failed to act) with deliberate indifference.**

Mr. Moses does not allege that, at the time of his prosecution, OPDA had a formal, written policy instructing prosecutors to suppress *Brady* evidence.[2] He also does not allege that OPDA prosecutors were ever trained or otherwise instructed that they should avoid disclosure of exculpatory evidence in violation of the Constitution. Mr. Moses alleges that "the District Attorney maintained a widespread custom and practice of [sic] whereby ADAs freely—and egregiously—violated the constitution's duty to disclose favorable evidence." Doc. No. 30 at ¶ 116. But this vague and conclusory allegation is entitled to no weight and should not be accepted by the Court. At best, this allegation concerns a *result*—not an official custom or practice.

Failure to disclose exculpatory evidence can occur for a variety of reasons. For example, it may occur because a prosecutor deliberately seeks to hide favorable evidence from the defense to ensure a conviction. It may occur because a prosecutor, due to time and workload pressures, fails to thoroughly seek out and review evidence in the State's possession that may be exculpatory. It may occur if a prosecutor is aware of the evidence but does not appreciate its exculpatory nature. It may occur due to simple misunderstandings or miscommunications between prosecutors as to what has already been disclosed to the defense. It may be attributable to the prosecutor's incorrect or incomplete knowledge of the governing law, or it may not. And as Mr. Moses acknowledges, it

---

[2] Mr. Moses does allege that OPDA had a written policy manual addressing *Brady* disclosures that was "incorrect" based on what it "suggest[ed]" and "impl[ied]." Doc. No. 30 at ¶¶ 126–128. But he does not contend that the policy manual actually instructed prosecutors to suppress evidence that is required to be disclosed under the Constitution.

even may occur without any fault whatsoever on the part of the prosecutor[3]—such as, for example, when a police officer conceals or deliberately misrepresents information.

Mr. Moses does not explain the specific alleged custom or practice among OPDA prosecutors that purportedly caused exculpatory evidence to be repeatedly withheld. Some of his allegations imply deliberate suppression of evidence, such as the claim that prosecutors were motivated to "win" by any means necessary, "even at the price of imprisoning innocent people." *See* Doc. No. 30 at ¶ 136. On the other hand, other allegations suggest that prosecutors inadvertently failed to identify and disclose exculpatory evidence due to time constraints and workload pressures. *See id.* at ¶ 124. His allegations of inadequate training and supervision, *see, e.g., id.* at ¶ 129, similarly imply unintentional failures to disclose due to ignorance or misunderstanding that could be remedied with better training and supervision. In other words, rather than identifying a specific "practice" among OPDA prosecutors that repeatedly caused *Brady* violations, he has alleged (at best) that, for a variety of reasons, *Brady* evidence was not disclosed to the defense in various cases over the years.

> **2. Mr. Moses has not adequately alleged that Mr. Connick acted with deliberate indifference because there was nothing to put him on notice, before Mr. Moses's conviction in 1995, that his office's policies were likely to cause *Brady* violations—particularly of the type alleged in Mr. Moses's case.**

Because Mr. Moses has not adequately alleged that OPDA promulgated official policies that are facially unconstitutional and that caused his alleged injuries, he must demonstrate deliberate indifference on the part of OPDA's alleged policymaker, Harry Connick. *See, e.g., Edwards v. City of Balch Springs*, 70 F.4th 302, 309 (5th Cir. 2023). He has failed to do so.

---

[3] *See* Doc. No. 30 at ¶ 121 (alleging that failure to disclose *Brady* material "is a constitutional violation, regardless of the prosecutor's subjective intent"); *id.* at ¶ 122 (alleging that "[e]ven if an officer prosecutor [sic] inadvertently failed to disclose *Brady* material or simply misunderstood the significance of the evidence in the context of the case, a constitutional violation has occurred").

"Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of a city 'policy or custom' that is actionable under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). "Municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by city policymakers." *Id.* (quotation omitted). "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quotation omitted). "Knowledge on the part of the policymaker that a constitutional violation ***will most likely result*** from a given official custom or policy is a *sine qua non* of municipal liability under section 1983." *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003) (emphasis added). "Deliberate indifference is a degree of culpability beyond mere negligence or even gross negligence; it must amount to an intentional choice, not merely an unintentionally negligent oversight." *Alvarez*, 904 F.3d at 391 (quotation omitted).

"Because the standard for municipal fault is a stringent one, a pattern of similar constitutional violations by untrained employees is ordinarily required to show deliberate indifference." *Pena v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (quotations omitted); *see also Davidson v. City of Stafford*, 848 F.3d 384, 396 (5th Cir. 2017) ("A pattern requires similarly, specificity, and sufficiently numerous prior incidents."). The Fifth Circuit has explained that only "very similar violations" can provide the "notice" to policymakers that would give rise to deliberate indifference. *See Jason v. Tanner*, 938 F.3d 191, 198 (5th Cir. 2019); *see also Robinson v. Midland County*, 80 F.4th 704, 710 n.3 (5th Cir. 2023) ("The deaths of other inmates are not sufficiently similar to put the county on notice of a failure to provide adequate

8

medical care because only one of them is alleged to have involved a failure to follow proper procedures, and none of the allegations involve fabrication of medical reports."); *Johnson v. Harris County*, 83 F.4th 941, 946–47 (5th Cir. 2023) (The "specific facts" of the alleged practice "must be similar to the case at hand: Prior indications cannot simply be for any and all bad or unwise acts, but rather must point to the specific violation in question.") (quotation omitted).

Although Mr. Moses alleges that "[i]n 1994 and 1995, the District Attorney was aware that *Brady* violations were regularly committed in criminal cases prosecuted in Orleans Parish, Doc. No. 30 at ¶ 130, this conclusory allegation must be disregarded because it is not supported by well-pleaded facts. Mr. Moses has failed to allege *facts* that would have put Mr. Connick on notice, before his conviction in 1995, of an urgent need to change OPDA's policies, training, or supervision with respect to *Brady* disclosures—particularly with respect to the alleged *Brady* issues in his own case.

Mr. Moses alleges that "Orleans Parish prosecutors and/or NOPD officers committed a pattern of *Brady* violations" in 41 cases over a 32-year period (between 1967 and 1999). Doc. No. 30 at ¶ 142.[4] But even accepting for purposes of this motion that all of these cases involved *Brady* violations, Mr. Moses does not allege any facts showing that OPDA's policymaker, Mr. Connick, was aware of such violations at the time they occurred. Nor does he allege that Mr. Connick was made aware of them even *after* they occurred. With one exception (*Kyles v. Whitley*), Mr. Moses provides no information about the post-conviction proceedings in any of these cases, including the

---

[4] Mr. Moses contends that his list of alleged *Brady* violations is "necessarily underinclusive" because it does not include *Brady* violations in cases resolved through plea deals. Doc. No. 30 at ¶ 143. However, it is "settled precedent" in the Fifth Circuit that "there [is] no constitutional right to *Brady* material prior to a guilty plea." *Alvarez v. City of Brownsville*, 904 F.3d 382, 392 (5th Cir. 2018) (en banc). Thus, there can be no *Brady* violation in a case resolved by guilty plea.

9

dates of any court decisions finding *Brady* violations.[5] Without this information, Mr. Moses cannot even begin to show that these cases put Mr. Connick on notice of problems with his office's policies before the date of Mr. Moses's conviction.[6] Indeed, at least 11 of the cases were not even *prosecuted* until after Mr. Moses's conviction in 1995, so they could not possibly have provided notice at the relevant time. Mr. Moses also has not shown that the alleged *Brady* violations in these other cases were "very similar" to the alleged violations in his case. *See Jason*, 938 F.3d at 198.

The Fifth Circuit's recent decision in *Verastique v. City of Dallas*, 106 F.4th 427 (5th Cir. 2024), further demonstrates the inadequacy of Mr. Moses's allegations. In *Verastique*, plaintiffs alleged that a Dallas police officer, Roger Rudloff, used excessive force while arresting them during widespread protests. They sought to hold the City of Dallas liable under *Monell*, alleging that there were 19 prior complaints of misconduct **by Mr. Rudloff** over 23 years. However, the Fifth Circuit affirmed the district court's dismissal of the claim on the pleadings, concluding that the other incidents were "not sufficiently similar, specific, or numerous." *See Verastique*, 106 F.4th at 432–34. The Fifth Circuit first explained that the allegations regarding the 19 other incidents were "devoid of critical factual enhancement," including facts that would have elucidated how and why the incidents occurred: "Plaintiffs, for example, cite five incidents allegedly involving a flashlight or nightstick. Some are listed incident-by-incident. But all still remain totally devoid of

---

[5] Moreover, with respect to that one case, Mr. Moses mischaracterizes the facts. Mr. Moses describes *Kyles v. Whitley* as an example of a case where "Orleans Parish ADAs violated *Brady*" between "October 1992 and August 1997." Doc. No. 30 at ¶ 139. But the trial and conviction in *Kyles*—and, therefore, any *Brady* violation—occurred in 1984. *See Kyles v. Whitley*, 514 U.S. 419, 430 (1995).

[6] *See, e.g.*, *Truvia v. Connick*, 577 F. App'x 317, 324 (5th Cir. 2014) ("Appellants' citations to over a dozen federal and state to show a 'continuum' of *Brady* violations are not probative because the vast majority of them occurred after Appellants were convicted in July 1976. The two cases that predated July 1976 . . . surely did not convey the requisite notice under a failure-to-train theory.").

critical facts. What prompted the encounters? Did the individuals threaten Rudloff with physical harm? Were they attempting to resist arrest?" *Id.* at 432.

In *Verastique*, the Fifth Circuit went on to explain that, even assuming these other alleged incidents were "sufficiently specific and similar" to the constitutional violations alleged in the lawsuit, they were insufficient as a matter of law to "create a pattern capable of providing constructive notice":

> It took twenty-three years to amass the nineteen incidents mentioned in the complaint. Plaintiffs posit that the protracted time span works in their favor. In their view, the fact that the incidents occurred over two decades further evinces a consistent pattern of failed discipline. Incorrect.
>
> Given a constant number of incidents, a longer time span yields a *lower rate* of violations—*militating against* constructive notice. Nineteen allegations over the span of twenty-three years yields a mere annualized incident rate of 0.826. In other words: Plaintiffs—at most—show that, for over two decades, Rudloff, on average, received *fewer than one accusation of misconduct per year*.

*Verastique*, 106 F.4th at 433–34.

The Fifth Circuit further explained that the complaint failed to provide information "such as department size and number of arrests" that would "provide the context necessary to evaluate whether an alleged department-wide pattern is so obvious as to impart constructive notice." *Verastique*, 106 F.4th at 434. The Fifth Circuit explained that "it is *impossible* to identify the existence of a pattern—much less one that imparts constructive notice," without such context. *Id.* That is because "[g]iven a constant number of incidents, the percentage of conduct supporting a pattern of illegality shrinks as the size of the police department or the number of arrests increases." *Id.* Thus, the plaintiffs failed to show "whether nineteen incidents over twenty-three years is sufficiently frequent to be obvious in the context of [the Dallas Police Department]," which "employs 3,200 to 3,300 officers and serves one of the largest cities in the nation." *Id.* at 10.

Critically, the allegations in *Verastique* involved 19 incidents *by a single police officer*—not across the entire police department. Applying the same standard, Mr. Moses does not come close to alleging a pattern that has "occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice." *Davidson v. City of Stafford*, 848 F.3d 384, 396 (5th Cir. 2017).

More recently, in *Damond v. City of Rayville*, _ F.4th _, 2025 WL 409795 (5th Cir. Feb. 6, 2025), the Fifth Circuit held that the plaintiff failed to adequately allege a "custom of allowing inmate-on-inmate violence by failing to separate violent and non-violent inmates" at the Richland Parish Detention Center. The Fifth Circuit noted that the plaintiff had identified "six instances in which inmates attacked others but were later returned to their dormitory." *Id.* at *2. The Fifth Circuit explained, however, that the plaintiff had "fail[ed] to identify the jail personnel who were present for or involved in the violent incidents." *Id.* The Fifth Circuit further explained that these incidents were "dissimilar to" the attack on the plaintiff, and that they "occurred over the course of several months, were motivated by differing factors, and took place in different locations." *Id.* The Fifth Circuit concluded that "[t]hese alleged incidents are insufficient to allege a custom or policy of tolerating widespread, unprovoked violence in the detention center or to put the officials on notice of the repeated constitutional violations." *Id.* at *3.

Mr. Moses has alleged that *Brady* violations occurred in 30 Orleans Parish cases between 1967 and 1995 (the year of his conviction). *See* Doc. No. 30 at ¶ 142. Even assuming for the sake of argument that Mr. Connick was aware, by 1995, of *Brady* violations in all of these cases (which is factually false and not supported by Mr. Moses's pleadings), and even assuming that the alleged *Brady* violations in these cases were very similar to the alleged violations in Mr. Moses's case, the claims against OPDA would still fail. Failure to disclose evidence in 30 cases over a 28-year

12

period—a rate of just over one per year, out of thousands of cases prosecuted each year by dozens of prosecutors—hardly demonstrates an unconstitutional official policy.[7] As explained in *Connick v. Thompson*, "*Brady* mistakes are inevitable. So are all species of error routinely confronted by prosecutors: losing a *Batson* claim; crossing the line in closing argument; or eliciting hearsay that violates the Confrontation Clause." *Connick v. Thompson*, 563 U.S. 51, 73 (2011) (Scalia, J., concurring). Finding deliberate indifference based on *Brady* violations in a miniscule percentage of cases "would repeal the law of *Monell* in favor of the Law of Large Numbers." *Id.*

**III.     Mr. Moses has not adequately alleged that OPDA's official policies were the "moving force" causing an alleged *Brady* violation in his case.**

Finally, even if Mr. Moses could establish a constitutional violation and a constitutionally defective policy concerning the *Brady* disclosures, his allegations do not establish that it was the "moving force" causing the alleged *Brady* violation in his case—*i.e.*, that the prosecutor or prosecutors responsible for the disclosures in his criminal case were acting pursuant to such a policy when they allegedly failed to disclose the allegedly exculpatory information concerning Frederick Stamps. The Complaint includes no allegations as to which prosecutors did what, and when, concerning the alleged nondisclosure. As discussed above, the Complaint does not even explain specifically what the "Stamps *Brady* Material" was—much less whether, or when, any OPDA prosecutor became aware of it. Nor do the allegations provide even a hint as to why this

---

[7] *See also Peterson v. City of Fort Worth*, 588 F.3d 838, 852 (5th Cir. 2009) ("Although the record omits any evidence of the department's size or the number of its arrests, the department's own website indicates that it presently employs more than 1,500 officers, and that there were more than 67,000 incidents of crime in the last year alone. Given the department's size, and absent any evidence of its total number of arrests during the same time period, 27 incidents of excessive force over a period of four years do not reflect a pattern that can be said to represent official policy of condoning excessive force so as to hold the City liable for the acts of its employees' unconstitutional conduct. To hold otherwise would be effectively to hold the City liable on the theory of respondeat superior, which is expressly prohibited by *Monell*.").

13

evidence allegedly was not disclosed to the defense. Notably, the claims against OPDA are based on the alleged "misconduct" of "the District Attorney Defendants," which was allegedly "undertaken pursuant to the policy and practice of the District Attorney." Doc. No. 30 at ¶ 184. But nowhere in the Complaint does Mr. Moses define the term "District Attorney Defendants" or otherwise explain whose alleged actions OPDA is being sued for.

Without such basic information, Mr. Moses has not plausibly alleged that the prosecutors purportedly responsible for the nondisclosure in his case were acting pursuant to an unconstitutional policy.

## CONCLUSION

For the reasons explained above, the claims against Jason Williams, in his official capacity as Orleans Parish District Attorney, must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

Respectfully submitted,

/s/ Matthew J. Paul
W. Raley Alford, III, 27354
Matthew J. Paul, 37004
Inga C. Petrovich, 31284
STANLEY REUTER ALFORD
  OWEN MUNSON & PAUL, LLC
909 Poydras Street, Suite 2500
New Orleans, Louisiana 70112
Telephone: (504) 523-1580
Facsimile:  (504) 524-0069
wra@stanleyreuter.com
mjp@stanleyreuter.com
icp@stanleyreuter.com

*Counsel for Jason R. Williams (in his official capacity as Orleans Parish District Attorney)*