UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **LARRY MOSES** * | **CIVIL ACTION** |
| **Plaintiff** * | **NUMBER: 24-1768** |
| * | |
| **VERSUS** * | **SECTION "M"** |
| * | **JUDGE BARRY W. ASHE** |
| * | |
| **THE CITY OF NEW ORLEANS,** *et. al.* * | **MAGISTRATE** |
| **Defendants** * | **JUDGE KAREN WELLS ROBY** |
| ****************************************** | |

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

Defendant, the City of New Orleans (the "City") respectfully submits this memorandum in support of its motion to dismiss the claims against it in Plaintiff Larry Moses's ("Moses") First Amended Complaint, R. Doc. No. 30, pursuant to Federal Rule of Procedure 12(b)(6).

### INTRODUCTION

This is a civil rights case arising from events leading to Moses's conviction for two murders in 1995 and the trial court's decision to vacate this conviction last year. Moses alleges that the State committed *Brady* violations by withholding information which would have revealed fabricated evidence and the unreliability of witnesses who testified against him.

After the City moved to dismiss the claims applicable to this motion, Moses filed his First Amended Complaint against the City of New Orleans; former New Orleans Police ("NOPD") detectives Wayne Rumore and John Ronquillo; the Successions of John Ronquillo; former NOPD detective Sergeants James Anderson and Patrick Jones; the Succession of Patrick Jones; and Orleans Parish District Attorney ("OPDA") Jason Williams.[1] He asserts federal law claims for the

---
[1] R. Doc. 30.

1

deprivation of civil rights under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments of the United States Constitution. He also asserts a *Monell* claim against the City and OPDA for allegedly maintaining unlawful policies, practices, and customs that ultimately led to his wrongful conviction. Lastly, Moses asserts several supplemental state law claims in connection with these allegations.

As discussed more fully below, Moses fails to state a claim upon which relief can be granted against the City. He has not established the requisite pattern of constitutional violations needed to demonstrate the existence of an official policy that resulted in a deprivation of his rights. Further, Moses has not pleaded sufficient facts to support a failure to train, supervise, or discipline claim. Accordingly, Moses's *Monell* claim against the City should be dismissed.

## FACTUAL BACKGROUND

In the early morning hours of January 4, 1994, Daniel Ratliff ("Ratliff") and Alma Causey ("Causey") were shot and killed during an armed robbery in the Ninth Ward of New Orleans.[2] NOPD detectives responded to the scene and spoke with witness Jean Barras ("Barras") who provided a description of the perpetrator and told the detectives she had heard him command the victims "something to the effect of get on the ground and give him their money."[3] The investigation subsequently "went completely cold."[4]

Approximately six months later, Frederick Stamps ("Stamps") reported he had been the victim of a robbery to the same NOPD district that responded to the murders.[5] Stamps claimed that this robbery was orchestrated by his ex-girlfriend, Gail Jenkins ("Jenkins") and a man he would

---

[2] *Id.* at ¶ 12.
[3] *Id.* at ¶¶ 21-22.
[4] *Id.* at ¶ 37.
[5] *Id.* at ¶¶ 39-40.

2

later identify as Moses.[6] Jenkins was arrested.[7] Moses alleges that—in reality—Stamps had threatened to harm Jenkins and when Moses sought to intervene, a fight between him and Stamps ensued.[8]

A week later, the detectives spoke to Stamps about the double murder.[9] Moses alleges that during these conversations, it was apparent Stamps was mentally unstable and had a vendetta against Moses.[10] Moses further alleges that Stamps and the detectives then fabricated a narrative about the night of the murder that implicated Moses and recorded it in their written reports.[11] Moses alleges that this narrative was inconsistent with the narrative initially provided by Barras.[12] Stamps told the detectives he had witnessed Moses commit the murders and later identified him from a photo lineup.[13]

Moses alleges that at some point after he was charged, the detectives spoke again with Barras, and she told them for the first time that she had recognized Moses's voice the night of the murder.[14] Moses alleges that this too was "made-up."[15] Moses was convicted for the murders and sentenced to life in prison.[16] He argues that his conviction was the result of the State withholding information that would have revealed the fabrication of the police narrative and Barra's voice-identification as well as the unreliability of Stamps.[17]

---

[6] *Id.* at ¶ 41.
[7] *Id.* at ¶ 44.
[8] *Id.* at ¶ 43.
[9] *Id.* at ¶ 46.
[10] *Id.* at ¶ 47.
[11] *Id.* at ¶¶ 48-49.
[12] *Id.* at ¶ 51.
[13] *Id.* at ¶¶ 49,52.
[14] *Id.* at ¶ 60.
[15] *Id.* at ¶ 66.
[16] *Id.* at ¶ 74.
[17] *Id.* at ¶ 73.

Following a joint investigation by the New Orleans Innocence Project ("IPNO") and the OPDA decades later, a post-conviction relief hearing was held.[18] The court found that the OPDA had violated *Brady* in withholding the favorable information.[19] Moses did not allege in his Application for Post-Conviction Relief, and the court did not find that City or NOPD officers did anything wrong relative to Moses's conviction.[20] Moses's conviction was vacated, and he subsequently filed the instant suit.[21]

## PROCEDURAL HISTORY

On July 15, 2024, Moses filed his initial Complaint.[22] On December 9, 2024 the City filed its First Motion to Dismiss pursuant to Rule 12(b)(6).[23] On January 24, 2024, Moses filed his First Amended Complaint.[24] The Court subsequently dismissed the City's First Motion to Dismiss as moot.[25] The City now submits this memorandum in support of its Motion to Dismiss Moses's First Amended Complaint.

## LEGAL STANDARD

A motion under Federal Rule of Civil Procedure 12(b)(6) challenges whether the plaintiff has asserted "a claim upon which relief can be granted." "Under Rule 12(b)(6), a claim may be dismissed when a plaintiff fails to allege any set of facts in support of his claim which would entitle

---

[18] *Id.* at ¶ 145.
[19] *Id.* at ¶¶ 147-152.
[20] Exhibit 1 – State of Louisiana v. Larry Moses, Criminal District Court Case No. 371-524 "D" - Post-Conviction Hearing Ruling dated May 25, 2023. Moses's Complaint repeatedly quotes this ruling (R. Doc. 1 at ¶¶ 141-146), and "'[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the plaintiff's] claims.'" *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000). (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)). Further, it is well-established and "'clearly proper in deciding a 12(b)(6) motion [that a court may] take judicial notice of matters of public record.'" *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (quoting *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007)) (citing *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994)).
[21] R. Doc. No. 1 at ¶ 147.
[22] R. Doc. 1.
[23] R. Doc. 25.
[24] R. Doc 30.
[25] R. Doc 31.

4

him to relief." *Taylor v. Books A Million, Inc.*, 296 F. 3d 376, 378 (5th Cir. 2002) (citing *McConathy v. Dr. Pepper/Seven Up Corp.,* 131 F. 3d 558, 561 (5th Cir. 1998)). "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead enough facts to "state a claim to relief which is 'plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544,570 (2007)). A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In conducting that review, the court accepts all well-pleaded facts as true, drawing "all reasonable inferences in favor of the nonmoving party." *Harmon v. City of Arlington, Texas*, 16 F.4th 1159, 1162 (5th Cir. 2021) (quoting *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (en banc)). The court is not, however, bound to accept as true legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678. "[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Taylor*, 296 F. 3d at 378. (internal quotations omitted).

## LAW AND ARGUMENT

### I.  Moses has not established that the City is liable under *Monell.*

It is well settled that municipalities are subject to lawsuits under § 1983. *Monell v. Department of Social Services*, 436 U.S. 658 (1978). A government entity cannot be held liable under § 1983 pursuant to a theory of *respondeat superior*; rather, it can only be responsible when the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may be fairly said to represent official policy, inflicts the injury." *Id.* at 694. Thus, to establish municipal liability under §1983, "a plaintiff must show that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Hicks-Fields v. Harris Cnty. Tex.,* 860 F.3d 803, 808 (5th Cir. 2017) (quoting

*Peterson v. City of Fort* Worth, 588 F.3d 838, 847 (5th Cir. 2009)). An official policy usually exists in writing but "may also arise in the form of a widespread practice that is so common and well-settled as to constitute a custom." *Alvarez v. City of Brownsville*, 904 F.3d 282, 390 (5th Cir. 2018)(en banc). To succeed on a municipal claim under § 1983, a plaintiff must also show that "the policy was implemented with deliberate indifference to the known or obvious consequences that constitutional violations would result." *Id.* "Deliberate indifference is a degree of culpability that goes beyond mere negligence or even gross negligence; it must amount to an intentional choice, not merely an unintentional oversight." *James v. Harris County*, 577 F.3d 612, 617–18 (5th Cir. 2009)(quoting *Rhyne v. Henderson County,* 973 F.2d 386, 392 (5th Cir. 1992)).

Moses has asserted several constitutional claims based on the alleged actions of the NOPD detectives who investigated the murders of Ratliff and Causey. These include violations of due process (Count 1), deprivation of liberty (Count 2), failure to intervene (Count 3), and civil rights conspiracy (Count 4). He argues, generally, that because the NOPD is operated by the City, these violations were undertaken pursuant to the "policy and practices" of the City (Count 6). However, Moses has not pleaded plausible facts to support that any official policy promulgated by a City policymaker was the moving force behind the violation of his rights. His claims against the City should be dismissed.

> **A. Moses has not established the requisite pattern of constitutional violations needed to demonstrate the existence of an official policy.**

A civil rights plaintiff may carry his burden of proof under the official policy prong of *Monell* in three ways. *See Brown v. Bryan Cnty., OK*, 219 F.3d 450,457 (5th Cir. 2000). First, he can demonstrate the existence of "a policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority." *Id.* (quoting *Bennett v. City of*

6

*Slidell*, 735 F. 2d 861, 862 (5th Cir. 1984)(en banc)). Second, an official policy can also be evidenced by custom, that is, "[a] persistent, widespread practice of city officials or employees, which although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Id.* (quoting *Bennett,* 735 F. 2d at 862). Finally, "[w]hen the person who committed the challenged act is in charge of policymaking in that part of the government, 'policy' can sometimes be found to have been established by the very act itself." *Hampton Co. Nat'l Surety, LLC v. Tunica Cnty., Miss.,* 543 F. 3d 221, 227 (5th Cir. 2008).

Here, Moses does not allege the existence of any written unconstitutional policy; nor does he allege that his rights were violated by the person in charge of policymaking. Rather, it appears he attempts to demonstrate the existence of an official policy through custom, that is, a pattern of violations by NOPD detectives that resulted in wrongful convictions. However, he has only provided what amounts to broad conclusory assertions. Moses's central allegation against the City, as described above, is that NOPD detectives allegedly fabricated and suppressed evidence during their investigation of the Ratliff and Causey murders, and that doing so resulted in Moses being wrongly convicted for the crime. Moses has pleaded no facts which would connect any known pattern of misconduct to these allegations.

Moses also alleges the existence of a "blue curtain" or code of silence among NOPD officers whereby wrongdoing by police is never reported. However, he fails to establish the requisite pattern of conduct to establish this custom as well. He also fails to connect this allegation to the facts of his case. Finally, Moses alleges that the NOPD failed to train, supervise, and discipline its officers, but again, pleads little more than a conclusory recitation of elements.

Establishing a municipal policy through a pattern of conduct requires "specificity and sufficiently numerous prior incidents." *Davidson v. City of Stafford,* 848 F.3d 384, 396 (5th Cir. 2017). The alleged conduct "must be similar to the case at hand: Prior indications cannot simply be for any and all bad or unwise acts, but rather must point to **the specific violation in question**." *Johnson v. Harris County*, 83 F.4th 941,946-47 (5th Cir. 2023)(quotation omitted, emphasis added). Only "very similar violations" can provide the "notice" to policymakers that would give rise to deliberate indifference. *See Jason v. Tanner*, 938 F.3d 191, 198 (5th Cir. 2019); *see also Robinson v. Midland County*, 80 F. 4th 704, 710 n. 3 (5th Cir. 2023).

Throughout his First Amended Complaint, Moses makes broad allegations about bad or unwise acts without the requisite specificity. His Amended Complaint is deficient for the same reasons as his original Complaint, and his additional allegations against the City (located primarily at paragraphs 86 – 88) due nothing to cure this deficiency.

Moses provides no facts that establish very similar conduct by other NOPD officers that provided requisite notice to the City. As such, he has not shown that policymakers had plausible notice of any misconduct that would give rise to "deliberate indifference."

### 1. Moses's Evidence Fabrication and Suppression Claims

At paragraphs 75 through 78, Moses alleges facts related to high incarceration and exoneration rates in the State of Louisiana and Orleans Parish. Notably, he does not plead any facts to establish the basis of the high rates incarceration, but he claims that the "actual perpetrators remain free," which seemingly indicates Moses recognizes that the State of Louisiana and Orleans Parish have a high frequency of criminal activity. Although Moses acknowledges that criminal activity does take place in Louisiana and New Orleans, he fails to provide facts that would establish that incarcerations occur as a result of evidence fabrication or suppression by the NOPD.

At paragraph 79 through 81, he provides similarly general statistics about the rate of exonerations in Orleans parish. He does not connect these to the facts of his case, alleging only that most exonerations involved "some form of police officer misconduct and the suppression of favorable evidence." Moses is conflating *Brady* allegations against the OPDA with police misconduct as he does throughout his Amended Complaint.

At paragraphs 82 through 84, Moses merely recites his claims that NOPD has a pattern of condoning misconduct and also failed to train, supervise and discipline officers. (Moses's failure to train claims are the subject of subsection I.A.2, *infra*.)  No facts are provided regarding NOPD condoning misconduct, and no facts are provided that establish the NOPD failed to train, supervise and discipline officers.

At paragraph 85 through 87, Moses makes factual allegations that were not included in his original Complaint, providing for the first time, a series of cases that could ostensibly be used to establish a pattern of NOPD misconduct. However, none of the 11 cases Moses cites relate to the fabrication of evidence by NOPD officers and most appear to be referenced in a manner that deliberately conflates his evidence suppression claims against the NOPD with his *Brady* claims against the OPDA.

For example, at paragraph 87, subpart iii, Moses cites to the *Issac Knapper* case as an example of a conviction being overturned because a "detective serving as the lead investigator had failed to turn over his report." This report "contradicted evidence put on by the State and the NOPD detective at trial, including differing witness descriptions of the perpetrator, and confirmation that the gun used to kill the victim was the same gun used in a similar armed robbery in the area just a month earlier for which the gunman was identified." However, at paragraph 142, subpart ix, Moses cites to the same *Issac Knapper* case as part of his argument against the OPDA. There he provides

9

that "*prosecutors* failed to disclose a police report that contradicted the prosecution's evidence and police witness testimony, including by confirming that the gun used to murder the victim was linked to another crime with a different, identified shooter."

If prosecutors had this exculpatory police report, it was provided to them by the NOPD and the allegation that the NOPD suppressed evidence in this case is not plausible. Moses's references to the *Reginald Adams, John Adams, Curtis Lee Kyles, Jerome Morgan, Eddie Triplett, and Cedric Dent* cases similarly conflate his allegations against the NOPD and OPDA.[26]

The handful of cases Moses references that do not appear to be re-purposed from his argument against the OPDA, do little to establish a pattern of evidence fabrication and evidence suppression by the NOPD that could have provided the notice to the City to give rise to "deliberate indifference." Eddie Tripplett was convicted in 1998 and Jarvis Ballard was convicted in 1999, [27], both of which were after Moses's conviction in 1995. Moses alleges no facts to establish that the NOPD contributed in anyway to the wrongful conviction of Malcom Alexander.[28] And although the misconduct alleged regarding the convictions of Norman Clark and Bobbie Jean Johnson is deplorable, neither represent the "specific violation in question" here.

Further, that Fifth Circuit has made clear that establishing a pattern of misconduct under *Monell* requires more than a handful of isolated actions by individual officers. In *Armstrong v. Ashley,* 60 F.4th 262 (5th Cir. 2023), the court held that "nine constitutional violations over a 24-year period and thousands of prosecutions are hardly sufficient to show a municipal custom." Even if the Clark and Johnson cases were considered to represent the same misconduct as the instance case, they would not be sufficient to show a custom.

---

[26] Compare R. Doc. 30. at ¶87, subparts v, vii,viii, ix, and x with R. Doc 30. at ¶142, subparts xiii, xii, xv, xxv, xxxvii, xxxxiv respectively.
[27] *Id.* at ¶87, subparts x and xi.
[28] *Id.* at ¶87, subparts vi.

The remainder of Moses's allegations against the City are unchanged from his initial complaint and largely comprise opinion statements and global assessments of the NOPD without any specific relation to his factual allegations.

Moses, quoting the opinion of an unidentified source, claims that the NOPD of the 1990s was a "troubled and unruly police department."[29] He provides similar generalized statements from the FBI, a criminology professor, and U.S. Attorney.[30] It is unclear how the quoted opinions concern the claims made by Moses.

Moses also references a study by the International Association of Chiefs of Police (IACP) which reported deficiencies in training and supervision at the NOPD, but at no point, does Moses allege that this report provided any finding related to the fabrication or suppression of evidence or even the NOPD's training regarding the handling of evidence.[31]

Next, Moses provides statistics related to criminal charges against NOPD officers, none of which relate to the fabrication or suppression of evidence or appear to have any bearing on his allegations against the detectives in this case.[32]

At paragraph 100, Moses quotes an unidentified City councilperson who alludes to "deeply seeded and widespread" problems at the NOPD without pleading additional facts which might indicate what these problems could be.

At paragraph 101 through 104, Moses points to a 1995 study by the New Orleans Human Relations Committee which found issues with the chain of command and management in NOPD districts. However, this study was conducted *after* Moses was arrested and could not thereby

---

[29] *Id.* at ¶88.
[30] *Id.* at ¶¶89-90,96.
[31] *Id.* at ¶¶ 91-94
[32] *Id.* at ¶ 89-90.

11

provide the "notice" needed to give rise to "deliberate indifference" to any purported misconduct. Further, even if the study was conducted prior to his arrest, Moses does not plead facts to show that this study made any determination regarding homicide unit's handling of evidence, which is not a part of any NOPD district.[33]

At paragraphs 105, Moses repeats his conclusory allegations, asserting the existence of an NOPD practice of condoning the fabrication and suppression of evidence, without providing factual support. He also recites again his vague failure to train, supervise, and discipline claims.

In short, Moses pleads no facts related to a pattern of evidence fabrication or suppression. He merely provides generalized conclusions about the NOPD as a whole without connecting any specific past violations or study to the facts of his case.

### 2. *Moses's failure to train, supervise, and discipline claims.*

Failure to train, supervise, and discipline claims are all types of *Monell* claim that require a plaintiff to meet the same specialized standard.[34]

To state a claim that a municipality is liable for failing to train, supervise, or discipline an employee, the plaintiff must allege "(1) that the municipality's training, supervisory, or disciplinary policies or practices were inadequate, (2) that the municipality was deliberately indifferent in adopting [these] deficient polic[ies], and (3) that the inadequate training, supervisory, or disciplinary polic[ies] directly caused the violations in question." *Watt v. New Orleans City*, 647 F. Supp. 3d 496, 502 (E.D. La. 2022), aff'd, No. 23-30050, 2023 WL 6807033 (5th Cir. Oct. 16, 2023)(internal citations omitted). Moreover, "absent specific allegations supporting a plausible

---

[33] In 1995 there were 8 NOPD districts in the City of New Orleans. The Homicide Section, which was responsible for the investigation at issue, was a part of the Investigative Services Bureau which was a City-wide Bureau and not limited to a district.
[34] *See Peña v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (stating standard for failure to train or supervise); *Hunter v. City of Houston*, 564 F. Supp. 3d 517, 529 (S.D. Tex. 2021), appeal dismissed sub nom. *Hunter v. City of Houston, Texas*, No. 21-20632, 2022 WL 1782610 (5th Cir. Mar. 21, 2022) (citing *Deville v. Marcantel*, 567 F.3d 156, 171 (5th Cir. 2009)) (noting test for failure to discipline).

causation inference" such a claim is a legal conclusion that "warrants dismissal under Rule 12(b)(6)." *Ratliff v. Aransas Cnty., Texas*, 948 F.3d 281, 285 (5th Cir. 2020).

Moses has provided what amounts to little more than a recitation of claims. As mentioned above, he frequently references studies that conclude that there are global deficiencies at the NOPD, but without the specificity required to support any plausible causation inference as to a violation of his rights. At paragraphs 91 through 94, he provides some details regarding the findings of the IACP study with respect to deficiencies in NOPD supervision. These include that "commanders and supervisors do not establish goals or objectives for their subordinates," that "a number of" NOPD officers had not "received management/command/supervisory experience" in the last four years, and that there were flaws in the establishment of performance expectations.[35] However, Moses does not connect these purported deficiencies with any of the alleged misconduct asserted in this litigation.

As discussed above, Moses points to a study by the New Orleans Human Relations Committee that found problems in the management of NOPD districts, which was published *after* his arrest. This study has no relation to the homicide unit because it is not part of an NOPD district.

At paragraph 106, Moses quotes conclusions from a National Guard Study, without elaborate upon by alleging any facts.

Moses also argues, generally, that the City "failed to promulgate proper or adequate polices or procedures for training and supervision."[36] But he provides no plausible support for this claim either. A failure to promulgate claim "must amount to an intentional choice, not merely unintentionally negligent oversight." *Grant v. LeBlanc,* No. 21-30230, 2022 WL 301546, at *5 (5th Cir. Feb. 1, 2022)(quoting *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 392 (5th Cir. 1992)).

---

[35] R. Doc. No. 30 at ¶ 93.
[36] *Id.* at ¶¶ 204 -205

Moses has not pleaded any facts that would meet this high standard. He has not alleged an intentional choice by the NOPD to not train its employees on the handling of evidence. Moreover, he has not alleged what policymaker would be making this purported choice.

Thus, Moses has not satisfied any of the elements required for a cognizable failure to train, supervise, or discipline claim.

### 3. Moses's "Blue Curtain" claim

Lastly, Moses asserts another type of generalized claim with an even more tenuous connection to the specific allegations at bar. At paragraphs 108 through 110 he claims that NOPD maintained the "practice of a 'blue curtain,' or code of silence" among officers whereby misconduct "including the manufacture of evidence" and "the suppression of exculpatory evidence" was not reported or covered up.[37] This too is wholly conclusory.

Moses cites two cases in support of this claim: *Thomas v. City of New Orleans,* 687 F.2d 80, 82 (5th Cir. 1982) and *Christopher Hero v. Dep't of Police,* No. 1775 (Civil Service Commission, City of New Orleans, Mar. 17, 1983). *Thomas* related to the firing of an NOPD officer after he reported another officer's use of excessive force. *Hero* involved the firing of a paramedic shortly after he intervened to stop an NOPD officer from beating a shooting suspect. The misconduct underlying both cases is indeed reprehensible but has nothing to do with the fabrication or suppression of evidence. Moses never alleges any excessive use of force by any NOPD officer in his Complaint. He has also not pleaded sufficient facts to suggest that a "code of silence" deprived him of any right. Alleged contradictions in witness statements taken by NOPD detectives hardly implies a cover-up. Indeed, it is evident the alleged contradictions are contained in the NOPD reports that were turned over to the OPDA, which would necessarily undermine

---

[37] *Id.* at ¶ 100.

Moses' cover-up theory. Moreover, a finding that the OPDA withheld such statements from Moses's defense counsel, similarly, does not implicate any action taken by the NOPD or the City – let alone the existence of a widespread cover-up practice or policy.

Further, claims based on a "code of silence" theory are consistently disfavored by the Fifth Circuit. In *York v. Welch*, No. 20-40580, 2024 WL 775179, at *6,8 (5th Cir. Feb. 26, 2024) the Court recently explained that these claims are interpreted as ratification claims and that "precedent has limited ratification to 'extreme factual situations.'" *See also, Snyder v. Trepagnier,* 142 F.3d 791,797-98 (5th Cir. 1998); *Coon v. Ledbetter*, 780 F. 2d 1158, 1161 (5th Cir. 1986).

The *York* Court found that "generic statistics" proffered by the plaintiffs lacked the context necessary to render their code-of-silence claims plausible. *Id.* at *8. The Court held that "cover-up" allegations based *solely* on the events underlying the lawsuit, "suggest[ed] that any cover-up was an isolated incident and 'not the persistent, often repeated constant violations that constitute custom and policy.'" *Id.* (citing *Campbell v. City of San Antonio*, 43 F.3d 973, 977 (5th Cir. 1995). Such is the case here.

### B. Moses's has not identified a policymaker at the City.

In addition to failing to satisfy the "official policy" prong of *Monell*, Moses has also failed to identify the requisite policymaker.

"A city cannot be liable for an unwritten custom unless 'actual or constructive knowledge' of such custom is attributable to a city policymaker." *Peña v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (quoting *Hicks-Fields*, 860 F.3d at 808).

In *Peña*, the Fifth Circuit found the policymaker element unsatisfied when a plaintiff's complaint "invite[d] no more than speculation that any particular policymaker, be it the chief of police or the city commission, knew about the alleged custom" of tasing non-threatening non-

15

suspects. *Id.* Given the plaintiff's "utter failure to allege facts connecting this floating custom to any particular policymaker," she could not demonstrate any actual or constructive knowledge of the custom. *Id.* at 623, n. 15.

Moses's claims fail for the same reasons. He blames the City's "final policymakers" for a purported policy that deprived him of his rights without identifying who these policymakers might be.[38] Even if Moses was able to establish an official policy based on a pattern of constitutional violations, he has not pleaded any facts that would demonstrate that the City had actual or constructive knowledge of the pattern.

It is also important to note that Moses's Complaint is predicated on a *Brady* violation by the OPDA.[39] He alleges that exculpatory information was improperly withheld from Moses's defense counsel by the State. Moses has pleaded no facts which would implicate a City policymaker for this violation or that the City was found liable for a *Brady* violation by any court that heard his case.[40] It goes without saying, the City has no authority over the OPDA and its prosecutorial decisions. The District Attorney is a state elected official, and the City has no control over the functions of the District Attorney's office.[41]

Because Moses has not pleaded facts to establish that an official City policy promulgated by an official City policymaker was the moving force behind a violation of his constitutional rights, Moses's claims fail under *Monell*. Accordingly, his § 1983 claims against the City should be dismissed.

---

[38] *Id.* at ¶¶ 108, 198, 200, 204, 206, 207.
[39] *Id.* at ¶¶ 145-153.
[40] *Id.*
[41] *See* La. R.S. 16:1-16.

**II.     Moses has not established a claim under the Louisiana Constitution.**

Moses fails to state a claim for a Louisiana constitutional violation against the City. Moses's Complaint contains a threadbare assertion that the "same conduct that violated Brown's federal constitutional rights also violated the rights that the Louisiana Constitution guarantees to Mr. Moses."[42]  Moses makes clear his federal and state constitutional rights are equivalent;[43] therefore, his state constitutional claims fail for the same reasons his federal claims fail.[44] Specifically, his conclusory allegations do not state a plausible claim against the City.

## CONCLUSION

Because Moses has failed to plead sufficient facts to support the foregoing claims, Moses's constitutional claims against the City should be dismissed.

Respectfully submitted,

/s/ *Corwin St. Raymond*
**CORWIN ST. RAYMOND, LSB #31330**
CHIEF DEPUTY CITY ATTORNEY
**DONESIA D. TURNER, LSB #23338**
CITY ATTORNEY
1300 PERDIDO STREET
CITY HALL - ROOM 5E03
NEW ORLEANS, LOUISIANA 70112
TELEPHONE:  (504) 658-9800
FACSIMILE:   (504) 658-9868
E-MAIL:          cmstraymond@nola.gov

*Counsel for Defendant the City of New Orleans*

---

[42] *Id*. at 213.
[43] *Id*. at 212.
[44] *See Brown v. Williams, et al.* No. 24-423, WL 4855323 (E.D. La. Nov. 21, 2024). *Brown* was a similar civil rights case arising from a vacated conviction. Plaintiff asserted identical state constitutional claims as here. (No. 24-423, R. Doc. 1. at 196 – 199.)  These claims were summarily dismissed by the Eastern District because Plaintiff's coextensive federal claims failed. *Id.* at *7.