UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| LARRY MOSES, | ) | |
| | ) | |
| *Plaintiff,* | ) | Civil Action No. 2:24-cv-1768-BWA-KWR |
| v. | ) | |
| | ) | Section M |
| The CITY OF NEW ORLEANS, | ) | Judge Barry W Ashe |
| WAYNE RUMORE, former New | ) | |
| Orleans Police Detective, JOHN | ) | Division 4 |
| RONQUILLO and THE SUCCESSION | ) | Magistrate Judge Karen Wells Roby |
| OF JOHN RONQUILLO, former New | ) | |
| Orleans Police Detective, PATRICK | ) | |
| JONES, and THE SUCCESSION OF | ) | |
| PATRICK JONES, former New Orleans | ) | |
| Police Detective Sergeant, JAMES | ) | |
| ANDERSON, former New Orleans | ) | |
| Police Detective Sergeant, and JASON | ) | |
| R. WILLIAMS, Orleans Parish District | ) | |
| Attorney, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |
| | ) | |

**Memorandum in Opposition to Defendant City of New Orleans's Motion to Dismiss
Plaintiff's First Amended Complaint**

Plaintiff Larry Moses, by and through his attorneys, respectfully submits this

memorandum in response and opposition to Defendant the City of New Orleans's motion to

dismiss, Dkt. 35, and states:

## INTRODUCTION

For nearly 29 years, Larry Moses lived a nightmare no person should ever endure—

wrongfully convicted of two murders he did not commit. *See generally* Dkt. 30, First Amended

Complaint. His wrongful conviction was not the result of mere mistake or misfortune; it was the

product of misconduct by law enforcement officers who deliberately suppressed exculpatory

1

evidence and fabricated false evidence. *Id.* No reliable evidence ever linked him to the crimes, yet he spent nearly three decades behind bars while the real perpetrators remained free. *Id.*

This was not an isolated incident. *Id.* ¶¶75–112. The NOPD has a long and well-documented history of evidence suppression and fabrication, a culture of misconduct enabled by its systemic failure to train and supervise its officers. *Id.*

In 2023, Mr. Moses was finally exonerated. But now, the City attempts to evade accountability for the constitutional violations that it enabled, arguing Moses's claims should be dismissed in their entirety. Because Moses's claims are timely and more than sufficiently pleaded, the motion should be denied.

## FACTS

At this stage, the Court must "accept as true all well-pleaded facts and construe the complaint in the light most favorable to the plaintiff." *Sw. Airlines Pilots Ass'n v. Sw. Airlines Co.*, 120 F.4th 474, 482 (5th Cir. 2024). Over the course of 46 pages and 229 paragraphs, the First Amended Complaint (1AC) sets forth in rich detail Plaintiff's claims. Dkt. 30. To avoid duplication, the 1AC is incorporated by reference. To the extent specific factual elaboration is necessary, it is set forth below.

## ARGUMENT

### I.    Governing Legal Standards

The Federal Rules establish notice pleading and require only "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P.8(a). To satisfy this standard, a plaintiff is not required to make "detailed factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Instead, the complaint need only contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (citing *Bell Atl. Corp.*

*v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim is facially plausible if the plaintiff alleges facts that, accepted as true, allow a court 'to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Arnold v. Williams*, 979 F.3d 262, 266 (5th Cir. 2020) (quoting *Iqbal*. 566 U.S. at 678). All reasonable inferences must be drawn in the plaintiff's favor. *Allen v. Hays*, 65 F.4th 736, 743 (5th Cir. 2023).

As a result, the Federal Rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014). As the Supreme Court has emphasized following *Iqbal* and *Twombly*, because a complaint need not set out particular legal theories, *Johnson*, 574 U.S. at 11–12, dismissal is improper "if the allegations support relief on any possible theory." *Wilson v. Birnberg*, 667 F.3d 591, 595 (5th Cir. 2012) (citing *Cinel v. Connick*, 15 F.3d 1338, 1341 (5th Cir. 1994)); *see, e.g.*, *Groden v. City of Dallas, Texas*, 826 F.3d 280, 284 (5th Cir. 2016) (applying *Johnson* to reverse dismissal of *Monell* claim for failure to identify a specific municipal policymaker and for failure to plead city "adopted an unconstitutional policy or that the policy was the moving force behind his constitutional violation"); *Escamilla v. Elliott*, 816 F. App'x 919, 924 (5th Cir. 2020) (reversing dismissal for applying too-onerous of a legal standard at pleadings phase).

In short, because the purpose of a plaintiff's pleadings are to provide notice, "a court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513–14 (2002).

II.    **The First Amended Complaint States a Plausible *Monell* Claim Against the City of New Orleans For Violating Moses's Due Process Rights**

In its motion, the City does not contest that the Complaint sufficiently alleges the liability of NOPD officers in causing Plaintiff's wrongful conviction. Among other things, the Complaint alleges a single Due Process count concerning the fabrication and suppression of evidence that corrupted the criminal proceedings and resulted in Mr. Moses being wrongfully convicted at an unfair trial. *See* Dkt. 30, ¶¶46–74, 156–62.

Instead, the City argues the complaint is not sufficient to state a claim plausibly giving it notice of Plaintiff's claims. The argument fails.

Under current law, municipal actors may not be liable under a doctrine of *respondeat superior*. Instead, pursuant to *Monell v. Dep't of Social Servs. of City of New York*, municipal actors bear liability under § 1983 when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury[.]"436 U.S. 658, 694 (1978). As a result, to state a claim against a municipality pursuant to 42 U.S.C. §1983, a plaintiff must plead that there was "(1) a policymaker; (2) an official policy; and (3) a violation of a constitutional right whose 'moving force' is the policy or custom." *Alvarez v. City of Brownsville*, 904 F.3d 382, 389 (5th Cir. 2018). For *Monell* liability, "an official policy may also be a persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy and practically ha[s] the force of law." *Hayes v. Berthelot*, No. CV 24-1434, 2025 WL 317662, at *4 (E.D. La. Jan. 28, 2025) (alteration in original).

**A.  The City's Motion is Premised On the Wrong Legal Standard**

The plaintiff's burden at trial on these claims is high. *Anderson v. Marshall Cty.*, 637 F.
App'x 127, 136 (5th Cir. 2016) (describing plaintiff's obligation to state a valid cause of action
against the city under § 1983 a "high legal burden"). But, Plaintiff's burden at the pleading phase
is not. *Groden*, 826 F.3d at 284. *Monell* allegations do not exist in a heightened pleading
standard beyond that required by Rule 8, *id.*, and the Supreme Court has repeatedly counseled
courts against imposing too high of standards in § 1983 cases. *E.g.*, *Johnson*, 574 U.S. at 11–12;
*Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168
(1993) ("We think that it is impossible to square the 'heightened pleading standard' applied by
the Fifth Circuit in this case with the liberal system of 'notice pleading' set up by the Federal
Rules.").

As a result, "only minimal factual allegations are required at the motion to dismiss stage,"
*Brown v. Burmaster*, 2023 WL 2585981, at *3 (E.D. La. Mar. 20, 2023), and a widespread
practice "need not be pled in exhaustive detail." *Hermes v. Greenwood Police Dep't*, No. CV 23-
1441, 2024 WL 5238272, at *6 (W.D. La. Dec. 27, 2024)).

Despite these rules, the City repeatedly argues that the 1AC has not "established"
Plaintiff's claims, as if Plaintiff were required to rely upon evidence at this juncture or
conclusively *establish* liability via a short plain statement. *See* Dkt. 35-1 at 2, 5, 6, 7, 8, 9, 10, 16
(repeatedly arguing that the 1AC does not "establish" certain facts). That is not the standard
under Rule 8. The question is whether, under a notice standard, the complaint has "plead facts
sufficient to show that her claim has substantive plausibility." *Johnson.*, 574 U.S. at 12; *see*
*Twombly*, 550 U.S. at 555; *Woods v. Sewerage & Water Bd. of New Orleans*, No. CV 21-1196,
2022 WL 168394, at *1 (E.D. La. Jan. 19, 2022). That standard has been met and exceeded.

The City's motion is premised on a standard more fit for a trial, not an argument at the pleadings, and that is inconsistent with Rule 8. Indeed, the Supreme Court has made clear that there is no heightened pleading requirement for § 1983 claims generally, including *Monell* claims specifically. *Johnson*, 574 U.S. at 11 ("[A] federal court may not apply a standard 'more stringent than the usual pleading requirements of Rule 8(a)' in 'civil rights cases alleging municipal liability[.]'") (quoting *Leatherman*, 507 U.S. at 164). Accepting all factual allegations as true and construing the Complaint in the light most favorable to Moses, all of Moses's claims against the City are beyond plausibly pleaded.

**B.  Moses's Due Process *Monell* Claims are Plausibly Pleaded**

In addition to the well-pleaded allegations of Plaintiff's Due Process claims, the 1AC includes allegations concerning the City of New Orleans's *Monell* liability that span 37 paragraphs across more than 10 pages. Dkt. 30, ¶¶ 75–112. Nonetheless, while construing the allegations and inferences therefrom in its favor and while refusing to consider the 1AC in its entirety, the City argues that Moses's complaint must be dismissed because he has not "pleaded plausible facts" to support his claims. Dkt. 35-1 at 6. This argument is without merit.

**1.  The 1AC Sufficiently Pleads Official Policy/Widespread Practice Claims**

Official customs or policies, including widespread practices like those alleged in the 1AC, subject a municipality to liability when they are "so common and well-settled as to constitute a custom that fairly represents municipal policy." *Garza v. City of Donna*, 922 F.3d 626, 637 (5th Cir. 2019). A plaintiff must plead facts sufficient to provide plausible notice supporting a claim that "(1) an official policy or custom was a cause in fact of the deprivation of rights inflicted, (2) the policy served as a moving force behind the constitutional violation, and (3) the policy was decided on by a policymaker with either actual or constructive knowledge of

the alleged policy." *Evans v. Lopinto*, No. CV 18-8972, 2022 WL 2291833, at *13 (E.D. La. June 24, 2022) (internal quotations omitted).

Moses has plausibly pleaded all three elements.

**First**, in addition to the claims about the Due Process violations in Plaintiff's criminal proceedings, the 1AC alleges points out that Louisiana has one of the highest per-capita incarceration rates in the world, with Orleans Parish taking the lead within the state. Dkt. 30, ¶¶75–76. This translates to the highest per-capita wrongful conviction rate in the country. *id.* Against that backdrop, at least 58 exonerations in Orleans Parish have involved the suppression of *Brady* material, including 33 of overturned convictions "involving some form of police officer misconduct and the suppression of favorable evidence." *Id.* ¶81. The NOPD thus "maintained a policy, custom, or pattern and practice of condoning misconduct, including by failing to train, supervise, and discipline police officers" for due process violations like suppressing and fabricating evidence, *id.* ¶82; it maintained an unwritten practice of not disclosing all favorable evidence to the accused, *id.* ¶83, and it maintained a widespread, unwritten practice of facilitating/condoning improper, illegal, and unconstitutional investigative techniques, *id.* ¶86.

The claim is straightforward:

> Throughout the 1970s, 1980s, and 1990s, the NOPD maintained a widespread practice of promoting, facilitating, and/or condoning improper, illegal, and unconstitutional investigative techniques, including (a) creation and presentation of false or materially misleading evidence; (b) failure to document and disclose exculpatory and impeachment evidence to prosecutors, defense counsel, and courts; and (c) as engaging in the affirmative and/or passive concealment of those types of misconduct.

*Id.* ¶86.

These allegations state a plausible—and actionable—claim of an unlawful practice that subjects the City to liability. *See Jett v. Dallas Ind. Sch. Dist.*, 491 U.S. 701, 737 (1989)

(municipal liability attaches where policymaking officials cause a constitutional deprivation "by acquiescence in a longstanding practice or custom" (citations omitted)); *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152 (1970) (acknowledging municipal liability under § 1983 where policymaking officials "in any way act[ed] to compel or encourage" an unconstitutional custom or practice).

Though the forgoing is sufficient, the 1AC goes on to allege "NOPD of the 1990s—when Mr. Moses was prosecuted—was a 'troubled and unruly police department' and had 'the highest rate of proven wrongful convictions and convictions caused by official misconduct in the country.'" Dkt. 30, ¶88. These problems were so bad—and so pervasive—that the FBI initiated an investigation into NOPD—called "Operation Shattered Shield" that found misconduct that "epitomized a completely broken department." *Id.* ¶89. A criminologist at Louisiana State University, Peter Scharf, described the failures at NOPD in the 1990s as an *era* of misconduct, not isolated to "an individual." *Id.* ¶90.  Consistent with these findings the International Association of Chiefs of Police (IACP) published a 1991 report about NOPD's failures, including training that was "'not nearly in compliance with professional expectations.'" *Id.* ¶91. As to criminal investigations—the very thing that went awry for Mr. Moses just a few years after publication of the IACP report—NOPD failed "in almost every crime category" including inadequate supervision and performance. *Id.* ¶94.

Despite having notice from, among other things, law enforcement entities like the FBI and IACP, before Mr. Moses was prosecuted, NOPD failed to meaningfully change any of these issues and so systemic problems persisted. *Id.* ¶¶95–96. As a result, yet another law enforcement official, the United States Attorney for this District, described NOPD's problems as "pervasive, rampant, and systemic." *Id.* ¶96. This was no idle assertion. Instead, in illustrating that there

were "systemic problems throughout the department, particularly with respect to its hiring, training, and discipline, and not any one "rogue" officer, during the 1990s a "shocking ten percent of NOPD's officers were facing criminal charges. *Id.* ¶¶97–98. Consistent with these systemic problems—and persistent customs of misconduct in criminal investigations and accountability—NOPD provided basically no training or supervision to its officers (*e.g.*, why supervise them if you're going to permit them to commit misconduct?). *See, e.g.*, Dkt. 30, ¶¶101–04, 106. Thus, "[d]espite knowing that NOPD's custom, pattern, and practice of promoting, facilitating, and/or condoning improper, illegal, and unconstitutional investigative techniques, and failing to adequately supervise, discipline, and train its officers was reasonably likely to lead to wrongful convictions, the NOPD leadership continued to maintain those customs, patterns, and practices of deliberate indifference to the rights of suspects and criminal defendants." *Id.* ¶105.

Rather than serving the public, NOPD had a subculture of officer protection, *id.* ¶107, and a "blue curtain" or code of silence." *Id.* ¶108. Pursuant to this custom, "police misconduct— *including the manufacture of false evidence, the suppression of exculpatory evidence, and the malicious investigation of innocent individuals without probable cause*—was routinely not reported by fellow officers or not disciplined or otherwise addressed by the department." *Id.* ¶108 (emphasis added).

Instead, "officers customarily engaged in misconduct themselves to cover up any misconduct they witnessed by a fellow officer." *Id.* These customs existed as early as the late 1970s and early 1980s, *id.* ¶¶109–110, and did not abate by the time Mr. Moses was prosecuted and thus contributed to his wrongful prosecution and conviction. *Id.* ¶111–12.

With this (and more) in the background, including Orleans Parish having the "highest rate of proven wrongful convictions and convictions caused by official misconduct in the country" and that NOPD officers have been involved in more than 33 Due Process violations, *id.* ¶¶83, 88, the 1AC additionally provides specific examples of Due Process violations (including evidence suppression and fabrication) by NOPD officers. Dkt. 30 ¶87. For instance, the 1AC points to the case of *Hill v. New Orleans*, which recognized NOPD (as opposed to individual officer) failings in criminal prosecutions and that the convictions of Kunta Gable and Sidney Hill involved the suppression of exculpatory evidence. Dkt. 30, ¶85. In addition, NOPD officers hid evidence from the defense *and the prosecution* in the case of Bobbie Jean Johnson, leading to his wrongful conviction. *Id.* ¶87. These are not isolated incidents, as the complaint indicates. NOPD officers also suppressed evidence in the cases of *Norman Clark, Isaac Knapper*, *Reginald Adams*, *John Floyd*, *Curtis Lee Kyles*, *Jerome Morgan*, *Jarvis Ballard*, and *Cedric Dent*. *Id.* These allegations are beyond sufficient to provide the City with notice of Mr. Moses's claims, and to plausibly demonstrate their veracity. That is all that required at this juncture. *Johnson*, 574 U.S. at 11–12; *Groden*, 826 F.3d at 284; *Escamilla*, 816 F. App'x at 924.

The City's argument that Moses has only provided "broad conclusory assertions," Dkt. 35-1 at 7, cannot be squared with the actual substance of the complaint. The 1AC explains, in beyond sufficient detail, the background practices that existed, their timeframe, and their timeframe in relationship to Mr. Moses's prosecution. *See* Dkt. 30, ¶¶75–86, 88–112. The City's claim that the 1AC lacks "requisite specificity" Dkt. 35-1 at 8 (citing *Johnson v. Harris County*, 83 F.4th 941, 946–947 (5th Cir. 2023), is belied by the complaint's actual language. All of the examples pointed to in the complaint—both those described generally and specifically—involve police misconduct that caused wrongful convictions. That conduct also involved Due Process

violations—*i.e.*, the suppression or fabrication of evidence. Dkt. 30, ¶¶81, 86–87. The timeframe for the pattern at issue is identified both generally, *id.* ¶86, and relative to the specific instances identified in the 1AC, *id.* ¶87.

Here, the consistent theme is that a person was convicted as a result of a due process violation, and that is for the "specific violation in question." *Johnson*, 83 F.4th at 946–947. The City's attempt to draw a distinction between overlapping and related due process theories should fail. *Brady* derives out of the same line of cases from holding that deliberate suppression of evidence, deception of the court, and fabrication of evidence violates due process. *See Pyle v. Kansas*, 317 U.S. 213, 215-16 (1942) (due process violated when police officers deliberately suppress evidence favorable to accused and threaten witnesses into false testimony); *Mooney v. Holohan*, 294 U.S. 103 (1935) (discussing evidence suppression in context of fabricated and perjured testimony claim and nondisclosure violates due process); *Brady v. Maryland*, 373 U.S. 83, 85–86 (1963) (discussing *Mooney* and *Pyle* as the basis for the holding under the Due Process Clause); *Kyles v. Whitley*, 514 U.S. 419, 432 (1995) (applying *Brady* in context of Orleans Parish suppression of evidence claim and recognizing that the case law relies on *Mooney* and *Pyle*). The Due Process allegations are overlapping, and even included in the same count of the 1AC. As a result, the acts complained of in the 1AC are "fairly similar to what ultimately transpired" with Mr. Moses, and the City's claims otherwise are contrary to the fact that the "specificity required should not be exaggerated." *Est. of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005).

**Second**, causation has been sufficiently pleaded. Specifically, the 1AC alleges:

> Mr. Moses's wrongful conviction was the result of the practices described above; as in other documented wrongful convictions, NOPD officers suppressed evidence; the code of silence meant the fabrication of evidence in Moses's case went unreported and unchecked; and the City was indifferent to the harms Mr. Moses suffered as a result of its failures. In short, the City's failures of training, supervision, and discipline led to a systemic pattern and practice of unconstitutionally obtained *Brady* violations by NOPD officers, which caused Plaintiff's wrongful conviction.

*Id.* ¶112. Dkt. 30. The 1AC follows up on this by alleging the City's "policies and procedures were implemented by officers of the NOPD, including the Defendant Officers who were responsible for working on the Daniel Ratliff and Alma Causey homicide investigation." *Id.* ¶201. And, finally, the 1AC alleges the City's "widespread policies and practices were allowed to flourish because NOPD directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of NOPD employees, and/or failed to adequately punish, discipline, and deter prior instances of misconduct." *Id.* ¶203. As a result, and in this way, the 1AC alleges that "NOPD violated Plaintiffs' rights by maintaining policies and practices that were the *moving force driving the foregoing constitutional violations*." *Id.* (emphasis added).

Particularly in light of the fact that "questions of causation are usually for a jury under the Seventh Amendment," *Anderson v. Nosser*, 456 F.2d 835, 841 (5th Cir. 1972), and not typically even appropriate at summary judgment, *James v. Texas Collin Cnty.*, 535 F.3d 365, 376 n. 10 (5th Cir. 2008), the complaint cannot be dismissed on this basis.

**Third**, the 1AC adequately pleads that the city's policymakers had notice of the unconstitutional practices. The Complaint alleges that the NOPD "*by and through their policymakers*, maintained a policy, custom, or pattern and practice of condoning misconduct, including by failing to train, supervise, and discipline police officers for Brady violations and

fabrication of evidence." Dkt. 30, ¶82 (emphasis added). The 1AC provides examples that would (and should) be known to policymakers of problems in the department, *e.g.*, *id.* ¶¶85–87, including concerns expressed by the FBI, the IACP, a criminologist, and even prosecutors. *Id.* ¶¶88–94. Despite notice, NOPD failed to change. *Id.*¶95. Further, the 1AC alleges:

> Despite knowing that NOPD's custom, pattern, and practice of promoting, facilitating, and/or condoning improper, illegal, and unconstitutional investigative techniques, and failing to adequately supervise, discipline, and train its officers was reasonably likely to lead to wrongful convictions, *the NOPD leadership continued to maintain those customs, patterns, and practices of deliberate indifference to the rights of suspects and criminal defendants*."

*Id.* ¶105 (emphasis added).

That is sufficient to inform the City of Moses's asserted claims. *See Mitchell v. City of New Orleans*, 184 F. Supp. 3d 360, 372 (E.D. La. 2016) (finding the notice element satisfied when the Plaintiff alleged that former NOPD superintendents were "responsible for the policies, practices, customs and procedures of the NOPD, as well as the hiring, training, supervision, discipline and control of police personnel under his command").

There is more.

The 1AC alleges that "the City *and its final policymakers* promulgated policies and procedures for the conduct of homicide investigations, the production of *Brady* material, and other investigative work," Dkt 30 ¶200, implemented or tolerated a pattern or practice of "the fabrication of evidence and failing to document and disclose material, exculpatory and impeachment evidence to prosecutors, defense counsel, and the court," *id.* ¶201, and the NOPD "encouraged the very type of misconduct at issue in this case," *id.* ¶203. The Complaint unambiguously alleges:

> "[T]he City and its final policymakers had notice of the above-referenced widespread practices and customs. This includes widespread practices and customs under which individuals suspected of criminal activity, such as Mr. Moses, were routinely deprived of their right to due process or Fourteenth Amendment rights. For instance, it was common that suspects were prosecuted based on fabricated evidence and/or that exculpatory and impeaching information was suppressed. The above-described widespread practices and customs, so well settled as to constitute *de facto* policies of the City, were able to exist and thrive, individually and together, because final policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

*Id.* ¶¶ 206–07. This satisfies Rule 8.

The City offers two other arguments and both fail.

First, the City argues, generally, that the City's policymakers did not have adequate notice of NOPD officer misconduct. Dkt. 35-1, at 8. Again, this is an argument for trial, not a problem with the complaint. The 1AC specifically, and repeatedly alleges NOPD's notice, as explained above. Viewing the complaint in the light most favorable to Moses, the allegations plausibly demonstrate the City's policymakers were aware of the problem of NOPD evidence suppression and fabrication—yet chose to do nothing about it. Dkt. 30 ¶¶ 87, 89, 91–94, 101–104, & 106–107.  At a minimum, Mr. Moses has alleged "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" of the City and its policymakers' acceptance, acquiescence, or encouragement of these practices. *Twombly*, 550 U.S. at 556.

Second, the City complains that the complaint conflates allegations against the NOPD with those against the OPDA. Dkt. 35-1, at 9. There are many problems with this argument. For one, the question is whether the complaint is sufficiently pleaded to provide NOPD notice of Plaintiff's claims against it, not how things will bear out at trial. *See Twombly*, 550 U.S. at 555. On that front, the 1AC plausibly pleads established claims. When police officers suppress or fabricate evidence, they have violated due process. *See Brown v. Miller*, 519 F.3d 231, 238 (5th

Cir. 2008). And when prosecutors suppress or fabricate evidence, that too violates due process. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Wearry v. Foster*, 33 F.4th 260, 272 (5th Cir. 2022).

There is no rule that only one entity can violate a Plaintiff's constitutional rights during a criminal prosecution. Jerome Morgan is a representative example. There, NOPD detectives pressured a witness to falsely identify Mr. Morgan, which was not disclosed to the defense. Dkt. 30 ¶87. Separately, prosecutors did not disclose a 911 call log. *Id.* ¶142. The OPDA committing a subsequent *Brady* violation does not mean that the NOPD did not violate Mr. Morgan's due process rights, just as the NOPD's unconstitutional conduct did not excuse the OPDA's *Brady* violation. In fact, under established law, it is "common for injuries to have multiple proximate causes." *Staub v. Proctor Hosp.*, 562 U.S. 411, 420 (2011); *see also Sosa v. Alvarez-Machain*, 542 U.S. 692, 704 (2004) ("Proximate cause is causation substantial enough and close enough to the harm to be recognized by law, but a given proximate cause need not be, and frequently is not, the exclusive proximate cause of harm.").

Even if that were not the case, a Plaintiff can plead in the alternative. *See* FED. R. CIV. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."); *Vasquez v. Bridgestone/Firestone, Inc.*, 325 F.3d 665, 674 (5th Cir. 2003) ("Plaintiffs are permitted to plead in the alternative."). As a result, a complaint is not deficient for pleading multiple claims of potential liability that exist in the alternative. *See Perkins v. United Surgical Partners Int'l, Inc.*, No. 23-10375, 2024 WL 1574342, at *5 n.9 (5th Cir. Apr. 11, 2024) ("If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.") (quoting FED. R. CIV. P. 8(d)(2)). It is for trial, not a motion directed at the pleadings to sort out whether, it is NOPD, OPDA, or both, who were ultimately liable for different violations of Mr. Moses's rights.

2.   **The Complaint Plausibly Pleads That the City's Failure to Train and Supervise Its Officers Caused Moses Harm**

"A municipality's failure to train its police officers can without question give rise to § 1983 liability." *Benfer v. City of Baytown, Texas*, 120 F.4th 1272, 1286 (5th Cir. 2024). Liability exists in this context when "[1] the [city] failed to train or supervise the officers involved; [2] there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and [3] the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights." *Pena v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (quoting *Thompson v. Upshur Cty.*, 245 F.3d 447, 459 (5th Cir. 2001) (alteration in original)).

Here, the failure to train claims must be understood and read against the other allegations of the complaint, which demonstrate systemic policy failure that, itself, bespeaks a failure to train. These allegations, on their own, provide sufficient factual basis for a plausible failure to train claim. *Cf. Griffith v. Strategic Tech. Inst., Inc.,* No. CIV.A. 11-2401, 2012 WL 893465, at *5 (E.D. La. Mar. 15, 2012) (complaint must be read "as a whole . . .rather than any one statement in isolation"); *Torres v. Inteliquent, Inc.*, No. CV 17-10022, 2018 WL 5809246, at *2 (E.D. La. Nov. 6, 2018) (recognizing the "complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible" (internal quotes and citation omitted)).

The complaint, again, goes further. For example, the 1AC alleges NOPD failed to train and supervise its officers regarding "constitutional duties of NOPD officers, the fabrication of evidence and failing to document and disclose material, exculpatory and impeachment evidence to prosecutors, defense counsel, and the court." Dkt. 30 ¶202. Multiple law enforcement or independent organizations substantiate these allegations: the IACP, *id.* ¶¶91–94, the New

16

Orleans Human Relations Committee, *id.* ¶¶101–04, and the Louisiana National Guard, *id.*

¶¶106–107. The IACP found:

- A stunning lack of training that inhibits investigative effectiveness
- A lack of advanced training for evidence handling
- A training program that was "not nearly in compliance with professional expectations

*Id.* ¶¶91–92. The New Orleans Human Relations Committee found:

- No ability for superiors to "meaningfully monitor, much less manage" their subordinates
- No supervisory training programs for sergeants and above
- Training that was "generally non-existent or haphazard," with "virtually no on-the-job supervision of policemen on the beat."

*Id.* ¶¶102–104. And the Louisiana National Guard found:

- City and department leaders do not understand, or simply choose to ignore, the importance of training for police officers
- One of the NOPD's greatest weaknesses was a lack of training
- NOPD officers receive almost no training on legal training, including on changes in the law, case law, and the result of criminal or civil proceedings against NOPD officers

*Id.* ¶ 106.

The City does not appear to contest the adequacy of the training in its memorandum.[1] But to the extent that it even makes the argument, it amounts to nothing more than disagreeing with Moses's well-pleaded facts. At this stage, Moses's allegations regarding the inadequacy of training at the NOPD must be accepted as true. *See Sw. Airlines Pilots Ass'n*, 120 F.4th at 482.

Deliberate indifference can be established in several ways. Two are discussed here. First, a municipality's deliberate indifference can be shown through a "[a] pattern of similar constitutional violations by untrained employees." *Connick v. Thompson*, 563 U.S. 51, 62

---

[1] The City makes a conclusory assertion that Moses has "not satisfied any of the elements required for a cognizable failure to train, supervise, or discipline claim." OPP. P 14. But there is nothing in the City's memorandum that would explain why the NOPD's training was adequate.

(2011). Second, even absent such a pattern, a single violation can show deliberate indifference if the need for training was obvious. *See Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 409–10 (1997) (noting that municipal liability attaches in situations where it is obvious "that the situation will recur and . . . that an officer's lacking specific tools to handle that situation will violate citizens' rights"). The 1AC beyond plausibly alleges both.

Starting with the latter, the 1AC alleges that the need for adequate training regarding the suppression of exculpatory and impeachment evidence, the fabrication of evidence, and the constitutional duties of NOPD, was obvious. Dkt.30 ¶¶202–204. Even If Moses's case was the first time that NOPD officers violated Due Process by suppressing or fabricating evidence— which it was not—the need for training was obvious to address the "clear constitutional dut[ies] implicated in recurrent situations that a particular employee is certain to face." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 396 (1989) (O'Connor, J., concurring in part).

The IACP specifically found, in addition to many other glaring deficiencies throughout the NOPD, an "absence of advanced training for evidence handling" Dkt. 30 ¶92. The Louisiana National Guard noted the same problems, and further observed that NOPD officers "receive almost no update training in changes in the law, case law, Supreme Court decisions, or even feedback from the city attorney on the results of criminal or civil cases against police officers for misconduct." *Id.* ¶ 106. These training failures were compounded by the blatant supervision failures alleged throughout the complaint. *Id*. ¶¶ 94, 97, 101–106.

In response, the City simply says that these allegations are made "without elaborat[ing] upon by alleging any facts." Dkt. 35-1, at 13. But, simply put, these are the facts. Moses is alleging specific deficiencies in NOPD training, allegations that are supported by multiple external sources.  Moses has plausibly alleged that the NOPD's extensive training failures—

specifically with respect to evidence suppression and fabrication—created an obvious risk of constitutional violations.

Moses has likewise plausibly alleged a mosaic of unconstitutional conduct sufficient to put the City on notice. *See* Dkt. 30 ¶¶75–112. When faced with this series of constitutional rights violations, the City could have improved its training programs to correct these problems. The City chose not to. *Id.*

Read holistically and not in piecemeal, the 1AC clearly contends and alleges the NOPD's training failures were an "intentional choice, not merely an unintentionally negligent oversight." *James v. Harris Cnty.*, 577 F.3d 612, 618 (5th Cir. 2009) (citing *Rhyne v. Henderson County*, 973 F.2d 386, 392 (5th Cir.1992)). That is all that is required.

Finally, the complaint plausibly alleges there was a causal connection between the NOPD's training failures and the violation of Mr. Moses's constitutional rights. While it is true that an "identified deficiency in a city's training program must be closely related to the ultimate injury," *Canton,* 489 U.S. at 391, there "is no requirement that Plaintiff prove 'sole causation,'" *Rodriguez v. City of Houston*, 2009 WL 10679669, at *18 (S.D. Tex. June 8, 2009).

The 1AC alleges that the defendant officers violated Due Process. Dkt. 30, ¶¶48–67. And further, that these constitutional rights violations were attributable to the NOPD's training failures. *Id.* ¶112. Viewing the 1AC in the light most favorable to the Moses, it is plausible that the City's failure to train its officers on their fundamental, constitutional obligations regarding the suppression and fabrication of evidence amounts to an intentional choice that led to constitutional violations in this case. *See James*, 577 F.3d at 617.

### 3. The City's Code of Silence Is Relevant to Moses's Claims and The Allegations are Plausibly Pleaded.

The City seems to misunderstand the relevance of its code of silence. While some courts have recognized that a code of silence can subject a municipality to liability under section 1983 on its own, *e.g.*, *Sofia Gutierrez v. Benavides*, No. 5:12-CV-18, 2013 WL 12394687, at *3 (S.D. Tex. Oct. 4, 2013) (citing *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 848 (5th Cir. 2009), the systemic code of silence Moses alleges within NOPD is part and parcel of his other *Monell* theories. Dkt. 30 ¶¶ 82–86, 101–103, 106–111. A practice of officers (1) committing misconduct, and then (2) suppressing or falsely denying the existence of misconduct, and (3) refusing to discipline officers for committing misconduct is relevant to—and supplies beyond ample notice of—Moses's *Monell* theories. *Id.* ¶¶156–182.Moses alleges that before and at the time of Moses's conviction, the NOPD maintained such a code. *Id.* ¶108. In maintaining a "blue curtain," police misconduct—like the due process violations that occurred in Mr. Moses's case— was not reported by fellow officers and not disciplined by supervisors. *Id.* ¶108.

In short, the existence of the code of silence—which is adequately and specifically pleaded—is just additional support for the fact that the allegations of the City's liability are plausible. The code of silence is something that exists in complement to systemic misconduct (else no such code would be necessary) that is allowed to flourish in a department and that goes beyond an isolated act of an a single officer or even a few.

### 4. Though Not Required, Moses Has Identified Policymakers

"At the motion-to-dismiss stage, a plaintiff need not allege the specific identity of the policymaker[.]" *Benfer*, 120 F.4th at 1285-86. "The specific identity of the policymaker is a legal question that need not be pled; the complaint need only allege facts that show an official policy, promulgated or ratified by the policymaker, under which the municipality is said to be liable."

20

*Groden,* 826 F.3d at 284 (reversing the district court's grant of the defendant's motion to dismiss because requiring the plaintiff to plead the specific identity of the policymaker was legal error); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988) ("We begin by reiterating that the identification of policymaking officials is a question of state law.").

"Presumptive policymakers for the police include the mayor, the city council, and the superintendent of police." *Mitchell*, 184 F. Supp. 3d 360, 372 (E.D. La. 2016) (citing *Webster v. City of Houston*, 735 F.2d 838, 841-42 (5th Cir. 1984); *see* New Orleans Code of Ordinances § 4-501 (establishing superintendent of police as head of police department)).

Despite the City's contrary claims, Dkt. 35-1 at 15, Moses was not required to plead the specific identity of the policymakers responsible for the NOPD's practices and customs. However, the 1AC has gone "above and beyond." Therein, Moses has identified "NOPD Superintendents Arnesta Taylor, who led the NOPD from 1991 to 1993, Richard Pennington, who led the NOPD from 1994 to 2002, and others who followed them through present day where Anne Kirkpatrick, is the Superintendent." R. Doc 30 ¶ 199. This is beyond what is necessary to meet the pleading requirements for municipal liability.

### III.    Moses Has Plausibly Alleged a Claim Under the Louisiana State Constitution and Louisiana State Law

In addition to violating Mr. Moses's rights under the United States Constitution, NOPD officers also violated Mr. Moses's rights under the Louisiana Constitution. R. Doc 30 ¶¶ 212–213; La. Const. Art. 1, §§ 2, 3, 5, 12, 13, 15, 16, 20, 22, & 24. The City has offered no independent justification for dismissing the claims under the Louisiana Constitution. *See* Dkt. 35 at 17. Moreover, Moses also alleged that the Defendant Officer committed the state law torts of negligence and IIED against him. Dkt. 30 ¶¶ 215–224. Critically, the City does not respond to

Moses's allegation that the City is vicariously liable for these state law torts. *Id.* ¶¶ 225–227. They have therefore forfeited any such arguments.

## IV.    Alternatively, Plaintiff Must Be Given Leave to Amend

Plaintiff believes the 1AC is beyond sufficiently pleaded. Should this Court find any aspect of the 46-page, 229 paragraph complaint wanting, dismissal with prejudice should not be granted. Instead, and in the alternative, Plaintiff seeks leave to amend the complaint.

Leave to amend a complaint should be freely given. FED. R. CIV. P. 15(a)(2). The language of Rule 15 "evinces a bias in favor of granting leave to amend." *Lyn–Lea Travel Corp. v. Am. Airlines*, 283 F.3d 282, 286 (5th Cir.2002). Therefore, there must be a "substantial reason" to deny leave to amend. *Id.* Leave to amend a complaint should not be denied unless there is "[1] undue delay, [2] bad faith or dilatory motive on the part of the movant, [3] repeated failure to cure deficiencies by amendments previously allowed, [4] undue prejudice to the opposing party by virtue of allowance of the amendment, [or] [5] futility of the amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also U.S. ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 386 (5th Cir. 2003) (applying the standard)

None of those circumstances are present here. First, there is no undue delay; in the event that amending the complaint is necessary, it is early in the proceedings. Second, no facts suggest that Mr. Moses has acted in bad faith. Third, while Mr. Moses has amended his complaint once before, it was not in direct response to a finding by this Court of a pleading deficiency. *See Tesla, Inc. v. Louisiana Auto. Dealers Ass'n*, No. CV 22-2982, 2023 WL 9059650, at *4 (E.D. La. Jan. 11, 2023) (granting leave to amend because Plaintiff had not been directed to respond to pleading deficiencies). Fourth, a defendant is prejudiced if an amended pleading would "require the defendant to reopen discovery and prepare a defense for a claim different from the [one] . . . that was before the court." *Smith v. EMC Corp.*, 393 F.3d 590, 596 (5th Cir. 2004) (citing

*Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir.1999)). The City would not be prejudiced here because discovery has just begun and is nowhere near closing. *See Smith*, 393 F.3d at 596 (affirming denial of leave to amend complaint on the second last day of trial). Additionally, any amendments to the Complaint would cure specific deficiencies, as opposed to pleading entirely new claims that would require preparation of new defenses.

Fifth, and finally, amending the complaint to address a deficiency would not be futile. The City's motion focuses on factual plausibility, not legal impossibility. If Mr. Moses's complaint is dismissed for failure to state a claim, amending the complaint would be "especially appropriate." *Griggs v. Hinds Junior Coll.*, 563 F.2d 179, 180 (5th Cir. 1977) ("Granting leave to amend is especially appropriate, in cases such as this, when the trial court has dismissed the complaint for failure to state a claim."). Thus, should the Court find the 1AC deficient in some way, Mr. Moses respectfully requests leave to amend his complaint to address any such deficiency.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss. In the alternative, should the Court find the Complaint deficient in some way, Plaintiff respectfully requests leave to amend his complaint to address any such deficiency.


Respectfully submitted,

/s/David B. Owens

David B. Owens*
LOEVY & LOEVY
311 N. Aberdeen St 3FL
Chicago IL 60607
c/o Civil Rights and Justice Clinic
University of Washington Law School

William H. Gates Hall, Suite 265
P.O. Box 85110, Seattle, WA 98145-1110
david@loevy.com
*admitted pro hac vice

William Most, La. Bar No. 36914
Caroline Gabriel, La. Bar No. 38224
MOST & ASSOCIATES

<u>**CERTIFICATE OF SERVICE**</u>

     I, David B. Owens, an attorney, certify that on February 26, 2025, I filed the foregoing Response via the Court's CM/ECF system, effecting service on all counsel of record.

<u>/s/David B. Owens</u>
*One of Plaintiff's Attorneys*