## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| LARRY MOSES, | ) | |
| | ) | |
| *Plaintiff,* | ) | Civil Action No. 2:24-cv-1768-BWA-KWR |
| v. | ) | |
| | ) | Section M |
| The CITY OF NEW ORLEANS, | ) | Judge Barry W Ashe |
| WAYNE RUMORE, former New | ) | |
| Orleans Police Detective, JOHN | ) | Division 4 |
| RONQUILLO and THE SUCCESSION | ) | Magistrate Judge Karen Wells Roby |
| OF JOHN RONQUILLO, former New | ) | |
| Orleans Police Detective, PATRICK | ) | |
| JONES, and THE SUCCESSION OF | ) | |
| PATRICK JONES, former New Orleans | ) | |
| Police Detective Sergeant, JAMES | ) | |
| ANDERSON, former New Orleans | ) | |
| Police Detective Sergeant, and JASON | ) | |
| R. WILLIAMS, Orleans Parish District | ) | |
| Attorney, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |
| | ) | |

## Memorandum In Opposition To OPDA's Motion To Dismiss Plaintiff's First Amended Complaint

Plaintiff Larry Moses, by and through his attorneys, respectfully submits this memorandum in response and opposition to Jason Williams' motion to dismiss, Dkt. 34, and states:

## INTRODUCTION

In 1994, Plaintiff Larry Moses was wrongfully convicted and spent the next 29 years incarcerated for crimes he did not commit. Dkt. 30, First Amend. Compl. ¶1. The wrongful conviction and incarceration were a direct result of the misconduct of the Orleans Parish District Attorney's (OPDA) Office. *Id.* ¶3. Defendant Jason Williams is the official policymaker for OPDA and defendant for OPDA under *Monell v. Department of Social Services of New York*,

436 U.S. 658 (1978). *Id.* ¶11. The First Amended Complaint (1AC) provides beyond ample notice to OPDA what the claims are and why, Mr. Moses alleges, OPDA bears responsibility for the tragedy that was his wrongful conviction and incarceration.

Contrary to the contentions made in OPDA's motion to dismiss, the actual substance of the 1AC vastly exceeds the notice pleading standard concerning allegations that that OPDA (1) suppressed evidence, (2) had an unconstitutional *Brady* policy, (3) acted with deliberate indifference to Mr. Moses's rights, (4) was on notice of past *Brady* violations, and (5) had policies that were the moving force behind Mr. Moses's injuries. The motion must be denied.

## FACTS

At this stage, the Court must "accept as true all well-pleaded facts and construe the complaint in the light most favorable to the plaintiff." *Sw. Airlines Pilots Ass'n v. Sw. Airlines Co.*, 120 F.4th 474, 482 (5th Cir. 2024). Over the course of 46 pages and 229 paragraphs, the First Amended Complaint (1AC) sets forth in rich detail Plaintiff's claims. Dkt. 30. To avoid duplication, the 1AC is incorporated by reference. To the extent specific factual elaboration is necessary, it is set forth below.

## ARGUMENT

### I.    Governing Legal Standards

The Federal Rules invoke notice pleading and require only "a short and plain statement of the claim showing that the pleader is entitled to relief," FED. R. CIV. P. 8(a), and therefore "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014). To satisfy this standard, a plaintiff is not required to make "detailed factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Instead, a complaint must "contain sufficient factual matter, accepted as

true, to 'state a claim to relief that is plausible on its face.'" *Id.*; *see also Vanderbrook v. Unitrin Preferred Ins. Co.*, 495 F.3d 191, 205 (5th Cir. 2007). A claim is plausible when "the plaintiff alleges facts that, accepted as true, allow a court 'to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Arnold v. Williams*, 979 F.3d 262, 266 (5th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678). All reasonable inferences must be drawn in the plaintiff's favor. *Allen v. Hays*, 65 F.4th 736, 743 (5th Cir. 2023).

Again, as the Supreme Court has emphasized following *Iqbal* and *Twombly*, because a complaint need not set out particular legal theories, *Johnson*, 574 U.S. at 11-12, dismissal is improper "if the allegations support relief on any possible theory." *Wilson v. Birnberg*, 667 F.3d 591, 595 (5th Cir. 2012) (citing *Cinel v. Connick*, 15 F.3d 1338, 1341 (5th Cir. 1994)). The Supreme Court in *Johnson* reversed dismissal on this basis, as has the Fifth Circuit in applying *Johnson*, *see, e.g.*, *Groden v. City of Dallas, Texas*, 826 F.3d 280, 284 (5th Cir. 2016) (applying *Johnson* to reverse dismissal of *Monell* claim for failure to identify a specific municipal policymaker and for failure to plead city "adopted an unconstitutional policy or that the policy was the moving force behind his constitutional violation"); *Escamilla v. Elliott*, 816 F. App'x 919, 924 (5th Cir. 2020) (reversing dismissal for applying too-onerous of a legal standard at pleadings phase). That is, because the purpose of a plaintiff's pleadings is to provide notice, "a court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513–14 (2002).

## II. The Motion Is Premised On The Wrong Legal Standard

Throughout the course of its memorandum, OPDA misconstrues the applicable legal standard, suggesting that the 1AC needs to prove every element of his claims. But at this stage it

would be reversible error to dismiss the First Amended Complaint "by demanding more than is required under Rule 12(b)." *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 736 (5th Cir. 2019). Though this is a case that must ultimately go to trial, litigants wishing to contest plaintiff's claims may rely on summary judgment rather than seeking to dismiss plausibly pled complaints. *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993).

### III.    The First Amended Complaint Beyond Sufficiently Pleads OPDA Violated Moses's Due Process Rights

With Counts I and V, the 1AC alleges that Mr. Moses was deprived of his Due Process rights under the Fourteenth Amendment because he was prosecuted, convicted, and imprisoned as a direct result of the suppression of exculpatory information by OPDA. Dkt. 30, ¶¶156–162, 198–210. The 1AC further alleges the cause of these constitutional violations was both an official OPDA policy and a custom of suppressing and failing to disclose material exculpatory evidence with deliberate indifference to the rights of individuals prosecuted by the OPDA. *Id.*

To state a *Brady* claim, the 1AC need only allege facts that, accepted as true, plausibly show that "(1) the prosecution suppressed evidence, (2) the evidence was favorable to the defense, and (3) the evidence was material." *Lawrence v. Lensing*, 42 F.3d 255, 257 (5th Cir. 1994). Evidence is favorable to the defense if it is either exculpatory or impeaching. *Grace v. Tim Hooper, Warden, La. State Penitentiary*, 123 F.4th 800, 802 (5th Cir. 2024). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "The threshold for materiality is that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."

4

*Grace*, 123 F.4th at 802. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence the defendant received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.*

Here, the 1AC alleges that OPDA had information that the voice identification by Ms. Barras was bogus and fabricated, that the investigation involving Mr. Stamps was not credible and involved changing stories, and that Mr. Stamps was biased, and had substance abuse issues and unstable mental health. Dkt. 30, ¶¶68–72. The undisclosed evidence led to both Mr. Moses's indictment by a grand jury and subsequent wrongful conviction. *Id.* ¶¶62, 71, 73–74.

Nonetheless, OPDA claims that the First Amended Complaint's descriptions of the suppressed *Brady* material are too vague, and do not explain how the suppressed evidence could have been used at trial. Mot., Dkt. 34 at 3–4. Defendants even claim the 1AC used only one sentence to describe Moses's suppression of evidence claim. *Id.* at 4.

This statement is both unpersuasive and untrue. The question is not whether the complaint *proves* specific facts or includes a certain number of sentences; it is whether the complaint sets out sufficient facts in detail to state a plausible claim. But, number of sentences aside, there are many that sufficiently describe the *Brady* violation alleged against OPDA here. To start, paragraphs 12-28 describe the Ratliff-Causey murders, and provide details about the significance of Ms. Barras, including that she did not know who the shooter was, Dkt. 30, ¶¶12-28. That fact was exculpatory to Plaintiff, who Ms. Barras knew. After describing the initial police investigation, which involved Ms. Barras, *id.* ¶¶29-38, the 1AC sets out facts related to Mr. Stamps' false claims about Plaintiff and that describes the manner *some* false evidence was generated against him, *id.* ¶¶39-53. Ms. Barras and Mr. Stamps came to be witnesses against

Plaintiff in the criminal prosecution because of false statements. *Id.* ¶¶60.  The OPDA prosecuted

Plaintiff, *id.* ¶61, and took Plaintiff to trial after he maintained his innocence. *Id.* ¶¶61-65.

The 1AC includes many allegations about the impact of the suppressed evidence. For

example, before trial OPDA learned of information about Mr. Stamps' unreliability, bias,

substance use issues, and mental health instability and diagnosis," which the 1AC even describes

as the "Stamps *Brady* Material." *Id.* ¶68. The 1AC does not equivocate about the importance of

this evidence:

> The Stamps *Brady* Material would have been favorable to Mr. Moses at trial and
> could have helped him prove his innocence and /or obtain an acquittal by
> challenging the quality of the police investigation, the credibility of the officers, the
> credibility of Mr. Stamps, and in other ways favorable to Mr. Moses.

*Id.* ¶69.

The 1AC alleges that owning to the policies and practices of, among other things, the

OPDA, favorable information—including the Stamps *Brady* material—was "secreted in files"

that were "never turned over to Mr. Moses or his defense attorney." *Id.* ¶70. The 1AC describes

aspects of the trial, including that Stamps testified against him but that:

> unbeknownst to Mr. Moses, Mr. Stamps had previously changed his story about the
> May incident involving Ms. Jenkins (which was supposedly the reason he came to
> claim Mr. Moses was the perpetrator in the first place). This information was known
> to Defendants but also undisclosed to Mr. Moses or his defense counsel.

*Id.* ¶72. As a result of the favorable information being hidden from Plaintiff, the 1AC alleges,

"Mr. Moses was wrongfully convicted of two murders he did not commit," and was then

sentenced to life imprisonment. *Id.* ¶73.

In addition, and entirely ignored by OPDA, the 1AC includes additional allegations about

the impact of the *Brady* violation it is responsible for (and which OPDA is certainly, actually and

truly, familiar with). In particular, the 1AC points out that it was a 2022 "a joint investigation

between the District Attorney and the New Orleans Innocence Project, Mr. Moses's post-conviction counsel," that ultimately "revealed that *Brady* material had been withheld from Mr. Moses's defense." *Id.* ¶145. A hearing was had, and post-conviction relief was granted related directly to the Stamps *Brady* material already identified in the complaint. This included a "finding that the State 'knew that their only eyewitness, Mr. Frederick Stamps, suffered from an apparent mental illness and, additionally, had a possible reason to blame' Mr. Moses for the murder." *Id.* ¶147. The 1AC makes clear that the trial court "the prosecution had medical records and handwritten notes about Mr. Stamps' medications, that could have at 'very least' been 'used for impeachment purposes during trial.'" *Id.* ¶149. Indeed, as OPDA knows, the trial court further found: (1) "the State knew, but had not disclosed, that Mr. Stamps had been inconsistent about the nature of the relationship between Mr. Stamps and Ms. Jenkins altogether"; that (2) Due to Mr. Stamps inconsistencies, mental illness, and potential grudge against [Mr. Moses] as a romantic rival, Stamps' credibility certainly would have been an issue ripe for cross-examination" had Mr. Moses been "provided this relevant information.; and (3) "none of this clearly favorable information was ever turned over to the defense during either pre-trial discovery" or otherwise prior to the trial." *Id.*¶¶150-52.

The 1AC sets out the specific constitutional violation that these acts engendered, too. To wit, in Count I, the 1AC describes a *Brady* violation,[1] and explains that without the suppression of the material and exculpatory information, "there is a reasonable probability that the outcome of the criminal case would have been different." *Id.* ¶86. In addition, Count I sets forth additional allegations about the OPDA's policies and practices and how they contributed to Plaintiff's

---

[1] While this count focuses primarily on the Defendant Officers it is applied to all defendants, and its allegations are incorporated into Count V, which is the claim against OPDA specifically. *See id.* ¶161.

wrongful conviction. *Id.* ¶¶184-197. Among other things, the 1AC alleges that if the District Attorney had acted differently, "Mr. Moses and other people like him would not have been wrongly convicted and imprisoned." *Id.* ¶195.

All of this is beyond sufficient to provide OPDA notice of a *Brady* claim involving the Stamps *Brady* material; *i.e.,* showing that Plaintiff has alleged: (1) OPDA suppressed evidence, (2) that evidence was favorable to the defense, and (3) the evidence was material. The 1AC alleges suppression, Dkt. 30, ¶¶70; it alleges the evidence was favorable, *id.* ¶68-69; and it alleges materiality, *id.* ¶¶69, 72-73; *see also id.* ¶¶145-52.

As the Supreme Court held just this week, "evidence can be material even if it 'goes only to the credibility of a witness,' particularly because a jury's estimate of the 'truthfulness and reliability of a given witness may well be determinative of guilt or innocence.'" *Glossip v. Oklahoma*, 604 U.S. ___, 2025 WL 594736, at *11 (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). Much like *Glossip*, where suppressed evidence (that permitted perjury at trial) concerned the drug use and the psychiatric vulnerabilities of a witness against a criminal defendant, *id.* at *10-*12, the Stamps *Brady* material includes "Mr. Stamps's unreliability, bias, substance use issues, and mental health instability and diagnosis." Dkt. 30, ¶68.

Even without *Glossip*, the law has long been well established that suppression of evidence bearing on the credibility of a purported eyewitness, particularly where it is the "essence of the State's case," is quintessential *Brady* material. *See Kyles v. Whitley*, 514 U.S. 419, 441; *see also, e.g. Mahler v. Kaylo*, 537 F.3d 494, 503 (5th Cir. 2008) (finding withheld statements by witnesses material because they could have been used for impeachment purposes and were central to the defense); *Johnson v. Cain*, 68 F. Supp. 3d 593, 610 (E.D. La. 2014) (holding that the suppression of a statement by the prosecution's main witness was a *Brady*

violation); *Graves v. Dretke*, 442 F.3d 334, 340 (5th Cir. 2006) (emphasizing the importance of examining the suppression of statements by a star witness when there was little to no physical evidence tying the defendant to the crime).

Here, there was no independent, reliable evidence to tie Mr. Moses to the crime, and the State relied entirely on the testimony and statements of Ms. Barras and Mr. Stamps. Dkt. 30, ¶71. Without Mr. Stamps, Mr. Moses would have never been charged and disclosure of his inconsistent statements (that were suppressed by OPDA), "would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense." *Kyles*, 514 U.S. at 441. "[T]he value of two of those witnesses would have been substantially reduced or destroyed." *Id.* Here, the 1AC plausibly alleges allegations that fall into this exact same category. Dkt. 30, ¶¶60–74. The claim is beyond plausibly pleaded, and OPDA's arguments otherwise simply misunderstand the governing standard at this juncture.

### IV.    The *Monell* Claim is Plausibly Pled

The motion to dismiss commits the same errors as it pertains to the *Monell* claim. Under current law, municipal actors (including OPDA) may not be liable under a doctrine of *respondeat superior*. Instead, under *Monell*, municipal actors can be held liable if action pursuant to an official policy caused a constitutional violation. 436 U.S. at 691.

As a result, to state a claim against OPDA pursuant to 42 U.S.C. §1983, a plaintiff must provide notice of a claim showing that there was "(1) a policymaker; (2) an official policy; and (3) a violation of a constitutional right whose 'moving force' is the policy or custom." *Alvarez v. City of Brownsville*, 904 F.3d 382, 389 (5th Cir. 2018). For *Monell* liability, "an official policy may also be a persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to

constitute a custom that fairly represents municipal policy and practically ha[s] the force of law." *Hayes v. Berthelot*, No. CV 24-1434, 2025 WL 317662, at *4 (E.D. La. Jan. 28, 2025) (alteration in original); *see also World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 753 (5th Cir. 2009) ("One way plaintiffs may prove *Monell's* municipal policy or custom requirement is to show a 'persistent, widespread practice of city officials or employees which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy.'").

The plaintiff's burden at trial on these claims is high. *Anderson v. Marshall Cty.*, 637 F. App'x 127, 136 (5th Cir. 2016) (describing plaintiff's obligation to state a valid cause of action against the city under § 1983 a "high legal burden"). But, Plaintiff's burden at the pleading phase is not. *Groden*, 826 F.3d at 284. *Monell* allegations do not exist in a heightened pleading standard beyond that required by Rule 8, *id.*, and the Supreme Court has repeatedly counseled courts against imposing too high of standards in § 1983 cases. *See, e.g.*, *Johnson*, 574 U.S. at 11-12; *Leatherman*, 507 U.S. at 168 ("We think that it is impossible to square the 'heightened pleading standard' applied by the Fifth Circuit in this case with the liberal system of 'notice pleading' set up by the Federal Rules."). As a result, "only minimal factual allegations are required at the motion to dismiss stage." *Brown v. Burmaster*, 2023 WL 2585981, at *3 (E.D. La. Mar. 20, 2023). "This is so because, at the pleading stage, plaintiffs usually will not have access to or personal knowledge of the specific details of a municipality's internal training or supervisory policies and procedures." *Id.*

### A. The First Amended Complaint Beyond Sufficiently Alleges that OPDA had an Unconstitutional Official *Brady* policy

In the 1AC, Plaintiff has presented *Monell* allegations that span nearly 15 pages over 60 paragraphs, including with one paragraph that has 39 subparagraphs. Dkt. 30, ¶¶113-143, 183-

10

97. In other words, there are nearly 100 paragraphs of allegations devoted to the *Monell* claim against OPDA. It is difficult to imagine what OPDA thins a "short plain statement" in Rule 8 means, if the complaint here is not sufficient. It's arguments must be rejected.

The 1AC points out that Orleans Parish has the highest per-capita incarceration rate of all Louisiana parishes, *id.* ¶75, and alleges that the "outsized rate of wrongful convictions in Orleans Parish is also attributable to the historical policies and practices of the District Attorney's office, led by Harry Connick Sr. from 1973 to 2003." *Id.* ¶113. In this time, and especially in the 1990s (when Plaintiff was wrongfully convicted), the OPDA: (1) "prioritized overzealous prosecutions and securing convictions, rather than seeking truth and justice," *id.* ¶114; it (2) "had no meaningful onboarding process for new assistant district attorneys (ADAs) and failed to appropriately train attorneys on their constitutional and ethical obligations, *id.* ¶115, and (3) it maintained a widespread custom and practice of whereby ADAs freely—and egregiously— violated the constitution's duty to disclose favorable evidence" pursuant to *Brady* and its progeny. *Id.* ¶¶116.

Moreover, the 1AC goes beyond these allegations and identifies, for example, how the failed systems worked for new ADAs. *Id.* ¶¶123-25. New ADAs did not have an incentive to learn about *Brady* obligations for a simple (unlawful) reason: "they were permitted to suppress this information as a matter of practice," and those practices "were reflected in written documents and informally, as a matter of custom." *Id.* ¶126. The 1AC then sets forth some of this information.

For example, OPDA had written *Brady* policies that were incorrect on the law and enabled constitutional violations by suggesting that disclosure was only obligated in most cases or where a specific court order demanded the production of the material, and by stating that

Case 2:24-cv-01768-BWA-KWR    Document 39    Filed 02/26/25    Page 12 of 26

*Brady* material was only that information which was exculpatory, though *Brady* material includes a broader suite of materials like impeachment or materials that can be used to call into question the integrity of a police investigation. *Id.* ¶¶126–27. In fact, the 1AC describes not only indifference to, but also hostility to *Brady*: Mr. Connick himself derided *Brady* and complained that "[w]hat some judges, or courts consider to be Brady is sometimes ridiculous to the extreme." *Id.* ¶ 133; *see also id.* ¶¶128-33 (describing other forms of indifference over time). Consistent with this custom, there was no discipline for *Brady* violations at OPDA and, instead, ADAs were further encouraged to win at all costs or face discipline if a case resulted in an acquittal. *Id.* ¶¶134-36. Acquittals—as a form of "loss"—were tracked at OPDA, but actual constitutional violations were not tracked at all. *Id.*¶¶136-68.

The 1AC then goes on to explain that between just October 1992 and August 1997 OPDA prosecutors violated *Brady* at least 18 times in felony cases, including cases that went to the United States Supreme Court—*Kyles v. Whitley*. *Id.* ¶139. Though *Kyles* was decided half a year before Plaintiff was prosecuted, OPDA did nothing to prevent the constitutional violation in his case. *Id.* ¶140. Instead, prosecutors continued to commit *Brady* violations, *id.* ¶¶141.

Indeed, the 1AC describes 39 specific violations (most of which were identified post-trial) of this pattern. *Id.* ¶142. The 1AC points out that the list is underinclusive, because it necessarily excludes *Brady* violations in cases that were resolved with plea deals, *id.* ¶143. The list is also under-inclusive because it does not include *Brady* violations at trial where the disclosure of exculpatory information should have led to no charges being filed but where the defendant might have been ultimately acquitted.

Beyond that, the 1AC alleges that before "Mr. Moses's wrongful prosecution, conviction, and nearly-30-year imprisonment, the District Attorney had widespread unwritten practices of

*Brady* violations and incorrect and unlawful written policies concerning the *Brady* disclosure

obligation that were followed by Assistant District Attorneys in Orleans Parish" *Id.* ¶184. In

addition to repeating allegations about a failure to train, *id.* ¶187, the 1AC identifies explicit

deliberate indifference and opposition to *Brady* disclosures at OPDA, *id.* ¶¶188-89, despite

knowing that constitutional rights were actually being violated. *Id.* ¶190.

 The 1AC then supplies specific allegations about notice to OPDA, via (1) knowledge of

its own practices, (2) state courts vacating or reverseing convictions after finding *Brady*

violations, (3) federal courts vacating or reversing convictions after finding *Brady* violations, (4)

complaints and lawsuits alleging constitutional violations, and (5) motions filed in criminal

proceedings." *Id.* ¶191. Despite such notice, the OPDA did not alter its practices (by providing

*Brady* material to criminal defendants) and instead continued to express indifference, and even

offer excuses as forms of ratification. *Id.* ¶192-93. If OPDA had different practices that complied

with the constitution, Plaintiff—and others—would not have been wrongfully convicted. *Id.*

¶¶194-95. Yet, because the DA caused Mr. Moses unfathomable harm, and violated his

constitutional rights, it is liable for his damages. *Id.*¶¶196-97.

 These allegations in the 1AC are beyond sufficient to plausibly allege OPDA had a

"persistent, widespread practice" of withholding exculpatory evidence and knowingly presenting

false evidence in violation of the Fourteenth Amendment that was "so common and well settled

as to constitute a custom that fairly represents municipal policy." *Marshall v. Webre*, 2023 WL

5952645, at *11 (E.D. La. July 25, 2022) (quoting *Webster v. City of Houston*, 735 F.2d 838, 841

(5th Cir. 1984)).

 The claim that a municipality permitted or encouraged misconduct in violation of the

Constitution is a well-established ground for *Monell* liability. *Jett v. Dallas Ind. Sch. Dist.*, 491

U.S. 701, 737 (1989) (municipal liability attaches where policymaking officials cause a constitutional deprivation "by acquiescence in a longstanding practice or custom"). The First Amended Complaint plausibly pleads these claims.

Nonetheless, OPDA implies the 1AC's allegations do demonstrate there was a failure to disclose evidence, but do not state facts to show it was because of an official custom or practice. Dkt. 34 at 6. The contention is simply false. The 1AC alleges paragraph after paragraph reflective of a custom. Courts have repeatedly recognized that where policymakers encourage unconstitutional conduct, whether explicitly or implicitly, that conduct can be fairly said to represent the "official policy" of the municipality. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152 (1970) (acknowledging municipal liability under § 1983 where policymaking officials "in any way act[ed] to compel or encourage" an unconstitutional custom or practice); *see also Webster v. City of Houston*, 689 F.2d 1220, 1227 (5th Cir. 1982) ("*Monell* sets § 1983 liability 'if high local officials overtly or covertly authorize or encourage constitutional violations by subordinate officials.'").

In fact, policymaking officials need not explicitly instruct, direct, or otherwise affirmatively implement a "custom" for that custom to be attributable to the municipality under *Monell*; to the contrary, a custom is attributable to the municipality where a municipal policymaker tacitly condones the practice. *See Gonzalez v. Ysleta Ind. Sch. Dist.*, 996 F.2d 745, 761 (5th Cir. 1993) (collecting cases). In addition, though Plaintiff is not required to add this level of specificity at the pleading phase, *Brown*, 2023 WL 2585981, at *3, the 1AC goes into detail about the customs that existed in OPDA in the 1990s. Dkt. 30, ¶¶113-143.

In other words, the claim here is that OPDA had an express custom of permitting and possibly even encouraging *Brady* violations, which is reflected in the fact that so many *Brady*

violations have been alleged and proven. Again, in under a 5-year period there were at least 18 *Brady* violations by OPDA prosecutors, including one found by the Supreme Court in *Kyles*, and there were dozens of others identified in the complaint specifically. *See* Dkt. 30, ¶¶139, 142. Indeed, even without these examples, the complaint plausibly alleges that because Mr. Connick tolerated, permitted, and encouraged an unconstitutional practice of withholding exculpatory evidence, that practice reflects the "official policy" of the ODPA. *Id.* ¶116.

The OPDA Defendants' argument that failing to disclose *Brady* material can occur for a variety of reasons is unavailing. Dkt. 34 at 6. The motion to dismiss is premised on resisting the complaint and inferences from the complaint, which is impermissible at this juncture In arguing that the *Brady* material was not turned over for some constitutional reason, the motion is fighting the standard at this stage that all facts and reasonable inferences from those facts must be drawn in the non-moving party's (here Mr. Moses's) favor. The OPDA Defendants' similar argument that the training and supervision was due to unintentional failures or ignorance or misunderstanding, Dkt. 34 at 7, fails for the same reason.

The fact that defendants may have their "spin," their own version of events, or even if they are themselves plausible, is completely irrelevant. *See, e.g.*, *B.W. v. Austin Indep. Sch. Dist.*, 121 F.4th 1066, 1071 (5th Cir. 2024) (allegations of facts consistent with other theories "does not mean that the mere existence of an alternative explanation entitles a defendant to dismissal."); *Wilson v. Birnberg*, 667 F.3d 591, 595 (5th Cir. 2012) ("Dismissal is improper 'if the allegations support relief on any possible theory.'"); *In re Pool Prods. Distribution Mkt. Antitrust Litig.*, 988 F. Supp. 2d 696, 713 (E.D. La. 2013) ("'The choice between two plausible alternative inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion'" Instead, the Court must accept the plaintiff's version of events, so long as that

version is plausible, and it may not dismiss the complaint 'merely because [it] finds a different version more plausible.'") (internal citations omitted).

**B.  The First Amended Complaint beyond sufficiently pleads that OPDA was on notice of a past history of *Brady* violations**

The *Monell* claims in the First Amended Complaint are supported by specific facts showing a pattern of *Brady* violations similar to those present in Mr. Moses's case. *See Mitchell v. City of New Orleans*, 184 F. Supp. 3d 360, 371 (E.D. La. May 2, 2016) ("In meeting their burden of showing that the municipality maintained such a practice, plaintiffs may attempt to prove other similar incidents of the use and toleration of [the practice].").

The governing standard for reviewing whether a plaintiff has properly sued a municipality is to determine whether the plaintiff has provided "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Donahue v. Strain*, 2017 WL 3311241, at *18 (E.D. La. Aug. 3, 2017) (citing *Thomas*, 800 F. Supp. 2d at 841). "Allegations that provide such notice could include . . . past incidents of misconduct to others, multiple harms that occurred to the plaintiff [himself], misconduct that occurred in the open, the involvement of multiple officials in the misconduct, or the specific topic of the challenged policy or training inadequacy." *Id.*

All of these allegations are present in the 1AC. It identifies actual practices; alleges specific notice to OPDA; identifies 18 *Brady* violations in less than a 5-year span; and then presents 39 instances of other constitutional violations that span more than four decades in which the OPDA's nondisclosure of evidence violated the defendant's constitutional rights. Dkt. 30, ¶¶113-143. The First Amended Complaint also identifies a specific case, *Kyles v. Whitley*,

16

decided before Mr. Moses was prosecuted, which explicitly put OPDA on notice of its *Brady* violations. 514 U.S. 419 (1995).

To be clear, the pattern includes not just the other instances but also the surrounding customs and practices of explicitly violating *Brady*, as alleged in the Complaint and described above. *See Griffith v. Strategic Tech. Inst., Inc.,* No. CIV.A. 11-2401, 2012 WL 893465, at *5 (E.D. La. Mar. 15, 2012) (complaint must be read "as a whole . . .rather than any one statement in isolation"); *Torres v. Inteliquent, Inc*., No. CV 17-10022, 2018 WL 5809246, at *2 (E.D. La. Nov. 6, 2018) (recognizing the "complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible" (citation omitted)).

That to the side, while "'the number of incidents and allegations necessary to establish a pattern representing a custom, on a motion to dismiss, varies,'" *Watt v. New Orleans City*, 647 F. Supp. 3d 496, 505 (E.D. La. 2022), the focus is on whether the past incidents are described with enough context to show there were similarities between the past incidents and the current claims. *Id.* The complaint in *this case* is plainly sufficient.

OPDA Defendants' memorandum relies heavily on *Verastique v. City of Dallas*, 106 F.4th 427 (5th Cir. 2024), and *Damond v. City of Rayville*, _F.4th _____, 2025 WL 409795 (5th Cir. Feb. 6, 2025). Dkt. 34 at 10–13. Neither of these cases are controlling or persuasive.

*Verastique* involved an attempted *Monell* claim related to police responses to George Floyd protests in 2020. That case involved an arguably *sui generis* event in terms of the scale of the protests—which the Court labeled "riots" that "inflicted extreme economic harm" on the City of Dallas—in the midst of a global pandemic, and in terms of the police response to those circumstances. 106 F.4th at 430. Obviously, nothing like that had occurred before and showing a *Monell* claim based upon past instances was doomed to fail and so the Plaintiffs could not muster

sufficient detail of their alleged prior claims. As a result, the Fifth Circuit found that the complaint's examples were too vague to provide sufficient information to provide notice of the claim and that they failed to "provide the context necessary to evaluate whether an alleged department-wide pattern is so obvious as to impart constructive notice." *Verastique*, 106 F.4th at 434. The court found some of the incidents "devoid of factual support" and "inscrutably vague" while other instances to be a "hodge-podge of unrelated allegations" that involved "stark factual dissimilarities to what the plaintiffs allegedly experienced." *Id.* at 433.

Such a concern is not present here. The First Amended Complaint provided a great deal of context, including allegations indicating that Mr. Connick was actually aware that his employees were regularly violating the due process rights of those being prosecuted, Dkt. 30 ¶191; that there was widespread knowledge that, in the 1990s, concealing exculpatory evidence in New Orleans was routine, *id.* at ¶139, which provided evidence of deliberate indifference. *Id.* ¶¶125-38. The backdrop at OPDA, in the 1990s when Moses was prosecuted, was one where *Brady* was disregarded as a matter of custom. That custom is sufficiently alleged.

In addition, far from being a "hodge-podge" of dissimilar or vague instances, the examples identified involve Due Process violations, and specifically, cases where courts have found that OPDA violated *Brady.* To set it up, the 1AC identifies 18 felony violations of *Brady* in less than a 5-year period and points to the Supreme Court's decision in *Kyles*. *Id.* ¶¶138. The 1AC points to these violations as proximately relevant to Mr. Moses's wrongful conviction as well. *Id.* ¶139.

That is sufficient on its own. There is more. The 1AC goes on to identify 39 other instances in Paragraph 142.  These examples mirror circumstances similar to what happened to

Mr. Moses and identify the year at issue, the nature of the Due Process violation, and even include a factual overview of how the violation occurred. *Id*. This is sufficient.

Likewise, OPDA's reliance on *Damond*'s concerns about the dissimilarity of the incidents, 2025 WL 409795 at *2, are unpersuasive here for the same reasons. This is not a case where the plaintiff is relying on scant and dissimilar examples. Here, the 1AC provided the same type of allegations found to be sufficient where a past history of *Brady* violations has adequately put OPDA Defendants on notice. *See, e.g.*, *Mitchell*, 184 F. Supp. 3d at 373 (finding allegations that policymaker was aware of "long history of prior incidents," and "'set the tone and direction' for these incidents of police harassment and deprivation of rights by approving, ratifying, and condoning these actions and by communicating . . . that [officers] would be protected from discipline or accountability" sufficient to withstand a motion to dismiss); *Butler v. City of Dallas*, 2015 WL 8467029, at *19 (N.D. Tx. 2015) (allegations stating general pattern of excessive force and two identifying specific similar instances "a close call" but "sufficient").

At a minimum, the 1AC has alleged "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" of OPDA's unconstitutional conduct sufficient to prove municipal liability. *Twombly,* 550 U.S. at 556; *see Flagg v. Stryker Corp.*, 647 F. App'x 314, 319 (5th Cir. 2016) ("[W]e must remember that the question at the motion to dismiss stage is not whether [the plaintiff] has *proven* the elements to succeed . . . or even whether he has made 'detailed factual allegations.' The question is whether [the plaintiff] has plausibly alleged enough information that, *with discovery*, he could prove the [Defendants] are liable." (emphasis in original) (internal citation omitted)). The allegations here are sufficient to "reasonably infer the existence of a persistent, widespread practice" "rising to the level of a custom that has the effect of official City policy." *Butler*, 2015 WL 8467029, at *19.

**C.  The First Amended Complaint Beyond Sufficiently Pleads Deliberate Indifference by OPDA's Policymakers**

The motion argues that the 1AC fails to sufficiently allege deliberate indifference. They are mistaken. The 1AC beyond adequately alleges deliberate indifference. Deliberate indifference exists when "policymakers are on actual or constructive notice that a particular omission in their [] program causes city employees to violate citizens' constitutional rights [and] . . . the policymakers choose to retain that program." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). The 1AC explicitly alleges OPDA's knowledge of, and even encouragement of, *Brady* violations both through incorrect written policies and policy-maker direct action. Dkt. 30, ¶¶123-38. In particular: "In 1994 and 1995, the District Attorney was aware that Brady violations were regularly committed in criminal cases prosecuted in Orleans Parish, including suppression of evidence by ADAs and NOPD." *Id.* ¶131. In fact, "showing hubris beyond deliberate indifference, the District Attorney publicly complained that "[w]hat some judges, or courts consider to be Brady is *sometimes* ridiculous to the extreme.'" *Id.* ¶133. Likewise, in "the five years after Kyles, when the District Attorney should have required more exacting compliance with *Brady*, affirmatively trained prosecutors on their disclosure obligations, and adopted a policy manual that adhered to the law, Orleans Parish ADAs committed more *Brady* violations. *Id.* ¶141.

This is sufficient. Again, there is more. The pattern of violations alleged also is beyond ample to show notice. *Piotrowski v. City of Houston*, 237 F.3d 567, 582 (5th Cir. 2001) ("A pattern could evidence not only the existence of a policy but also official deliberate indifference."). As discussed in greater detail above, the 1AC provided (1) statistical evidence regarding the widespread and persistent nature of Brady violations by the OPDA in the 1970s and 1980s; (2) public statements made by Mr. Connick and others acknowledging these

violations and the failure to address them; and (3) dozens of specific examples of other documented instances of such violations. The First Amended Complaint describes how Mr. Connick encouraged *Brady* violations—by creating a culture focused on "winning" at all costs, Dkt. 30, ¶¶136; by tracking prosecutors' wins and losses, *id.* ¶135; by failing to train attorneys on their constitutional and ethical obligations, *id.* ¶¶115, 129; by allowing prosecutors to not affirmatively investigate whether they had obtained all favorable information, *id.* at ¶129; by demonstrating to employees that they would face no negative consequences for their failures to comply with *Brady*, *id.* at ¶134; and by promulgating a written *Brady* policy that was incorrect on the law, *id.* ¶¶ 126–127.

These allegations, taken together, are more than sufficient to allege that Mr. Connick knew the *Brady* policy was insufficient and incorrect and customs and practices of OPDA were leading to *Brady* violations, and chose to make no changes. Thus, dismissal would be improper.

### D. The First Amended Complaint Beyond Sufficiently Pleads that OPDA's Official Policies Were the Moving Force Behind Moses's Injuries

The First Amended Complaint has alleged that the "moving force[s]" behind the *Brady* violations were OPDA customs and practices of suppressing and failing to timely disclose material exculpatory evidence, fabricating and knowingly allowing the presentation of false evidence, and engaging in the affirmative concealment of such misconduct. Dkt. 30 ¶¶184–96. "For the 'moving force' element, a plaintiff must 'show[] either that the policy itself was unconstitutional' or that it 'was adopted with deliberate indifference to the known or obvious fact' that a specific constitutional violation would follow." *Liggins v. Duncanville*, 52 F.4th 953, 955 (5th Cir. 2022) (citing *Webb v. Town of Saint Joseph*, 925 F.3d 209, 219 (5th Cir. 2019)).

As explained above, OPDA had customs and practices that amounted to an official policy of promoting, facilitating, and condoning misconduct by its employees concerning the

suppression of *Brady* material. Because such behavior violates the Fourteenth Amendment by being an unconstitutional policy adopted with deliberate indifference, the First Amended Complaint alleged that OPDA's unconstitutional policies caused his constitutional injury. *See Jauch v. Choctaw Cty.,* 874 F.3d 425, 435–36 (5th Cir. 2017) (finding it "obvious" that policy whereby certain arrestees were indefinitely detained was the moving force behind due process violation of indefinite detention); *Arnold v. Alvarado*, 2024 WL 1603518, at *5 (E.D. La. Apr. 12, 2024) (finding allegations "clear" that failure to "enforce the policies that are meant to govern the use of force" led to the use of excessive force against plaintiff); *Durant v. Gretna City*, 2020 WL 263669, at *29 (E.D. La. Jan. 17, 2020) (arrest pursuant to unconstitutional ordinance established that ordinance itself "obvious[ly]" caused plaintiff's injury).

As further example, in *Arnold*, the plaintiff had suffered injuries from an excessive use of force by a police officer. *See* 2024 WL 1603518, at *5. The court acknowledged that this behavior was a direct result of the policies which "perpetuat[ed] an unconstitutional cycle of violence" at the sheriff's office and created a culture in which such behavior was tolerated and encouraged. *Id.* at *5. So too here. The constitutional violations suffered by Mr. Moses directly reflect the policy, practice, and custom of the OPDA to encourage *Brady* violations and to prioritize winning at trial above all else.

Accordingly, the 1AC has sufficiently alleged that OPDA's custom and practice of permitting, encouraging, and failing to prevent *Brady* violations were the moving force behind his injuries. In arguing to the contrary, the OPDA Defendants' memorandum cites no case law that supports its argument that the 1AC should be dismissed for failing to disclose which prosecutors did what or what the *Brady* material explicitly contained. Dkt. 34 at 12–13. This is not a requirement for pleading a *Monell* claim. (Nor is it relevant). The First Amended

Complaint has alleged that these customs and practices were created and continued by then-District Attorney and OPDA policies promulgated or in place under his leadership. Dkt. 30 ¶ 113. The First Amended Complaint alleges that there was *Brady* material concerning the witnesses' statements and backgrounds that was not disclosed. *Id.* ¶¶66–72. Dismissal is inappropriate here.

## V.    In the Alternative, Leave to Amend Should be Granted

The complaint is sufficient. In the alternative, because dismissal with prejudice would be error, Plaintiff must be permitted to amend. Leave to amend a complaint should be freely given. FED. R. CIV. P. 15(a)(2). The language of Rule 15 "evinces a bias in favor of granting leave to amend." *Lyn–Lea Travel Corp. v. Am. Airlines*, 283 F.3d 282, 286 (5th Cir.2002). Therefore, there must be a "substantial reason" to deny leave to amend. *Id.* The Supreme Court has held that leave to amend a complaint should not be denied unless there is "[1] undue delay, [2] bad faith or dilatory motive on the part of the movant, [3] repeated failure to cure deficiencies by amendments previously allowed, [4] undue prejudice to the opposing party by virtue of allowance of the amendment, [or] [5] futility of the amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also U.S. ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 386 (5th Cir. 2003) (applying the standard).

None of those circumstances are present here. First, there is no undue delay; in the event that amending the complaint is ordered, it is early in the proceedings. Second, no facts suggest that Moses has acted in bad faith. Third, while Mr. Moses has amended his complaint once before, it was not in direct response to a pleading deficiency identified by this Court. *See Tesla, Inc. v. Louisiana Auto. Dealers Ass'n*, 2023 WL 9059650, at *4 (E.D. La. Jan. 11, 2023) (granting leave to amend because Plaintiff had not been directed to respond to pleading

deficiencies). Fourth, a defendant is prejudiced if an amended pleading would "require the defendant to reopen discovery and prepare a defense for a claim different from the [one] . . . that was before the court." *Smith v. EMC Corp.*, 393 F.3d 590, 596 (5th Cir. 2004) (citing *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir.1999)). Defendants would not be prejudiced here because discovery is not anywhere close to closing. Additionally, the amended pleadings would not be so different as to require preparation of unanticipated defenses. Finally, amending the complaint to address a deficiency would not be futile. If Mr. Moses's complaint is dismissed for failure to state a claim, amending the complaint would be "especially appropriate." *Griggs v. Hinds Junior Coll.*, 563 F.2d 179, 180 (5th Cir. 1977) ("Granting leave to amend is especially appropriate, in cases such as this, when the trial court has dismissed the complaint for failure to state a claim.").

Thus, in the alternative, should the Court find the First Amended Complaint deficient in some way, Plaintiff respectfully requests leave to amend his complaint to address any such deficiency.

## CONCLUSION

The claims in the First Amended Complaint have been plausibly pled, and this court should deny OPDA Defendants' motion to dismiss.

Respectfully submitted,

/s/David B. Owens

David B. Owens*
LOEVY & LOEVY
311 N. Aberdeen St 3FL
Chicago IL 60607
c/o Civil Rights and Justice Clinic
University of Washington Law School
William H. Gates Hall, Suite 265
P.O. Box 85110, Seattle, WA 98145-1110

david@loevy.com
*admitted pro hac vice

William Most, La. Bar No. 36914
Caroline Gabriel, La. Bar No. 38224
MOST & ASSOCIATES

<u>**CERTIFICATE OF SERVICE**</u>

I, David B. Owens, an attorney, certify that on February 26, 2025, I filed the foregoing Response via the Court's CM/ECF system, effecting service on all counsel of record.

<u>/s/David B. Owens</u>
*One of Plaintiff's Attorneys*