**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| LARRY MOSES, | Civil Action No. 24-01768 |
| *Plaintiff*, | |
| | Section M |
| v. | Judge Barry W. Ashe |
| | |
| THE CITY OF NEW ORLEANS, *et al.*, | Division 4 |
| | Magistrate Judge Karen Wells Roby |
| *Defendants*. | |

## REPLY MEMORANDUM IN SUPPORT OF OPDA'S MOTION TO DISMISS

Defendant Jason R. Williams, in his official capacity as Orleans Parish District Attorney ("OPDA"), through undersigned counsel, respectfully submits this reply to the opposition filed by Plaintiff Larry Moses, Doc. No. 39, and in further support of OPDA's motion to dismiss, Doc. No. 34.

### I.     Mr. Moses has not adequately alleged a *Brady* violation.

As explained more fully in OPDA's opening brief, Mr. Moses has not adequately alleged that prosecutors violated his constitutional rights by failing to disclose material exculpatory evidence in his criminal case. In arguing to the contrary, Mr. Moses goes beyond the allegations of his Complaint and relies on conclusory allegations with respect to materiality.

Mr. Moses argues that "OPDA had information that the voice identification by Ms. Barras was bogus and fabricated." Doc. No. 39 at 5. To the contrary—the Complaint does not allege that OPDA had any such information. The Complaint alleges, in a conclusory fashion, that Ms. Barras "provide[d] a false and fabricated account that she 'voice identified' and recognized the perpetrator's voice as belong to Mr. Moses," and vaguely insinuates that NOPD officers had some

1

involvement in this alleged fabrication. *See* Doc. No. 30 at ¶¶ 60, 66. Yet nothing in the Complaint suggests that any OPDA actor was aware of this alleged fabrication.

Mr. Moses also argues that "OPDA had information . . . that the investigation involving Mr. Stamps was not credible and involved changing stories." Doc. No. 39 at 5. Here again, the Complaint does not allege any such thing. The Complaint alleges that Mr. Stamps and NOPD officers worked together to create a "false, fabricated narrative." Doc. No. 30 at ¶ 48. But nothing in the Complaint suggests that any OPDA actor was aware of "changing stories" by Mr. Stamps, or that the police investigation was "not credible" (whatever that might mean). Indeed, Mr. Moses expressly alleges that "the Defendant Officers did not ever disclose their own acts in fabricating evidence." *Id.* at ¶ 66. Mr. Moses later alleges that information about Mr. Stamps changing his story was "known to Defendants," *Id.* at ¶ 72, but this conclusory allegation against the undifferentiated group of all Defendants does not adequately allege that any OPDA actor was actually aware of such information.[1]

Mr. Moses also argues that "OPDA had information . . . that Mr. Stamps was biased, and had substance abuse issues and unstable mental health." Doc. No. 39 at 5. As explained in OPDA's original brief, Mr. Moses has not provided any further explanation of what this information was, which is essential in assessing how effective (*i.e.*, material) it would have been in impeaching Mr. Stamps and undermining his testimony. Nor does he directly allege that any OPDA actor was

---

[1] *See, e.g., Cain v. City of New Orleans*, No. 15-cv-4479, 2016 WL 2849478, at *5 (E.D. La. May 13, 2016) ("This pleading structure—lumping all defendants together and asserting identical allegations as to each, without distinction—largely prevents the Court from discerning which defendants are allegedly responsible for which allegedly unlawful actions."); *Floyd v. Dillmann*, 614 F. Supp. 3d 454, 460–61 (E.D. La. 2022) (dismissing claims against former NOPD sergeant where "collective allegations" failed to adequately allege his personal involvement).

aware of this information, or provide any explanation of how any OPDA actor would have become aware of it.

Mr. Moses's allegations also fail to show that the allegedly suppressed information was material. He notes, correctly, that evidence *may* be material if it impeaches a witness for the state. *See* Doc. No. 39 at 8. The problem, however, is that the facts alleged by Mr. Moses do not plausibly *show* that the vaguely described information that purportedly undermined Mr. Stamps's credibility was in fact material in light of the evidence presented at trial. Mr. Moses cites several cases for the proposition that "evidence bearing on the credibility of a purported eyewitness" is "quintessential *Brady* material." Doc. No. 39 at 8. Yet these cases in fact demonstrate the inadequacy of Mr. Moses's pleadings.

For example, in *Kyles v. Whitley*, 514 U.S. 419, 441 (1995), the Supreme Court explained how disclosure of prior inconsistent statements by the two eyewitnesses who identified Curtis Kyles as the murderer "would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense." The Supreme Court described in detail what these witnesses had testified to at trial, what they said before trial that was different, and how the inconsistencies could have been used to undermine their testimony. *See id.* at 423, 441–45. Similarly, in *Mahler v. Kaylo*, 537 F.3d 494, 500 (5th Cir. 2008), the Fifth Circuit found the pretrial statements of several witnesses to be material because they stood "in direct contrast to the prosecution witnesses' trial testimony" on "the question at the heart of Mahler's defense"— whether a shooting occurred in the course of an active physical altercation.[2] By contrast, Mr. Moses

---

[2] Similarly, in *Johnson v. Cain*, 68 F. Supp. 3d 593, 610–12 (E.D. La. 2014), which also involved a claim of self-defense, another section of this Court found pretrial statements of "the prosecution's main witness" to be material because they told "a very different version of events" than he testified to at trial. The Court noted that "the jury's lengthy deliberation centered on the question of whether

3

does not even explain precisely what the "Stamps *Brady* Material" was—much less how and why it would have so thoroughly undermined Mr. Stamps's credibility as to make it reasonably probable that the result at trial would have been different, in light of all the evidence presented.

With respect to materiality, Mr. Moses apparently believes it is sufficient to allege that "there is a reasonable probability that the outcome of the criminal case would have been different." Doc. No. 39 at 7 (quoting Doc. No. 30 at ¶ 86). But this is nothing more than a legal conclusion that restates the legal standard for materiality. And, as noted in OPDA's original brief, while Mr. Moses alleges certain facts surrounding the underlying murder, he makes no serious attempt to explain what evidence was presented at trial. Mr. Moses has not provided OPDA and this Court with the facts necessary to assess whether his assertion is plausibly true—in other words, whether there actually is a reasonable probability that the outcome of Mr. Moses's criminal case would have been different if certain information had been disclosed to him.

**II.     Mr. Moses has not adequately alleged that OPDA's policymaker adopted any unconstitutional policy with deliberate indifference to the rights of criminal defendants.**

Mr. Moses argues that only "minimal" factual allegations are required to plead a *Monell* claim,[3] but the Fifth Circuit has held that a plaintiff must plead "***specific facts***" describing the "policy or custom and its relationship to the underlying constitutional violation." *Guillot on behalf of T.A.G. v. Russell*, 59 F.4th 743, 752 (5th Cir. 2023) (emphasis added).

Mr. Moses insists that he has adequately alleged "that OPDA had an Unconstitutional Official *Brady* policy," Doc. No. 39 at 10, but he still cannot even explain what exactly the

---

Mr. Johnson had specific intent to kill," and that the inconsistent statement of "the government's key and only eyewitness" would have supported the defendant's theory. *Id.* at 611–12.

[3] Doc. No. 39 at 10 (quoting *Brown v. Burmaster*, No. 22-cv-847, 2023 WL 2585981, at *3 (E.D. La. Mar. 20, 2023)).

purported "policy" was that allegedly caused repeated *Brady* violations. Mr. Moses argues that he must have met his pleading burden because he included "nearly 100 paragraphs of allegations devoted to the *Monell* claim against OPDA." *Id.* at 11. But he has simply thrown together dozens of allegations without any consideration as to how they fit into a coherent theory.

Some of his allegations suggest that prosecutors "freely" and "egregiously" suppressed evidence that they knew to be exculpatory because they were more concerned with "securing convictions" than "seeking truth and justice," "even at the price of imprisoning innocent people." *See* Doc. No. 30 at ¶¶ 114, 116. Other allegations suggest that exculpatory evidence was not disclosed because prosecutors were too busy and did not have enough time to learn their cases, causing them to "struggle[ ] to discern" the evidence that should be disclosed. *See* Doc. No. 30 at ¶¶ 123–124. Other allegations suggest that exculpatory evidence was not disclosed because prosecutors did not understand the governing law and were not trained—though Mr. Moses does not identify any specific, widespread misunderstandings of the law that allegedly caused *Brady* violations. *See id.* at ¶¶ 115, 129. Other allegations suggest that exculpatory evidence was not disclosed because prosecutors received incorrect instruction from a policy manual. *See id.* at ¶¶ 126–128. Other allegations suggest that prosecutors sometimes were not even aware of exculpatory evidence because they were not "require[d] . . . to affirmatively investigate whether they had obtained all favorable information from police officers, investigators, or detectives." *See id.* at ¶ 129. Some of Mr. Moses's allegations even suggest that NOPD officers "hid evidence" from the prosecution. *See* Doc. No. 38 at 10. The Complaint points in all of these directions at once, and in other directions as well, but without including the factual support to substantiate any

of these theories.[4] And the fact that the allegations are so scattered cuts against any plausible inference that the *Brady* violations alleged in the Complaint (including the alleged violation in Mr. Moses's case) were all caused by an identifiable policy decision by Mr. Connick.

Mr. Moses argues that it is "resisting the complaint and inferences from the complaint" to point out that "failing to disclose *Brady* material can occur for a variety of reasons." Doc. No. 39 at 15. But as shown in the preceding paragraph, ***the Complaint itself*** implies that *Brady* violations occurred in a variety of different ways and for a variety of different reasons. Even worse, Mr. Moses does not even attempt to explain *why* any particular alleged *Brady* violation occurred (including the alleged violation in his case), or how it related to OPDA's alleged official policies.

Mr. Moses argues that "a custom is attributable to the municipality where a municipal policymaker tacitly condones the practice." Doc. No. 39 at 14. But as explained in OPDA's opening brief, a policymaker cannot "condone" an unwritten practice unless he knows that it is happening—and not just occasionally, but that it is "so common and well-settled as to constitute a custom that fairly represents municipal policy."[5] *See also Davidson v. City of Stafford*, 848 F.3d 384, 396 (5th Cir. 2017) (explaining that the pattern "must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of ***knowledge that the objectionable conduct is the expected, accepted practice***.") (emphasis added). If Mr. Moses cannot even identify the specific alleged common practice among OPDA prosecutors that purportedly caused repeated *Brady* violations, he certainly cannot show that Mr. Connick was aware of the practice and condoned it.

---

[4] In his opposition brief, Mr. Moses argues that "OPDA had an express custom of permitting ***and possibly even encouraging*** *Brady* violations," Doc. No. 39 at 14 (emphasis added)—further demonstrating that Mr. Moses himself is not even clear on what the alleged policy was.

[5] Doc. No. 34-1 at 5 (citing *Alvarez v. City of Brownsville*, 904 F.3d 382, 389–90 (5th Cir. 2018) (en banc); *Pena v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018)).

Mr. Moses contends that Mr. Connick "was actually aware that his employees were regularly violating the due process rights of those being prosecuted," Doc. No. 39 at 18, but this claim is completely unsubstantiated by the Complaint. There are no well-pleaded factual allegations showing that Mr. Connick was aware of suppression of evidence in any case at or around the time when it allegedly happened. The only allegations on this point are conclusory, with no factual detail that could make them plausible.[6] For example, Mr. Moses alleges that "complaints and lawsuits alleging constitutional violations" and "motions filed in criminal proceedings" provided notice to the District Attorney that OPDA's policies were causing unconstitutional convictions. Doc. No. 30 at ¶ 190. But he does not identify any such complaints, lawsuits, or motions, or explain what they said or when they were filed. Mr. Moses also alleges that notice was provided by decisions of state and federal courts reversing convictions on *Brady* grounds. *Id.* But, as explained in OPDA's original brief, Mr. Moses does not allege when these decisions were issued (or, critically, whether they were issued before his own criminal case). *See* Doc. No. 34-1 at 9–10.

This inattention to timing pervades Mr. Moses's Complaint and undermines the plausibility of his claims. For example, Mr. Moses relies heavily on the allegation that Mr. Connick showed "hubris" and "hostility to *Brady*" by stating publicly that "[w]hat some judges or courts consider to be *Brady* is sometimes ridiculous to the extreme." Doc. No. 39 at 12, 20 (quoting Doc. No. 30 at ¶ 133). Putting aside the inaccurate characterization of Mr. Connick's statement, Mr. Moses fails to allege when this statement was made. That omission is understandable, because the quote is from a letter that Mr. Connick wrote to Judge Calvin Johnson in 1998, *several years after Mr.*

---

[6] *See, e.g.*, Doc. No. 30 at ¶ 130 ("In 1994 and 1995, the District Attorney was aware that *Brady* violations were regularly committed in criminal cases prosecuted in Orleans Parish, including suppression of evidence by ADAs and NOPD officers.").

*Moses's conviction.*[7] Obviously, any comments that Mr. Connick made after Mr. Moses's conviction could have played no role whatsoever in causing a *Brady* violation in his case.

Mr. Moses argues that he has adequately alleged municipal liability by showing a "pattern" of *Brady* violations in other cases over the years. *See* Doc. No. 39 at 12; *id.* at 20 (arguing that "[t]he pattern of violations alleged also is beyond ample to show notice"). But he has not shown "*any* pattern of conduct—much less a pattern of similar violations." *Verastique v. City of Dallas, Texas*, 106 F.4th 427, 432 (5th Cir. 2024). Once again, Mr. Moses has made no effort to explain *why* the alleged *Brady* violations occurred in any case or establish a causal connection to OPDA's alleged unconstitutional policies. Indeed, Mr. Moses makes no effort, in his Complaint or in his opposition brief, to demonstrate the similarity of the various alleged *Brady* violations. Mr. Moses also fails to address the jurisprudence explaining that "it is *impossible* to identify the existence of a pattern" of unconstitutional conduct based on numbers of alleged incidents without "context" showing the relevant total numbers. *See* Doc. No. 34-1 at 11–13. In other words, just as the number of allegedly illegal arrests by a police department must be compared to the total number of arrests, *see Verastique*, 106 F.4th at 434, the number of convictions allegedly involving *Brady* violations by OPDA must be compared to the total number of convictions. If that context had been included, it would have been clear that the *Brady* violations alleged by Mr. Moses amount to a miniscule percentage of the thousands of cases prosecuted annually by OPDA, completely undermining any inference that suppression of evidence was "so persistent and widespread as to practically have the force of law." *See Johnson v. Harris County*, 83 F.4th 941, 946 (5th Cir. 2023).

---

[7] *See* Exhibit 1, January 12, 1998 letter. This document may be considered in ruling on OPDA's Rule 12(b)(6) motion because it is central to Mr. Moses's claim and is quoted in his Complaint. *See Whitfield v. City of New Orleans*, 421 F. Supp. 3d 818, 823 (E.D. La. 2019). In any event, the letter certainly does not reflect "hostility to *Brady*"; to the contrary, Mr. Connick expressly reaffirmed his office's policy of complying with legal and ethical disclosure obligations.

**III.    Mr. Moses has not adequately alleged that OPDA's official policies were the "moving force" causing his constitutional rights to be violated.**

As explained above, Mr. Moses has not identified any specific alleged policy or common practice among OPDA prosecutors that purportedly caused *Brady* violations in his case (or in any other case). Nor has he provided any factual allegations about the actions of the prosecutors who handled his case, such as what they did or didn't do, when it occurred, or *why* it occurred. Mr. Moses even argues, remarkably, that such facts are not even "relevant." Doc. No. 39 at 22. But they are not merely relevant—they are essential. Mr. Moses cannot show that OPDA's alleged policies caused a *Brady* violation in his case without addressing what happened in his case and how that was influenced by the alleged official policies.

Mr. Moses notes that, in some cases, it may be "obvious" that an occurrence was caused by an official policy or procedure. *See* Doc. No. 39 at 22 (quoting *Jauch v. Choctaw County*, 874 F.3d 425, 435–36 (5th Cir. 2017)). But here—considering the numerous possible reasons why exculpatory evidence might not be disclosed, together with Mr. Moses's failure to describe the alleged policies with any precision—causation is not at all obvious. The logical implication of Mr. Moses's position is that every single instance of nondisclosure of *Brady* material that occurred during Mr. Connick's administration can be presumed to have been caused by OPDA's official policies. This is an absurd and unreasonable result, and it should be rejected.

**CONCLUSION**

For the reasons explained above and in OPDA's original brief, the claims against Jason Williams, in his official capacity as Orleans Parish District Attorney, must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

9

Respectfully submitted,

 /s/ Matthew J. Paul
W. Raley Alford, III, 27354
Matthew J. Paul, 37004
Inga C. Petrovich, 31284
STANLEY REUTER ALFORD
  OWEN MUNSON & PAUL, LLC
909 Poydras Street, Suite 2500
New Orleans, Louisiana 70112
Telephone: (504) 523-1580
Facsimile:  (504) 524-0069
wra@stanleyreuter.com
mjp@stanleyreuter.com
icp@stanleyreuter.com

*Counsel for Jason R. Williams (in his official capacity as Orleans Parish District Attorney)*