UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

LARRY MOSES                                             CIVIL ACTION

VERSUS                                                  NO. 24-1768

THE CITY OF NEW ORLEANS, *et al.*                       SECTION M (4)

### ORDER & REASONS

Before the Court is a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure filed by defendant Jason R. Williams, in his official capacity as Orleans Parish District Attorney ("OPDA").[1] Plaintiff Larry Moses responds in opposition,[2] and Williams replies in further support of his motion.[3] Also before the Court is a motion to dismiss pursuant to Rule 12(b)(6) filed by defendant the City of New Orleans (the "City),[4] to which Moses responds in opposition.[5] Having considered the parties' memoranda, the record, and the applicable law, the Court issues this Order & Reasons denying both motions.

### I.   BACKGROUND

This case concerns constitutional violations that allegedly occurred during a criminal investigation and prosecution that led to Moses being convicted of, and incarcerated for, two murders.[6] The story begins in the early morning hours of January 4, 1994, when Daniel Ratliff and Alma Causey were shot and killed during an armed robbery on Humanity Street near its

---

[1] R. Doc. 34.
[2] R. Doc. 39.
[3] R. Doc. 41.
[4] R. Doc. 35.
[5] R. Doc. 38. Moses also filed a notice of supplemental authority in opposition to both motions to bring to the Court's attention the recent decision in *Flanks v. City of New Orleans*, 2025 WL 660037 (E.D. La. Feb. 28, 2025), which was released after Moses filed his opposition memoranda. R. Doc. 40.
[6] R. Doc. 30 at 1. The following facts are taken from the amended complaint, the allegations of which are taken as true at this motion-to-dismiss stage.

intersection with Feliciana Street in the Ninth Ward of New Orleans.[7] The New Orleans Police Department ("NOPD") reported to the scene to investigate.[8] Then-detective Wayne Rumore was the lead investigator and worked with then-detectives John Ronquillo and Patrick Young on the case.[9] Their work was supervised by then-supervising detectives Patrick Jones and James Anderson.[10] Upon arrival at the scene, NOPD officers spoke with Jean Barras, the only actual, but partial, eyewitness to the crime.[11] Barras, who was inside a home on the corner of Feliciana and Humanity Streets, looking out of a window facing Humanity Street, reported that she saw the perpetrator and provided a description, but admitted that she did not see the shooting or the person's face.[12] She also said that she heard the perpetrator command the victims to get on the ground and give him their money.[13] Barras, who knew Moses, did not implicate him, described a person that did not meet Moses's height and build at the time, said she did not know the perpetrator, and did not report seeing or hearing any other persons in the area before or after the shooting.[14] No evidence collected at the crime scene linked Moses to the murders.[15] Moses's name was mentioned to police when a family member of one of the victims reported that he heard a rumor that Moses and Ratliff had an argument a few days before the shooting.[16] Moses was not questioned at that time.[17]

---

[7] *Id.* at 4.
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.* at 4-5.
[12] *Id.* at 5.
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.* at 6.
[17] *Id.*

On May 28, 1994, Frederick P. Stamps reported to the NOPD that his ex-girlfriend, Gail Jenkins, used a man named "Larry" to lure him into an armed robbery.[18] Moses alleges that what really happened is that Stamps committed domestic violence against Jenkins, and when Moses intervened to deescalate the situation, Stamps also attacked him, leading to a fight.[19] Jenkins was arrested, but Stamps told the officers that he did not know "Larry's" last name.[20]

About a week later, in June 1994, Rumore, Ronquillo, and Jones met with Stamps and spoke with him about the Ratliff-Causey homicide.[21] In those conversations, which were not recorded, Stamps made it clear to the officers that he had a vendetta against Moses, had credibility issues, and was mentally unstable.[22] Moses alleges that the officers and Stamps created a false narrative implicating him in the Ratliff-Causey homicide.[23] According to Moses, Stamps falsely claimed that he was walking down Humanity Street before the shooting, where he interacted with Moses, who threatened him with a gun.[24] Stamps said that he then heard Moses talking with the victims, and Ratliff begging for their lives.[25] Stamps also claimed that he actually saw Moses commit the murders and saw Barras observe it all from the window.[26] The officers presented Stamps with a six-person photographic lineup – claiming that it had been created in January, not June – from which Stamps identified Moses.[27] On June 6, 1994, a warrant was issued for Moses's arrest for the Ratliff-Causey homicide.[28] After Moses was charged, officers spoke with Barras

---

[18] *Id.* at 7.
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.* at 7-8.
[24] *Id.* at 8.
[25] *Id.*
[26] *Id.*
[27] *Id.* at 8-9.
[28] *Id.* at 9.

3

who "voice identified" Moses as the perpetrator.[29] The case went to trial where the officers, Stamps, and Barras testified consistent with what Moses calls their fabricated documents and statements.[30] Moses was convicted and sentenced to life in prison.[31]

In 2022, a joint investigation between the OPDA and the New Orleans Innocence Project (Moses's post-conviction counsel) revealed that *Brady* material had been withheld from Moses's defense.[32] Moses's counsel filed a motion for post-conviction relief on his behalf.[33] After a hearing, the state court granted relief.[34] That court found that the OPDA "knew that their only eyewitness, [Stamps], suffered from an apparent mental illness and, additionally, had reason to blame" Moses for the murders.[35] The court also found that the prosecution had medical records and handwritten notes about Stamps's medications that could at the "very least" have been "used for impeachment purposes during trial."[36] Further, the court found that the OPDA knew, but had not disclosed, that Stamps had been inconsistent about the nature of his relationship with Jenkins.[37] In sum, the court concluded that "[d]ue to … Stamps's inconsistencies, mental illness, and potential grudge against [Moses] as a romantic rival, Stamps'[s] credibility certainly would have been an issue ripe for cross-examination" had Moses been "provided this relevant information," yet "none of this clearly favorable information was ever turned over to the defense during either pre-trial discovery" or otherwise prior to the trial.[38] In May 2023, Moses's conviction was vacated and the charges against him were dismissed on July 19, 2023.[39]

---

[29] *Id.*
[30] *Id.* at 10-11.
[31] *Id.* at 11.
[32] *Id.* at 31.
[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] *Id.* at 32.
[37] *Id.*
[38] *Id.*
[39] *Id.*

On July 15, 2024, Moses filed this action against Williams, in his official capacity as the OPDA, the City, former NOPD detectives Rumore, Ronquillo, Jones, and Anderson, and former OPDA assistant attorneys Allison Monahan and Glynn Alexander.[40] The City filed notices of death as to Alexander, Jones, and Ronquillo, and a Rule 12(b)(6) motion to dismiss the complaint.[41] As a result, Moses filed an amended complaint adding the successions of Jones and Ronquillo as defendants, and dropping Monahan and Alexander as defendants.[42] The Court dismissed as moot the City's motion to dismiss because it was no longer directed at the operative complaint.[43]

In the amended complaint, Moses brings claims against all defendants under 42 U.S.C. § 1983 for violations of the Fourteenth Amendment, alleging that they deprived him of his constitutional rights to due process and a fair trial through the fabrication of evidence that implicated him in the murders and by withholding favorable information from his defense team.[44] Moses also brings a § 1983 claim against the City and defendant officers for depriving him of his liberty without probable cause in violation of the Fourth and Fourteenth Amendments.[45] Next, Moses brings § 1983 claims against the City and defendant officers for failing to intervene to prevent the violation of his constitutional rights and for conspiring to deprive him of his constitutional rights.[46] Fifth, Moses brings a § 1983 claim against Williams, in his official capacity, for the OPDA's policy and practice of withholding *Brady* material in violation of the Fourteenth Amendment.[47] Sixth, Moses brings a § 1983 claim against the City for its policy and

---

[40] R. Doc. 1.
[41] R. Docs. 16; 17; 18; 25.
[42] R. Doc. 30.
[43] R. Doc. 31.
[44] R. Doc. 30 at 33-34.
[45] *Id.* at 34-35.
[46] *Id.* at 35-37.
[47] *Id.* at 37-39.

5

practice of fabricating evidence and failing to disclose *Brady* material to prosecutors, defense counsel, and the court in violation of the due process protections provided by the Fourteenth Amendment.[48] Seventh, Moses alleges that all defendants violated the Louisiana constitution.[49] Next, Moses alleges state-law claims for negligence and intentional infliction of emotional distress against the defendant officers.[50] Lastly, Moses alleges a vicarious liability claim against the City for the state-law tort claims alleged against the defendant officers.[51] The City and Williams move to dismiss the amended complaint pursuant to Rule 12(b)(6), arguing that Moses fails to state claims against them.[52]

## II.   LAW & ANALYSIS

### A. Rule 12(b)(6) Standard

The Federal Rules of Civil Procedure require a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The statement of the claim must "'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A pleading does not comply with Rule 8 if it offers "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "'naked assertions' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557) (alteration omitted).

---

[48] *Id.* at 39-42.
[49] *Id.* at 42.
[50] *Id.* at 42-44.
[51] *Id.* at 44.
[52] R. Docs. 34; 35.

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a party to move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is plausible on the face of the complaint "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Plausibility does not equate to probability, but rather "it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Thus, if the facts pleaded in the complaint "do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)) (alteration omitted).

In considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court employs the two-pronged approach utilized in *Twombly*. The court "can choose to begin by identifying pleadings that, because they are no more than conclusions [unsupported by factual allegations], are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. However, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* "'[The] task, then, is to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success.'" *Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 385 (5th

7

Cir. 2017) (quoting *Doe ex rel. Magee v. Covington Cty. Sch. Dist.*, 675 F.3d 849, 854 (5th Cir. 2012)).

A court's review of a Rule 12(b)(6) motion to dismiss "is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000)). A court may also take judicial notice of certain matters, including public records and government websites. *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008); *see also Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005). Thus, in weighing a Rule 12(b)(6) motion, district courts primarily look to the allegations found in the complaint, but courts may also consider "documents incorporated into the complaint by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned." *Meyers v. Textron, Inc.*, 540 F. App'x 408, 409 (5th Cir. 2013) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

## B. Williams's Motion to Dismiss (R. Doc. 34)

### 1. The parties' arguments

Williams argues that Moses does not adequately allege that the prosecutors violated his constitutional rights by failing to disclose material exculpatory evidence because Moses does not describe what the material was and how it would have been used for impeachment or to prove his innocence.[53] Williams further argues that, even if he could show a *Brady* violation, Moses has not adequately alleged that the OPDA maintained an unconstitutional written policy or that the district

---

[53] R. Doc. 34-1 at 1, 3-4.

attorney at the relevant time, Harry Connick, Sr., was deliberately indifferent to a practice of *Brady* violations within the OPDA's office.[54] Williams contends that Moses has alleged "unintentional failures to disclose due to ignorance or misunderstanding that could have been remedied with better training and supervision," rather than a practice or policy or inadequate training that caused *Brady* violations.[55] Williams further argues that Moses does not adequately allege that Connick had notice before Moses's conviction that his policies were causing *Brady* violations.[56] Finally, Williams contends that Moses has not adequately alleged that the OPDA's polices were the moving force behind the alleged *Brady* violation because he has not shown that the prosecutors in his case were acting in accordance with a policy or custom of the office.[57]

In opposition, Moses argues that, in counts I and V of the amended complaint, he has alleged that he "was deprived of his [d]ue [p]rocess rights under the Fourteenth Amendment because he was prosecuted, convicted, and imprisoned as a direct result of the suppression of exculpatory information by [the] OPDA," which resulted from "both an official OPDA policy and a custom of suppressing and failing to disclose material exculpatory evidence with deliberate indifference to the rights of individuals prosecuted by the OPDA."[58] Moses contends that he has adequately described the suppressed *Brady* material – namely, that the OPDA had information that Barras's voice identification of the perpetrator was fabricated and that Stamps was unreliable, biased, and not credible, had substance abuse issues, and was mentally unstable – and how it would have been used to show his innocence and impeach Barras and Stamps.[59] Moses also argues that he has adequately alleged a *Monell* claim against Williams by alleging that, in the 1990s, the

---

[54] *Id.* at 1, 4-13.
[55] *Id.* (quotation at 7).
[56] *Id.* at 7-13.
[57] *Id.* at 1, 13-14. Williams's motion does not address Moses's Louisiana constitutional law claim.
[58] R. Doc. 39 at 4.
[59] *Id.* at 5-9.

9

OPDA's policymaker, Connick: (1) "'prioritized overzealous prosecutions and securing convictions, rather than seeking truth and justice,'" (2) "'had no meaningful onboarding process for new assistant district attorneys (ADAs) and failed to appropriately train attorneys on their constitutional and ethical obligations,'" and (3) "'maintained a widespread custom and practice … whereby ADAs freely – and egregiously – violated the constitution's duty to disclose favorable evidence'" pursuant to *Brady* and its progeny.[60] Moses points out that he alleges specific examples of how the OPDA failed to train new attorneys and permitted them to suppress *Brady* material as a matter of practice by labeling acquittals as "losses" and failing to track instances of, and discipline attorneys for, *Brady* violations.[61] He further observes that the amended complaint alleges that the OPDA had notice of its own internal practices and also was aware that state and federal courts vacated or reversed convictions due to *Brady* violations and that there were 18 documented *Brady* violations by the OPDA's office in a span of five years.[62] Next, Moses argues that he sufficiently alleges deliberate indifference by the OPDA's policymaker by showing: numerous other instances of *Brady* violations during the relevant time; Connick's public statements acknowledging *Brady* violations, but failing to address them; a culture at the OPDA's office of winning at all costs; a failure to train attorneys on their constitutional and ethical obligations; the OPDA's practice of allowing attorneys to not affirmatively investigate whether they had obtained all favorable information; the OPDA's practice of not disciplining attorneys for failing to comply with *Brady*; and the OPDA's promulgation of a written *Brady* policy that was not legally correct.[63] Finally, Moses contends that the first amended complaint is sufficient to

---

[60] *Id.* at 10-23 (quote at 11 (quoting R. Doc. 30 at 22)).
[61] *Id.* at 11-13.
[62] *Id.* at 13-19.
[63] *Id.* at 20-21.

allege that all of these policies and customs of the OPDA's office were the moving force behind the alleged constitutional violation.[64]

Williams replies, reiterating his argument that Moses fails to adequately allege what information was withheld by the OPDA's office (as opposed to the defendant officers) and how it would have been used to reach a different result in the criminal case.[65] Williams also argues that Moses has not sufficiently pleaded specific facts showing that the OPDA's policymaker adopted an unconstitutional policy with deliberate indifference to the rights of criminal defendants because the examples in the complaint of other *Brady* violations do not show a cohesive pattern.[66] Further, Williams argues that there are no allegations Connick knew his employees were violating the due process rights of the accused and there are no relevant examples of Connick's alleged disdain for *Brady*.[67] Finally, Williams contends that Moses has not identified a specific policy or common practice among the OPDA prosecutors that was the moving force behind the alleged constitutional violation.[68]

### 2. Analysis

Section 1983 provides a remedy against "every person," who under color of state law, deprives another of any rights secured by the Constitution and laws of the United States. 42 U.S.C. § 1983; *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). The statute is not itself a source of substantive rights; it merely provides a method for vindicating federal rights conferred elsewhere. *Olabisiomotosho v. City of Hous.*, 185 F.3d 521, 525 (5th Cir. 1999). To pursue a claim under § 1983, a plaintiff must: (1) allege a violation of rights secured by the Constitution or laws of the

---

[64] *Id.* at 21-23.
[65] R. Doc. 41 at 1-4.
[66] *Id.* at 4-6.
[67] *Id.* at 7-8.
[68] *Id.* at 9.

United States; and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law. *Sw. Bell Tel., LP v. City of Hous.*, 529 F.3d 257, 260 (5th Cir. 2008); *see also West v. Atkins*, 487 U.S. 42, 48 (1988).

"Under *Brady*, a local government entity, including a district attorney's office … deprives a criminal defendant of his right to due process when it suppresses or withholds evidence that is both favorable to the defendant and material to his defense." *Truvia v. Connick*, 577 F. App'x 317, 321-22 (5th Cir. 2014). A § 1983 *Brady* claim brought against the district attorney in his or her official capacity is treated as a suit against the state because the governmental entity is the real party in interest, and such claims are analyzed under the *Monell* doctrine. *Id.* at 322; *Hafer v. Melo*, 502 U.S. 21, 25 (1991). In *Monell*, the Supreme Court held that a governmental entity is liable under § 1983 only when the entity itself caused the constitutional violation at issue. 436 U.S. at 694. To succeed on an official-capacity claim under *Monell* (*i.e.*, the claim against the governmental entity), the plaintiff must establish: (1) an official policy or custom, of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose "moving force" is that policy or custom. *Valle v. City of Hous.*, 613 F.3d 536, 541-42 (5th Cir. 2010) (quotation omitted). "A municipality [*i.e.*, the governmental entity] cannot be held liable under a theory of *respondeat superior*." *York v. Welch*, 2024 WL 775179, at *2 (5th Cir. Feb. 26, 2024) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121-22 (1988)). Thus, "[i]t is only when the execution of the government's policy or custom inflicts the injury that the municipality may be held liable under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (quotation and alteration omitted).

"At the motion-to-dismiss stage, a plaintiff need not allege the specific identity of the policymaker, but must allege facts that show an official policy, promulgated or ratified by the

policymaker, under which the municipality is said to be liable." *Benfer v. City of Baytown*, 120 F.4th 1272, 1285-86 (5th Cir. 2024) (quotations omitted). An official policy "incudes a policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority." *York*, 2024 WL 775179, at *3 (quotation and alteration omitted). And, for *Monell* liability, "[a]n official policy may also be a persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy and practically ha[s] the force of law." *Id.* (quotation and alteration omitted). To prove the existence of a custom, a plaintiff must show "a pattern of abuses that transcends the error made in a single case." *Benfer*, 120 F.4th at 1286 (quotation omitted). "A successful showing of such a pattern requires similarity and specificity; prior indications cannot simply be for any and all bad or unwise acts, but rather must point to the specific violation in question." *Id.* (quotation omitted). The pattern of similar and specific acts also "must be comprised of sufficiently numerous prior incidents rather than merely isolated instances." *Id.* (quotation omitted). Indeed, "'[i]solated violations are not the persistent, often repeated, constant violations, that constitute custom and policy as required for [*Monell*] liability.'" *Skyy v. City of Arlington*, 712 F. App'x 396, 400 (5th Cir. 2017) (quoting *Piotrowski v. City of Hous.*, 237 F.3d 567, 581 (5th Cir. 2001)). Considering all these requirements, "[s]howing a pervasive pattern is a heavy burden." *Benfer*, 120 F.4th at 1286 (quotation omitted).

Moreover, the official policy or custom "must be either unconstitutional or adopted with deliberate indifference to the known or obvious fact that such constitutional violations would result." *Blanchard-Daigle v. Geers*, 802 F. App'x 113, 116 (5th Cir. 2020) (quotation omitted).

13

Deliberate indifference is established by showing "a pattern of similar violations arising from a policy so clearly inadequate as to be obviously likely to result in a constitutional violation." *Covington v. City of Madisonville*, 812 F. App'x 219, 225 (5th Cir. 2020) (quotation omitted). However, the Fifth Circuit has recognized a narrow "single incident" exception to the pattern requirement that allows deliberate indifference to be based on a single incident when "it should have been apparent to the policymaker that a constitutional violation was the highly predictable consequence of a particular policy." *Id.* (quotation omitted). "Mere negligence, even gross negligence, is not sufficient to establish deliberate indifference." *Id.*

In *Connick v. Thompson*, the Supreme Court recognized that "[i]n limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." 563 U.S. 51, 61 (2011). The governmental entity's "failure to train its employees in a relevant respect" is considered "a policy or custom that is actionable under § 1983" only when it "amount[s] to deliberate indifference to the rights of persons with whom the untrained employees come into contact." *Id.* (quotations and alteration omitted). Because "[d]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action[,]" the governmental entity may be deemed deliberately indifferently only when the "policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights [and the policymakers] choose to retain that program." *Id.* (quotation and alteration omitted). "The city's 'policy of inaction' in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution." *Id.* at 61-62 (quotation omitted). "A pattern of similar constitutional violations by untrained employees is

14

ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 62 (quotation omitted). And "[p]olicymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action – the deliberate indifference – necessary to trigger municipal liability." *Id.* (quotation omitted). On the other hand, "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.*

The "moving force" element of *Monell* liability requires a plaintiff to "show that the municipal action was taken with the requisite degree of culpability and demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *York*, 2024 WL 775179, at *3 (quotation and alteration omitted). Causation in this context "requires proximate causation." *Id.* When a plaintiff claims that a municipality caused an employee to inflict an injury, "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id.* (quotation omitted). Accordingly, to survive a motion to dismiss, "a complaint's description of a policy or custom and its relationship to the underlying constitutional violation cannot be conclusory; it must contain specific facts." *Id.* (quotation and alteration omitted). Importantly, "[t]he causal link 'moving force' requirement and the degree of culpability 'deliberate indifference' requirement must not be diluted, for where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondent superior liability." *Covington*, 812 F. App'x at 225-26 (quotation omitted).

In counts 1 (claim against all defendants for violating the Fourteenth Amendment) and 5 (*Monell* claim against the OPDA), which must be read together because they cross-reference each

15

other, Moses alleges that the OPDA's office had a policy and practice of withholding and failing to disclose favorable information and of failing to train attorneys on their constitutional obligation to disclose such *Brady* material, which were both moving forces behind the violation of his Fourteenth Amendment right to due process.[69] Moses has alleged sufficient facts, at this pleadings stage of the proceeding, to state a *Monell* claim against Williams, in his official capacity as the current OPDA, for *Brady* violations and a failure to train. First, the district attorney is the policymaker for the OPDA, and Moses identifies Connick as the OPDA at the time he was prosecuted and convicted.[70] *See Flanks*, 2025 WL 660037, at *7-8 (finding Williams to be the proper defendant when complaint identified Connick as the OPDA, and thus the official policymaker under Louisiana law, at the time of the plaintiff's prosecution and conviction). This is enough.

Next, Moses has alleged sufficient facts, at this stage to show that Connick had actual or constructive knowledge of an official policy, practice, or custom of similar constitutional violations. Moses points to the OPDA's written *Brady* policy that was in effect from 1987 to 1993, that was allegedly "incorrect and enabled constitutional violations, suggesting that the disclosure obligation was triggered only in 'most' cases and where a specific court order demanded the production of *Brady* material (implying that, without a court order, such information need not be disclosed)."[71] Moses also lists 30 OPDA prosecutions in which he says *Brady* violations occurred, including instances from 1967, up to and including 1995, when he was tried.[72] At this motion-to-dismiss stage, this listing constitutes a plausible allegation that the OPDA had a custom of nondisclosure of favorable evidence, as would violate *Brady*, with Connick on constructive or

---

[69] R. Doc. 30 at 33-34, 37-39.
[70] *Id.* at 4.
[71] *Id.* at 24.
[72] *Id.* at 27-29.

16

actual notice of such violations – including the need to train, supervise, and discipline prosecutors – as to reflect his deliberate indifference. *See, e.g., Flanks*, 2025 WL 660037, at *8-10 (distinguishing cases to find that plaintiff's allegation of 26 instances of *Brady* violations in an 18-year period was sufficient to state a *Monell* claim). Moreover, as discussed in *Flanks*, the *Brady* violations identified by Moses as occurring during Connick's tenure need not have come to light before Moses's trial to demonstrate constructive notice to the policymaker and those violations need not be identical to those in Moses's case. *Id.* at *10-11.

Finally, Moses has stated enough facts, at this juncture, to allege that the OPDA's policy or practice was the moving force behind the alleged constitutional violation. Specifically, he has alleged a sufficient number of prior instances of *Brady* violations during Connick's tenure, which when combined with Connick's alleged disdain for *Brady*, would satisfy the requisite causal link between the policy and the deprivation of federal rights.[73] *Id.* at *12 (finding allegations of similar *Brady* violations and Connick's disdain for *Brady* to satisfy the "moving force" element of *Monell* at the motion-to-dismiss stage).

### C. The City's Motion to Dismiss (R. Doc. 35)

The City, like Williams, argues that Moses fails to state a claim against it because he does not establish the pattern of constitutional violations required to demonstrate the existence of an official policy that resulted in the deprivation of his rights and does not plead sufficient facts to support a claim for failure to train, supervise, or discipline.[74] The City contends that Moses does not allege any facts connecting the NOPD's alleged pattern or practice of fabricating and suppressing evidence, or failing to report wrongdoing, to his wrongful conviction.[75] The City also

---

[73] *Id.* at 25.
[74] R. Doc. 35-1 at 2.
[75] *Id.* at 7-12.

argues that Moses inappropriately conflates his claims against the City with his *Brady* claim against Williams – in a backdoor attempt to bolster his allegations of a pattern.[76] Further, the City argues that the examples of supposedly similar NOPD conduct alleged in the complaint are not similar enough to Moses's case, or occurred after Moses's conviction, and so, says the City, are not sufficient to establish a pattern and could not have provided the notice needed to find deliberate indifference.[77] As to Moses's claim for failure to train, discipline, and supervise, the City argues that Moses does not provide enough detail concerning the programs to identify how they were deficient and the examples cited in the amended complaint are not relevant.[78] Moreover, the City contends that Moses's allegations of a "blue curtain" of silence among officers, whereby instances of the manufacture of incriminating evidence or the suppression of exculpatory evidence were not reported, are too conclusory.[79] The City also argues that Moses has not identified a City policymaker because his claims are really premised on the OPDA's alleged *Brady* violation.[80] Finally, the City argues that Moses has not stated a claim for a Louisiana constitutional violation.[81]

In opposition, Moses argues that he has pleaded enough facts to show a widespread practice at the NOPD of creating false evidence and suppressing exculpatory or impeachment evidence by citing a number of cases from 1974 to 1994 in which this occurred, along with investigations by independent agencies into the NOPD in the 1990s that found misconduct in the department.[82] Moses contends that this information was sufficient to put the policymaker on notice of these

---

[76] *Id.*
[77] *Id.*
[78] *Id.* at 12-14.
[79] *Id.* at 14-15.
[80] *Id.* at 15-16.
[81] *Id.* at 17. The City does not specifically address Moses's claims related to probable cause, failure to intervene, conspiracy to violate constitutional rights, or vicarious liability for the state-law tort claims of negligence and intentional infliction of emotional distress.
[82] R. Doc. 38 at 6-14.

problems within the NOPD.[83] Moses also argues that he has not improperly conflated his *Brady* claim against Williams with his claims against the City because more than one governmental entity can violate constitutional rights during a prosecution and, as a plaintiff, he is permitted to plead in the alternative.[84] Moses maintains that he has pleaded enough facts to state a claim for the City's failure to train and supervise the officers by showing that independent studies have documented such issues in the NOPD and the City acted with deliberate indifference in failing to correct these problems in the wake of the studies.[85] Further, Moses argues that the "code of silence" allegations are just more support for his allegation that the NOPD had a pattern or practice of misconduct and is not a standalone § 1983 claim.[86] Next, Moses argues that, at this pleadings stage of the proceeding, he need not identify a specific policymaker, but he has referenced in the complaint the NOPD superintendents who led the department during the relevant time.[87] Lastly, Moses contends that he has stated claims for Louisiana constitutional violations.[88]

The City's motion is denied for much the same reasons as is Williams's motion, albeit on a much thinner set of allegations. Nonetheless, at this stage of the proceeding, this Court finds that Moses has alleged just enough facts to state a plausible claim that some City policymaker (presumably, the NOPD superintendent) had knowledge of the NOPD's alleged custom or practice during the relevant timeframe of fabricating unfavorable evidence and suppressing favorable evidence, and that this custom or practice was the moving force behind the alleged constitutional violation. In his amended complaint, Moses identifies several similar instances of the fabrication or suppression of evidence by the NOPD, as well as studies by outside groups that could have put

---

[83] *Id.*
[84] *Id.* at 15-16.
[85] *Id.* at 16-19.
[86] *Id.* at 20.
[87] *Id.* at 20-21.
[88] *Id.* at 21.

the policymaker on notice of these problems, and that because the custom or practice did not change, the policymaker was deliberately indifferent.[89]  At this juncture, these allegations are sufficient – though barely – to survive a motion to dismiss.[90]

### III.   CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that Williams's motion to dismiss (R. Doc. 34) is DENIED.

IT IS FURTHER ORDERED that the City's motion to dismiss (R. Doc. 35) is DENIED.

New Orleans, Louisiana, this 14th day of March, 2025.

BARRY W. ASHE
UNITED STATES DISTRICT JUDGE

---

[89] R. Doc. 30 at 13-22.

[90] This Court is aware that there are only nine examples of evidence fabrication or suppression listed in Moses's amended complaint for the 20-year period from 1974 to 1994, *id.* at 13-16, and that this number may not itself be sufficient to establish a custom or practice as a matter of law.  *Cf. Armstrong v. Ashley*, 60 F.4th 262, 277-78 (5th Cir. 2023) (upholding dismissal of *Monell* claim against a district attorney where plaintiff listed only nine cases over a 24-year period as examples of the district attorney's *Brady* violations).  But because instances of the fabrication or suppression of evidence by a police department may not be as easily uncovered as instances of *Brady* violations by a district attorney, the Court accepts the lower number as a sufficiently pleaded plausible allegation of a custom or practice at this juncture to see if discovery may reveal a higher number of such instances more in line with prior decisions finding that a custom or practice was established.  Whether Moses's *Monell* claim against the City will survive a summary-judgment motion, then, is a decision for a different day.